UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

D.W.,

Defendant.

**JUDGMENT, MEMORANDUM
AND ORDER ON
SENTENCING**

13-CR-173

**Appearances**

**United States**

**Robert L. Capers**
United States Attorney, E.D.N.Y.
By: **Erik David Paulsen**
U.S. Attorney's Office, E.D.N.Y.
271 Cadman Plaza East
Brooklyn, NY 11201

**Defendant**

**Deirdre Dionysia Von Dornum
Douglas G. Morris
Samuel Jacobson**
Federal Defenders of New York
One Pierrepont Plaza
16th floor
Brooklyn, NY 11201

**Amicus**

Lambda Legal Defense & Education
Fund, Inc.; National Center for
Lesbian Rights; National Center for
Transgender Equality; and the
Sylvia Rivera Law Project

**Hayley Gorenberg**
Lambda Legal Defense & Education
Fund, Inc.
120 Wall Street
19th Floor
New York, NY 10005

**<u>Amicus</u>**

Washington Lawyers' Committee
for Civil Rights and Urban Affairs

**Brandon W Duke**
Winston & Strawn
1111 Louisiana Street, 25th Floor
Houston, TX 77002

**Benjamin Sokoly**
**Jeffrey Amato**
**Jonathan McCoy**
**Sean Anderson**
Winston & Strawn LLP
200 Park Avenue
NY, NY 10002

JACK B. WEINSTEIN, Senior United States District Judge:

I.   **Introduction** ................................................................................................ 4

II.   **Factual Background** .................................................................................... 6

   A.   **Abuse and Neglect by Biological Parents** .............................................. 6

   B.   **Abuse and Trauma in First Foster Family** ............................................ 6

   C.   **Abuse and Trauma in Second Foster Family** ........................................ 8

   D.   **Adoption** ................................................................................................ 9

   E.   **Sexual History and Addiction to Child Pornography** .......................... 11

   F.   **State Incarceration** ............................................................................... 12

      1.   **Repeated Rape** ................................................................................ 12

      2.   **Mental Health and Suicide Attempts** ............................................. 13

   G.   **Release from State Custody** ................................................................. 13

III.   **Instant Offenses** ........................................................................................ 17

   A.   **FBI Investigation** ................................................................................. 17

      1.   **Possession of Child Pornography** ................................................... 18

      2.   **Fictitious Bus Company** ................................................................. 18

   B.   **Arrest** .................................................................................................... 21

   C.   **Sexual Exploitation of a Child** ............................................................. 21

   D.   **Plea Negotiations and Trial Preparation** ............................................. 22

   E.   **Guilty Plea** ........................................................................................... 23

   F.   **Metropolitan Detention Center ("MDC") Incarceration** ..................... 23

      1.   **Risk of Suicide** .............................................................................. 23

      2.   **Disciplinary Issues** ........................................................................ 26

      3.   **Lack of Family Support** ................................................................. 28

   G.   **Sentencing** ............................................................................................ 30

      1.   **Offense Level, Category, and Sentencing Guidelines Range** ......... 30

      2.   **Victim Impact** ............................................................................... 30

      3.   **Medical and Psychological Evaluations** ......................................... 31

         a)   **Dr. Richard B. Krueger, M.D.** ................................................ 32

         b)   **Dr. Robert Prentky, Ph.D.** ..................................................... 37

         c)   **Dr. Barry Rosenfeld, Ph.D.** .................................................... 41

      4.   **Sentencing Hearing of June 2015** ................................................. 42

**5.     Defendant's July 2015 Letter to Court**................................................................ 45

**H.     Evidentiary Hearings** ............................................................................................ 46

   **1.     Guilty Plea** ...................................................................................................... 47

   **2.     Witness Testimony** ......................................................................................... 51

      **a)     Medical Experts** ...................................................................................... 52

      **b)     Bureau of Prisons ("BOP") Experts** ...................................................... 53

      **c)     Additional Witnesses** .............................................................................. 57

**I.     Amicus Curiae Briefs** ............................................................................................ 59

**IV.   Sentencing Considerations** ........................................................................................... 60

**A.     Risk of Harm to Defendant While in BOP Custody** ............................................ 62

   **1.     Designation to Medium or High Security Facility** ......................................... 62

   **2.     Prison Rape Elimination Act ("PREA")** ........................................................ 68

      **a)     BOP PREA Program Statement** .............................................................. 70

      **b)     BOP PREA Intake Screening** .................................................................. 72

   **3.     Limitations of PREA** ...................................................................................... 76

   **4.     Characteristics Rendering Defendant Highly Vulnerable** ............................. 78

      **a)     Previous Sexual Victimization** ............................................................... 83

      **b)     Sexual Orientation** .................................................................................. 84

      **c)     Mental Illness** ......................................................................................... 85

      **d)     Sex Offender Status** ................................................................................ 88

**B.     BOP's Use of Solitary Confinement to Protect and Punish** ................................ 91

   **1.     Special Housing Units ("SHUs")** ................................................................... 94

      **a)     Disciplinary Segregation** ........................................................................ 94

      **b)     Administrative Detention** ....................................................................... 95

      **c)     Protective Custody** .................................................................................. 97

      **d)     BOP Tracking of Inmates in SHU** .......................................................... 109

   **2.     Lack of Alternatives to Protective Custody** ................................................... 112

      **a)     Transfer to Different Housing Unit** ........................................................ 116

      **b)     Transfer to Different Facility** ................................................................. 117

   **3.     Effects of Solitary Confinement** .................................................................... 118

      **a)     SHU Syndrome** ....................................................................................... 118

      **b)     Effects on Vulnerable Inmates** ............................................................... 122

      c)   Post-SHU Syndrome ............................................................................ 123

      d)   Destructive Effects of Isolation on Defendant ................................ 125

  C.   FMC Devens; BOP Program for Sex Offenders ................................ 125

    1.   Sex Offender Management Program ("SOMP") ............................ 127

    2.   Residential Sex Offender Treatment Program ("SOTP-R") ................. 128

    3.   PREA Compliance ............................................................................ 131

  D.   Risk of Harm Posed by Defendant to the Public .............................. 133

    1.   Pedophilia and Pornography Addiction ........................................ 134

    2.   Risk Assessment ............................................................................ 135

    3.   Significance of Fantasies ................................................................ 140

      a)   Letter Concerning Sexual Fantasy with Young Boy ...................... 141

      b)   Fictitious Bus Company Applications ............................................ 143

    4.   Amenability to Treatment .............................................................. 145

      a)   Defendant's Child Pornography Addiction .................................. 145

      b)   Defendant's Empathy .................................................................... 148

    5.   Effects of Incarceration on Defendant's Recidivism .................... 153

      a)   Empirical Research ........................................................................ 153

      b)   Expert Testimony .......................................................................... 156

    6.   Proposed Treatment Plan ................................................................ 163

      a)   Individual and Group Therapy ...................................................... 163

      b)   Outside Controls ............................................................................ 165

      c)   Educational Training ...................................................................... 166

      d)   Outside Support .............................................................................. 166

  E.   Community Reentry Plan .................................................................... 166

V.  Law .................................................................................................................. 172

  A.   Statutory Mandatory Minimum ........................................................ 172

  B.   Sentencing Commission Guidelines .................................................. 173

  C.   Restitution .......................................................................................... 174

  D.   Eighth Amendment ............................................................................ 176

    1.   Proportionality Analysis Applicable to Sentencing ........................ 176

      a)   Length of Sentence ........................................................................ 181

      b)   Mandatory Minimum Sentences .................................................... 181

    **2.**   **Impact of Conditions of Incarceration on Sentence Proportionality** .................... 186

**VI.**   **Application of Law to Facts** ........................................................................ 193

  **A.**   **Fifteen Year Sentence If Properly Carried Out Not Unconstitutional** .................... 194

    **1.**   **Gravity of Offense** ........................................................................ 195

    **2.**   **Severity of Sentence** ..................................................................... 196

    **3.**   **MDC and Pre-Release Halfway House** ................................................ 202

  **B.**   **Guidelines Excessive** ............................................................................ 204

**VII.**  **Conclusion** .......................................................................................... 208

  **A.**   **Sentencing Recommendations to BOP** ....................................................... 208

  **B.**   **Unconstitutionality Should Court's Recommendations Not Be Followed** ............... 210

  **C.**   **Sentence Imposed** ................................................................................ 210

## I.    Introduction

Defendant is guilty of serious crimes: possession of child pornography and sexual exploitation of a child. A fifteen year minimum term of incarceration is mandated by statute.

The long term required, if served under the routine harsh and dangerous prison conditions D.W. faces, would be destructive to him, dangerous to society, and unconstitutional.

Under prevailing prison conditions, such a long term of incarceration would deny D.W.—with his severe mental problems—any meaningful opportunity to obtain needed medical treatment. It would likely expose him—gay, and previously repeatedly raped—to physical and sexual abuse. It would greatly increase the risk of suicide, given his repeated attempts at taking his own life. To protect him, it would probably include long, debilitating protective solitary confinement. Predictably, D.W. would be released from prison—if he survived—in more danger of recidivism than if he had served a shorter sentence, thus presenting a greater danger to society. Appropriately carried out, however, a sentence of fifteen years can be structured to avoid cruel prison conditions for this defendant, thereby avoiding unconstitutionality.

The trial judge cannot close his or her eyes to the conditions a particular defendant being sentenced will necessarily experience in prison.  When a long term is fixed by statute, the prison environment must be considered by the sentencing judge in estimating total harm and benefits to prisoner and society—a utilitarian as well as a compassionate exercise.

Ours is a Madisonian government of independent departments—legislative, executive and judicial.  To effectively carry out the people's business these divisions of government must sometimes assist each other.  Respectful cooperation is often required.  The administration of criminal justice is an example:  investigators, prosecutors, defense counsel, courts, prisons, and social assistance agencies must work together to protect the public and help the adjudicated criminal to a life free of crime.  So, while a judge, in general, may lack the power on sentencing to direct the operation of federal prisons in an individual case—a responsibility of the Department of Justice—he or she must properly and reasonably recommend (assuming the recommendation will be given effect) how a person with special vulnerabilities should be treated in prison.

Sentencing is not merely an announcement of judgment.  It is a prediction and assumption of how the sentence will be carried out.

In D.W.'s case the judge must include in his sentence a strong recommendation on how the federal prison system must treat him.  The judge assumes that the Department of Justice will respect these specific recommendations.

Only defendant's initials are used in this memorandum because, were his full name published, the likelihood of his being attacked in prison would increase.

## II.    Factual Background

### A.    Abuse and Neglect by Biological Parents

Defendant is a twenty-seven year old male born in Brooklyn, New York.  *See* Presentence Investigation Report ("PSR") at ¶ 81.

He has lost contact with his biological parents.  He was separated from them when he was five years old.  They lost custody as a result of their drug use and neglect.  *Id*.  In February 1996, the Kings County Family Court terminated their parental rights.  *See* Def.'s Post-Hr'g Mem. of Points and Authorities, Feb. 23, 2016, ECF No. 130 ("Def.'s Post-Hr'g Mem."), Ex. 13 (Forestdale Adoption Homestudy) at 4.  He has not seen them since.  PSR at ¶ 81.

As accurately stated by defense counsel:

> The first four years of [D.W.'s] life are a black hole. What we do know is that he and his siblings were removed from his parents' custody due to his mother's crack addiction, that he had *huge amounts of lead in his system*, that he likely suffered from *fetal alcohol [and drug] syndrome*, and that his *intellectual functioning was severely impaired*.

Def.'s Sentencing Mem., June 8, 2015, ECF No. 69 ("Def.'s Sentencing Mem.") at 4 (emphasis added).

### B.    Abuse and Trauma in First Foster Family

At age four, defendant was placed in his first foster care home.  A psychological assessment conducted when he was five revealed diminished mental capacity and other symptoms identified in children exposed to drugs while in utero.  PSR at ¶ 81.  Lead exposure as a child increased adverse effects on defendant's mentation.  *Cf. G.M.M. ex rel. Hernandez-Adams v. Kimpson*, 116 F. Supp. 3d 126, 129-130 (E.D.N.Y. 2015) (describing the harm caused to young children by lead and the disproportionate exposure of low-income and minority families).  Symptoms included "tiny stature, difficulties with language acquisition and comprehension of concepts, articulation

6

problems, etc."  Def.'s Post-Hr'g Mem., Ex. 12 (Joan Healy, Ph.D., Psychological Assessment

Report for [D.W.], Jan. 8, 1994) at 5.

The psychologist who performed the early evaluation, Dr. Joan Healy, noted that D.W.

defecated in his bed and smeared feces on his face and in his hair.  *Id*.  According to her, this could

be interpreted as a "*gesture of despair in a child with plenty of reasons to feel that way*."   *Id.*

(emphasis added).  Dr. Healy observed that defendant suffered the traumatic consequences of his

early separation from his parents:

> [His] sad and traumatic past is very much "with" him.  His limited
> intelligence makes things worse, and he has trouble figuring out
> exactly what's happening to him and his siblings, and why.
> Fantasies tend to be starkly realistic, with "cops taking the kids"
> away from one mother and giving them to another.

*Id*.

Defendant was described as a "retarded and very young child with a deprived and

emotionally traumatized background," living "on the edge of his world" in a "bunker of fear and

depression."   *Id*.  She called his self-esteem "abysmal" and determined that he was "a deeply

traumatized child . . . who lives on the edge, and can easily slip over, if additional stress is added."

*Id*. at 6.  She concluded that he needed "calm and stable" surroundings in order to overcome his

trauma:

> *This child needs school and home environments that are calm and*
> *stable*, consistent in their requirements of him, and coordinated in
> their ideas about what his behavior should be.  This child has a
> limited mind, and the simpler things are at this age the more he'll be
> able to absorb.  *This is not to say that he doesn't know what's going*
> *on – he is all too well aware of the environment and trauma he's*
> *been exposed to, and his depression, far from being pathological, is*
> *a "normal" reaction to it*.  Different, more affirming experiences
> will hopefully bring him out of his present dysphoria.

*Id*. (emphasis added).  D.W.'s foster placements by the City did not provide the stability and

tranquility he required.

At his first foster home, defendant was repeatedly raped.  PSR at ¶ 83.  His anus was penetrated.  *Id.*  His genitalia and mouth were violated.  *Id.*  Physically beaten by his foster brother when he refused to drink urine out of a bottle, he suffered a broken arm, a final signal to the City's child welfare services that he needed to be removed from that home.  *Id.*

When interviewed by a psychologist about his first foster home, he reported:  "The kid who broke my arm also forced his penis into my mouth and would say 'suck it like a pacifier, you baby.'"  *Id.*  Two other children living in the foster home reported stories of similar abuse; their foster brother "would wake them in the middle of the night, urinate in their mouths, make them take off their pants, and [tell] them to 'lick [his] butt.'"  *Id.*; *see also* Def.'s Post-Hr'g Mem., Ex. 14 (Accident Report of Feb. 14, 1994).

Eventually, due to the children's reports of abuse, D.W. was transferred out of this foster family and placed with another one.  *See* Def.'s Post-Hr'g Mem., Ex. 15 (Social Worker Report of Nov. 8, 1993).

### C.    Abuse and Trauma in Second Foster Family

In a psychiatric assessment carried out shortly after his placement with a second foster family, D.W. was reported as functioning below his age level, and as having suffered from "*severe emotional deprivation*."  Def.'s Post-Hr'g Mem., Ex. 17 (Psychiatric Evaluation of D.W. by Dr. Flora F. Morente, M.D., Sept. 7, 1994) (emphasis added).  At age six, he was described by an evaluating psychologist as experiencing strong feelings of rejection and abandonment:

> [D.W.] was found to be restless, having difficulty in relaxing, hyperactive, "always on the go", nervous, jittery and fidgety. [D.W.'s] meager projective record is *suggestive of a child who experiences himself as deprived, rejected and damaged*.  He seems to lack ego functions related to object constancy and the ability to self-soothe, leading him to often experience rageful and depressive effects in a direct, overwhelming manner.  *Generally, he does not*

> *see himself as being protected by others but rather views himself as*
> *alone, isolated and abandoned.*

Def.'s Post-Hr'g Mem., Ex. 18 (Psychological Examination of D.W. by Randolph J. Malsky, Ph.D., Oct. 1994) at 5 (emphasis added).

The abuse continued.  At this second foster placement, defendant was repeatedly raped. PSR at ¶ 84.  He described his sexual abuse at the hands of his foster father as "penetrat[ion] . . . with his penis 'over and over.'"  *Id.*

Child welfare eventually removed him from this second foster home.  The six-year-old had fled to a school bus in his underwear, clothing in hand, after being warned by his foster mother that if he was late to school she "would beat him all day."  *Id.*

### D.    Adoption

When he was about six years old, in 1995, D.W. was placed in a foster family of "lower socioeconomic circumstances."  *Id.* at ¶ 85.  He was legally adopted by the family in 1998.  *Id.* Defendant described the family as "strict but nice," with loving parents.  *Id.*

At age seven, a psychiatric evaluation again determined his self-esteem to be "poor." Def.'s Post-Hr'g Mem., Ex. 19 (Psychiatric Evaluation of D.W. by Dr. Flora F. Morente, M.D., June 30, 1996) at 2.  His intelligence was described as "borderline to low average;" he met the criteria for Attention Deficit Hyperactivity Disorder ("ADHD").  *Id.* at 3.  A psychological examination by Dr. Randolph J. Malsky, Ph.D. when D.W. was seven-and-a-half years old noted the effects of defendant's emotional deprivation and presaged his future behavior:

> It appears that while [D.W.] identifies with being vulnerable, fragile,
> and at times, at the mercy of environmental influences, *there also*
> *seems to be a developing identification with the aggressor.  The*
> *latter seems to be, from a defensive position, stemming from fears of*
> *annihilation*.  His apparent polarized view of the world about him
> leaves him emotiall[y] frightened, fatigued and depressed with
> minimal  resources  to  meet  age  appropriate  developmental

> challenges. *There appears to be a relatively high risk of [D.W.]*
> *developing more serious psychopathology.*

Def.'s Post-Hr'g Mem., Ex. 23 (Psychological Examination by Dr. Randolph J. Malsky, Ph.D, Mar. 30, 1996) at 7 (emphasis added).

By age eight, D.W. had been diagnosed with a learning disorder, as well as ADHD. *See* Def.'s Post-Hr'g Mem., Ex. 10 (Psychiatric Evaluation of D.W. by Dr. Flora F. Morente, M.D., Feb. 16, 1997) at 1. Ritalin was prescribed. The effect of this "psychostimulant medication" was closely monitored. *Id.* Again, he was described as being of "borderline to low average" intelligence and having "poor" self-esteem. *Id.* at 2. Lead exposure history was noted as contributing to his ongoing problems. *Id.* at 3.

Between 1998 and 2007, D.W. was treated at the Far Rockaway Mental Health Clinic. *See* Def.'s Post-Hr'g Mem. at 9. Provided were combinations of individual, group, and family therapy, as well as medication management. *Id.* He was identified as having an "excessive need to please adults." *See* Def.'s Post-Hr'g Mem., Ex. 24 (Far Rockaway Mental Health Clinic, Clinical Notes of Diane Nadasy, CSW, Dec. 3, 1999), Ex. 25 (Far Rockaway Mental Health Clinic, Clinical Notes of Diane Nadasy, CSW, July 16, 1999) (stating that D.W.'s "tendency is towards pleasing adults and he may feel that this is the only way that he'll be liked").

Defendant attended special education classes until he graduated from Far Rockaway High School in 2007. PSR at ¶ 95. His learning disabilities prevented him from earning a regular high school diploma. *Id.* at ¶ 105.

While in high school, D.W. worked at menial jobs at St. John's Episcopal Hospital in Queens through a Board of Education program that offered job training to students. *See* Def.'s Post-Hr'g Mem. at 10; PSR at ¶ 112.

In the fall of 2007, defendant began attending Manhattan Community College.  *See* PSR at ¶ 106.  He did not earn any credits.  In May of 2008 he was placed on academic probation.  *Id.*

He subsequently was employed as a cashier at a Best Buy store for a year and a half; he was fired for failing to accurately record tardiness.  *Id.* at ¶ 111.  He then began work as a bus monitor.  *Id.* at ¶ 110.

D.W. suffered from periods of intense depression resulting from his inability to complete college and loss of his job at Best Buy.  *See* Dr. Richard Krueger, Psychiatric and Risk Assessment of Defendant, June 5, 2015, ECF No. 69-1 ("Krueger Report") at 5, attached as Ex. A to Def.'s Sentencing Mem., June 8, 2015, ECF No. 69.  He reported trying to kill himself in 2007.  He tried to jump in front of a car; a friend intervened and pulled him back.  *See* Gov't Ex. 403 (BOP Suicide Risk Assessment, Feb. 22, 2013) at 1.  It does not appear that during this time his treatment addressed the severe abuse he had suffered as a young child.  *See* Def.'s Post-Hr'g Mem. at 9-10. His adopted family was reportedly not aware of D.W.'s traumatic past until he wrote to his adoptive brother while incarcerated at the federal Metropolitan Detention Center ("MDC") in the instant case.  *Id.* at 10; PSR at ¶ 103.

### E.    Sexual History and Addiction to Child Pornography

Defendant reported that his first "crush" was at age eight on an eight year old female.  *See* Krueger Report at 9.  He told Dr. Krueger, an evaluating psychiatrist, that he considers himself bisexual.  He reported that at age eleven, he began to look at, and masturbate to, images of prepubescent, pubescent and young teenaged males and females—males much more than females. He felt that he had a problem with "pornography addiction" from the age of eleven onwards, oftentimes deleting pornographic images from his computer to try and stop viewing them.  *Id.*

He has never had a female coital partner, even though his first non-genital touching and petting was at thirteen with a thirteen-year-old girl. He had intercourse with a fifteen or sixteen year old male on one occasion when he was fourteen. *Id.*

### F.    State Incarceration

While employed as a school bus attendant in April of 2009, at age twenty, defendant was arrested. He had given "wedgies" to three young boys—that is to say he pulled their underwear up between their buttocks—and he fondled two of them. PSR at ¶¶ 70-72. He also reportedly showed these victims pictures of naked children on his cell phone. *Id.* at ¶ 70.

In a New York State criminal court, he pleaded guilty to two counts of sexual abuse and one count of endangering the welfare of a minor child. *Id.* at ¶¶ 70-72. For this crime, at age twenty-one, he was sentenced to three years in State prison. *Id.* at ¶¶ 70-72, 87.

### 1.    Repeated Rape

During his State period of incarceration, from April 2009 until April 2012, defendant was repeatedly raped by other prisoners. *Id.* at ¶¶ 96, 100; Krueger Report at 5.

The first rape occurred in the shower room of the Oneida State Correctional Facility by another inmate. PSR at ¶ 96. A sixty-year old inmate "smashed [defendant's] head against a showerhead and then raped him anally." Krueger Report at 5. The assailant, who was attending the same sex offender treatment program as D.W., was removed from the facility. *Id.* As a result of his complaint, D.W. was treated by other inmates as "an outcast." PSR at ¶ 96.

Transferred to Auburn Correctional Facility, defendant was again assaulted and anally raped by "several individuals." *See* Krueger Report at 6; PSR at ¶ 96. Fearing the usual ostracism that results from making a rape complaint in prison, defendant suffered this abuse in silence. *See* Krueger Report at 6; PSR at ¶ 96. "[Defendant] said that [the] rapes had an [adverse] effect on

12

him.  He said that he had kept thinking about them, that he had become very guarded and untrusting of anyone, and he described the development of a startle[d] response."  Krueger Report at 6.

### 2.    Mental Health and Suicide Attempts

While in State custody, D.W. was prescribed Celexa, Paxil, and Remeron to treat depression and anxiety.  *See* Def.'s Post-Hr'g Mem., Ex. 37 (State of New York Department of Correctional Services Treatment and Medication Records).

Repeatedly, he tried to commit suicide.  He twice attempted to hang himself.  *See* Gov't Ex. 403 (BOP Suicide Risk Assessment, May 8, 2013) at 14 (also submitted as Def.'s Ex. KK). On at least one of these instances, he was saved by a correctional officer.  *See* Def.'s Post-Hr'g Mem., Ex. 29 (Psychiatric Evaluation of D.W. by David Stern, M.D., May 3, 2012) at 1; Gov't Ex. 403 (BOP Suicide Risk Assessment, Feb. 22, 2013) at 1; Gov't Ex. 403 (BOP Suicide Risk Assessment, May 8, 2013) at 15.  He stated that he then paid another inmate to "stab" or "punch" him.  Instead, that person reported him.  *See* Def.'s Post-Hr'g Mem., Ex. 29 (Psychiatric Evaluation of D.W. by David Stern, M.D., May 3, 2012) at 1; Gov't Ex. 403 (BOP Suicide Risk Assessment, Feb. 22, 2013) at 1.

D.W. stated that, while in custody at Rikers Island, he stockpiled medications and took them all at once.  He was placed on suicide watch.  At Bellevue Hospital, in a hospital prison ward, he tried to cut his wrists; at Downstate Correctional Facility, he dug into his wrists and was again placed on suicide watch.  Krueger Report at 7.

### G.    Release from State Custody

Released from State custody in April 2012, defendant moved to the Charles H. Gay Shelter for Men on Ward's Island.  PSR at ¶ 87.  He was not allowed to live with his adoptive mother while on parole because of his sex offender status—a daycare center had recently opened near her

13

home.  *Id*.  D.W. became increasingly "paranoid," depressed, and concerned with his safety at the

shelter.  *See* Dr. Robert Prentky, Evaluation of D.W., Sept. 12, 2013, ECF No. 69-2 ("Prentky

Report") at 9, attached as Ex. B to Def.'s Sentencing Mem., June 8, 2015, ECF No. 69.  He feared

that other former prisoners would attack him if they found out he was a sex offender.  He overheard

other shelter residents calling sex offenders "pieces of shit who should be killed."  *Id*. at 9, 15.

Defendant experienced daily anxiety attacks; he reported feeling depressed, paranoid, and afraid,

a sense that had started to overwhelm him after his first rape in prison.  PSR at ¶ 97.

D.W. lost the help of his adoptive family following the significant shame and

embarrassment they suffered as a consequence of his State arrest.  *See* Def.'s Post-Hr'g Mem. at

14-15; PSR at ¶ 89; *see also* Letter of D.W. to the Court, July 6, 2015, ECF No. 74 (describing the

adverse effect on his family of his State trial).  Estranged from his family and with no support

network, D.W. entertained suicidal ideations upon his release from State prison.  *See, e.g.*, Def.'s

Post-Hr'g Mem., Ex. 28 (GOSO Assessment, Apr. 24, 2012) at 2 ("[D.W.] presently reports

suicidal ideation but has no concrete plans to take actions on his ideations."), Ex. 29 (Psychiatric

Evaluation of D.W. by David Stern, M.D., May 3, 2012) at 2 ("While [D.W.] is currently not

actively suicidal, his history of impulsive suicide attempts and the continued stress of his current

living situation and the stressors inherent in his transition to the community make his risk for

relapse of depression or suicidal attempt higher."), Ex. 30 (Mental Health Evaluation of D.W. by

Debjani Bhowmick, NP, Aug. 6, 2012) at 1-2 (recounting that he felt that his life was over before

it began and reporting past suicide attempts), Ex. 31 (D.W. Psych Note by Debjani Bhowmick,

Sept. 17, 2012) at 1 (indicating that D.W. reported suicidal thoughts and lack of communication

with his family), Ex. 32 (Queens Counseling for Change Sex Offender Client Summary Report,

Aug. 2012) ("Parolee stated that he felt depressed and thought of suicide . . . . and stated that he

just said it but did not mean it.  However, he does admit, in the past, to being suicidal."), Ex. 42 (Queens Counseling for Change Sex Offender Client Summary Report, Jan. 2013) (noting that D.W. indicated "the following Risky Emotional States:  depression, stress, abandonment, frustration, lonely, anxiety, feelings of useless, worthless, and suicidal feelings").  He reported "feeling bad about [him]self for committing [a] sex offense—especially since he himself was a victim of sexual abuse as a minor."  Def.'s Post-Hr'g Mem., Ex. 32 (Queens Counseling for Change Sex Offender Client Summary Report, Aug. 2012).

In April 2012, he walked along Grand Central Parkway with the intention of jumping in front of a car.  He called his adoptive mother in what appears to have been a cry for help; she responded that she "could not deal with him anymore."  Gov't Ex. 403 (BOP Suicide Risk Assessment, Feb. 22, 2013) at 1; Gov't Ex. 403 (BOP Suicide Risk Assessment, May 8, 2013) at 15.  Ultimately, a friend picked him up.

D.W. attended sex offender treatment—a condition of his State parole—at Queens Counseling for Change.  He also received psychiatric care from St. Luke's-Roosevelt Hospital Center and services from Getting Out and Staying Out ("GOSO"), a reentry program in New York City which provided assistance with medication and job placement.  *See* Def.'s Post-Hr'g Mem. at 12; PSR at ¶ 97.

In an assessment carried out shortly after his release from State custody, GOSO noted defendant's "remarkable mental health history," including his past suicide attempts and current reports of suicidal ideation.  *See* Def.'s Post-Hr'g Mem., Ex. 28 (GOSO Assessment, Apr. 24, 2012).  He was referred to Dr. David Stern, M.D., a psychiatrist, for evaluation.

Dr. Stern reported that D.W. had been diagnosed with borderline personality disorder and adjustment disorder with depressed mood.  *See* Def.'s Post-Hr'g Mem., Ex. 29 (Psychiatric

Evaluation of D.W. by David Stern, M.D., May 3, 2012) at 1.  The doctor observed that "[t]he possibility of Dissociative Identity Disorder and Borderline Personality Disorder should be considered when making a psychiatric referral." *Id.* at 2.  He noted that although D.W. denied a suicidal ideation or plan, he was "feeling suicidal two days prior." *Id.*  The doctor concluded that "[w]hile he is currently not actively suicidal, his history of impulsive suicide attempts and the continued stress of his current living situation and the stressors inherent in his transition to the community *make his risk for relapse of depression or suicidal attempt higher*." *Id.*  (emphasis added).

Celexa was prescribed for his depression, Trazodone as an anti-depressant and sedative, and Depakote to stabilize his mood. *See* Def.'s Post-Hr'g Mem., Ex. 38 (Initial Medical Evaluation by Dr. Vani Gandhi at St. Luke's-Roosevelt Hospital, May 15, 2012) at 2, Ex. 31 (D.W. Psych Note by Debjani Bhowmick, Sept. 17, 2012) at 1; PSR at ¶ 102.  Defendant continued to report feeling depressed and experiencing suicidal thoughts. *See* Def.'s Post-Hr'g Mem., Ex. 31 (D.W. Psych Note by Debjani Bhowmick, Sept. 17, 2012) at 1, Ex. 32 (Queens Counseling for Change Sex Offender Client Summary Report, Aug. 2012).  He attended monthly counseling sessions for depression.  PSR at ¶ 97.

Because of his status as a sex offender, defendant struggled to find gainful employment. *Id.* at ¶ 109.  He started handing out flyers for an energy company, North American Power, in 2012. *Id.*  He then volunteered for "Green Energy," a company located on the same premises as North American Power, where he was ultimately arrested in 2013 for the instant offenses. *Id.*

As described below, despite engaging with the mental health support network available to him upon his release from State prison, D.W. relapsed.  He downloaded, viewed and collected child pornography while on probation.  According to Dr. Robert Prentky—a forensic psychologist

who examined D.W. in September 2013 (*see infra* Part III.G.3)—the resources available to him in

the community did not target his specific risk or needs:

> After he was released from [State] prison, the precautionary
> measures instituted by society and all of the rehabilitative services
> available to ex-offenders failed [D.W.] by not identifying and
> targeting precisely the risk that he posed and what his urgent needs
> were.

Prentky Report at 10-11.

## III.    Instant Offenses

### A.    FBI Investigation

On February 7, 2013, an agent working for the Federal Bureau of Investigations ("FBI")

logged into a publicly available peer-to-peer file-sharing program available on the internet.  PSR

at ¶ 3.  He observed a user, operating under the screen name "Mikemunozl," sharing over 1,800

files, including pornographic images of children.  *Id*. at ¶¶ 3-4.  Records obtained from the file-

sharing website indicated two email addresses linked to the "Mikemunzol" screen name.  *Id*. at ¶

6.  Both addresses were traced to a "facebook.com" account registered to an individual in Far

Rockaway, New York, who shared the name and appearance of defendant.  *Id*.  The internet

protocol address associated with the file-sharing activity was registered to "Golden Care," a

Queens-based business.  *Id*. at ¶¶ 5, 8.

The FBI interviewed the owner and manager of Golden Care.  *Id*. at ¶ 8.  She informed the

agents that the second floor was rented out to a company, "Green Energy," which accessed the

internet through the Golden Care router.  *Id.*  Green Energy had two employees; one was defendant.

*Id*.

A search warrant was issued authorizing a search of the Green Energy premises.  *Id*. at ¶

9.  D.W. was present and agreed to be interviewed.  *Id*.  He granted the agents access to his peer-

to-peer file-sharing account and made oral and written admissions regarding his use of the screen name "Mikemunzol" and the trading of child pornography on the internet. *Id*. at ¶¶ 10-11.

### 1.    Possession of Child Pornography

Defendant told FBI agents that he had been working without pay at Green Energy for three to four months. *Id*. at ¶ 12.  As a condition of his State parole release, he had been denied access to computers. *Id*. at ¶ 7.  Nevertheless, for about a month prior to his arrest, defendant had been using two computers at Green Energy, from which he traded child pornography. *Id*. at ¶¶ 10-13.

Defendant told FBI investigators that he stored child pornography on an external hard drive.  He explained that he had obtained some of the child pornography on the hard drive prior to his State arrest in 2009.  He had given the hard drive to a friend to keep in a safe deposit box.  The friend did not know that it contained child pornography.  D.W. retrieved the hard drive upon being released from State prison in April 2012. *Id*. at ¶¶ 13-14, 16.

He informed investigators that "*he had been viewing and trading child pornography since his release, and that he was addicted to child pornography*." *Id*. at ¶ 14 (emphasis added).  When arrested he possessed at least 1,000 video files and 7,000 child pornography images on his computer. *Id*. at ¶ 18.  Defendant admitted to his adoptive mother that he has "an addiction" to child pornography and "*really needs help*." *Id*. at ¶ 89 (emphasis added).

### 2.    Fictitious Bus Company

During execution of the search warrant, the FBI found several school bus routes.  It appears that defendant "fantasized about being a bus driver," and he had imagined a company called "Mike Transportation, Inc." *Id*. at ¶ 17; *see also* Gov't Post-Hr'g Mem. of Law in Opp'n to the Def.'s Req. for an Incarceratory Sentence Below the Statutorily-Required Mandatory Minimum, Apr. 1, 2016, ECF No. 140 ("Gov't Opp'n Post-Hr'g Mem."), Ex. 501 (Def.'s Fictitious Bus Company

Documents) at 50-62.  The defendant told the FBI that he never in fact travelled to the schools identified in the made-up routes.  PSR at ¶ 17.

One of the documents retrieved by the FBI was a "questionnaire for a position as bus driver, bus escort, or bus attendant."  *Id*.  The document included questions such as "What is your sexual orientation?; Have you or are you attracted to children in any way?; As part of security pre-screening, if you were asked to do something like give a description of your body would you?; Are you circumcised?; Are you a very hairy person?"  *Id.*; *see also* Gov't Opp'n Post-Hr'g Mem., Ex. 501 (Def.'s Fictitious Bus Company Documents) at 51-54.

It is not clear whether the questionnaire made-up by defendant was ever used by him.  *See* PSR at ¶ 17 (not mentioning how and if the questionnaire was used by defendant); Gov't Sentencing Mem., June 10, 2015, ECF No. 71 ("Gov't Sentencing Mem.") at 5 (observing that "[t]hese materials can be interpreted different ways: perhaps the defendant was actually planning to start a bus company, or perhaps he was merely fantasizing about it.  What is clear, however, is that he was using this fake bus company to lure people at his shelter to share their interest in child pornography and to provide nude photos.").

Dr. Krueger testified that the bus company fantasy "could be consistent with a pedophilic interest pattern."  Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 71:19-20; *see also infra* Part IV.D.3. Defendant's counsel has posited that the incident relates to D.W.'s childhood traumatic experience and related desire to become a bus driver.  *See* Def.'s Post-Hr'g Mem. at 7, n.5; Def.'s Reply to Gov't Mem. in Opp'n, Apr. 26, 2016, ECF No. 149 ("Def.'s Reply to Gov't Mem. in Opp'n") at 18-19.   Pointed out was that when D.W. was found running in his underwear to catch the school bus, it was the bus matron who comforted him.  *See* Def.'s Post-Hr'g Mem. at 7 ("Terrified and fearing for his life, [D.W.] ran to the bus, wearing just his underwear.  In this deeply vulnerable

state, [D.W.] was taken into the care of the bus matron, who covered him in a jacket, comforted him, and brought him and his situation to the attention of school officials.  After this incident, [D.W.] was removed from [his foster] home—he was quite literally rescued by his bus matron."); Def.'s Reply to Gov't Mem. in Opp'n at 19 (writing that D.W. "was reenacting, remembering, holding onto, absorbing and reabsorbing a rare act of human kindness in a dark time" and that his "creation of a bus company has to do with him processing his past" rather than amounting to "evidence of any serious deceit or an intent to abuse children"); *see also* PSR at ¶ 84; Prentky Report at 5-6.

Several of D.W.'s childhood medical and psychological evaluations indicate a consistent and recurring desire to become a school bus driver.  *See, e.g.*, Def.'s Post-Hr'g Mem., Ex. 19 (Psychiatric Evaluation of D.W. by Dr. Flora F. Morente, M.D., June 30, 1996) at 2 (indicating that D.W., when seven years old, "would like to be a bus driver when he is grown"), Ex. 10 (Psychiatric Evaluation of D.W. by Dr. Flora F. Morente, M.D., Feb. 16, 1997) at 2 (again stating that D.W., then eight years old, "would like to be a bus driver when he is grown"), Ex. 20 (Queens Mental Health Clinic Psychiatric Evaluation, July 9, 1998) (noting that D.W., then nine years old, "wants to be a school bus driver"), Ex. 21 (FEGS Progress Note, Apr. 8, 1999) (stating that D.W., aged ten, "was looking forward to returning to school so that he can resume his job as the bus matron's assistant"), Ex. 22 (Far Rockaway Mental Health Clinic Clinical Note, July 5, 2000) (when asked to make three wishes, D.W., aged eleven, wrote "I wish I was a teacher to buses [*sic*] kid around").

**B.     Arrest**

Defendant was arrested on the premises of Green Energy on February 22, 2013—the same day that the search warrant was executed.  PSR at ¶¶ 9, 14.   He has been incarcerated at the Brooklyn MDC since the date of his arrest.  *See* Def.'s Post-Hr'g Mem. at 16.

**C.     Sexual Exploitation of a Child**

Defendant's charge of sexual exploitation of a child relates to conduct that occurred prior to his 2009 State arrest.  It was uncovered when federal agents reviewed evidence from his State conviction.  PSR at ¶ 19.  Included were images that had been on defendant's phone, retrieved at the time of his 2009 arrest by the New York City Police Department ("NYPD") pursuant to a search warrant.  *See* Gov't Sentencing Mem. at 1-2.  Among the images were sexually explicit photographs of at least one young boy, as well as photographs of local day care centers.  *See id*. at 2; Gov't Opp'n Post-Hr'g Mem., Ex. 501 (Def.'s Pictures of Nearby Childcare Centers) at 203-208.  The evidence indicated that the images of the young boy had not been downloaded from the Internet, as defendant had originally claimed.  PSR at ¶ 19.  Rather, the pictures has been taken by him.  *Id*.

Investigators interviewed the pastor of a local church frequented by defendant prior to his State incarceration.  The pastor noted that defendant had shared a close relationship with a young boy, and expressed his suspicion that the boy might have been sexually abused by defendant.  *Id*.

After obtaining the mother's permission, agents interviewed the boy.  He told them that he first met defendant at church, when he was about five or six years old.  He recounted that defendant showed him child pornography, which he identified as "sex with teens or younger," on a laptop computer.  The boy indicated that, on several occasions, defendant took him out to his car, where he sexually abused him.  He said that they would sit in the back seat and his pants and underwear

21

would be pulled down by defendant.  *Id.* at ¶ 20.  Defendant would then use his hand to rub the

victim's penis and masturbate him.  *Id*.  The defendant never touched the boy's anus or put his

mouth on his penis.  *Id*.  On at least one occasion, defendant masturbated in front of the boy.  *Id*.

The agents showed the boy images seized from the defendant.  He identified himself in some of

the pictures.  *Id*.

There is no indication that these images were distributed by defendant.  They do not involve

penetration or sodomy.  *See* Def.'s Sentencing Mem. at 6.  Defendant has not engaged in any

sexual contact with minors since his State arrest in 2009.  Krueger Report at 15.

### D.      Plea Negotiations and Trial Preparation

A five-count indictment was filed in federal court on March 15, 2013.  *See* Indictment,

Mar. 15, 2013, ECF No. 7.  It included four counts for distribution of child pornography and one

count for possession of child pornography.  *Id*.

Defendant entered a plea of "not guilty."  *See* Minute Entry, Mar. 23, 2013, ECF No. 10.

Plea negotiations were conducted over a long period while defendant remained in the MDC.  *See*

Order, Apr. 19, 2013, ECF No. 16.

A superseding indictment was filed.  *See* Superseding Indictment, Aug. 28, 2014, ECF No.

45.  Added was a count for receipt of child pornography.  *Id*. at 2.

Asking for an adjournment of a trial set for October 2014, the parties jointly requested

permission to pursue plea negotiations.  *See* Parties' Joint Letter, Sept. 2, 2014, ECF No. 46.  It

was agreed that defense counsel would file a notice of intent to employ an insanity defense by late

September.  *Id*.

On September 22, 2014, notice was provided to the prosecution and the court that an insanity defense would be pursued on defendant's behalf.  *See* Notice of Insanity Defense, Sept. 22, 2014, ECF No. 50.

Trial was reset for November 10, 2014.  *See* Second Scheduling Order, Sept. 25, 2014, ECF No. 53.  A plea hearing before the magistrate judge was scheduled for October 14, 2014.  *See* Minute Entry, Sept. 30, 2014.

A superseding information was filed in October 2014, charging two counts: sexual exploitation of a child and possession of child pornography.  *See* Superseding Information, Oct. 14, 2014, ECF No. 56; *see also* Gov't Letter, Oct. 3, 2014, ECF No. 54.  Defendant waived his right to prosecution by indictment and consented to prosecution by information.  *See* Waiver of Indictment, Oct. 14, 2014, ECF No. 55.

### E.      Guilty Plea

On October 14, 2014, defendant pleaded guilty before a magistrate judge to one count of possession of child pornography in violation of sections 2252(a)(4)(b) and 2252(b)(2) of title 18 of the United States Code, and one count of sexual exploitation of a child in violation of sections 2251(a) and 2251(e).  *See* Hr'g Tr., Oct. 14, 2014, ECF No. 59.  He did so despite being advised that, as a result of the plea, a fifteen-year mandatory minimum sentence would apply.  *Id*. at 17:20-18:25.

### F.      Metropolitan Detention Center ("MDC") Incarceration

#### 1.      Risk of Suicide

The defendant has serious mental problems with repeated suicide attempts.  He arrived at the MDC on February 22, 2013.  In his intake form, he reported that he had been the victim of

sexual assault.  *See* Def.'s Ex. T (BOP Intake Screening Form, Feb. 22, 2013).  He also stated that he was thinking of killing himself.

Immediately, he was placed on a suicide watch.  A psychology report indicated his "overall risk of suicide" to be "high."  Gov't Ex. 403 (BOP Suicide Risk Assessment, Feb. 22, 2013) at 1.  He remained on suicide watch for five days and was subsequently placed in the Special Programs Unit of the MDC, where inmates in need of additional psychological treatment are housed.  *See* Gov't Ex. 403 (BOP Post Suicide Watch Report, Feb. 27, 2013) at 8; Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 159:02-09.

While in custody at the MDC, defendant attempted suicide.  *See* PSR at ¶ 98.  Feeling utterly "helpless" and overwhelmed by depression, defendant slashed his wrist with a razor.  *Id*.  He explained:  "I was inside my mind.  Thinking of [my adoptive] Mom and family.  I felt like my situation was helpless."  *Id*.

Defendant again expressed suicidal ideas on May 8, 2013, as he was being taken to the MDC's Special Housing Unit ("SHU"):  "He stated that he had just been in SHU overnight pending an outside medical trip, and stated his intention to not return to SHU.  He stated that his current thinking is to kill himself and 'put me and my family out of misery.'"  Gov't Ex. 403 (BOP Suicide Risk Assessment, May 08, 2013) at 15; *see also infra* Part IV.B (addressing the use of SHUs by the Bureau of Prisons).  The psychology report identified the following "suicide risk factors": "SHU placement pending [Special Investigative Services] investigation, nature of his legal charges, history of suicide attempts, history of sexual abuse, unable to contact family currently, history of mental health concerns/treatment, reported suicidal ideation today."  *Id*.  It also noted that "[i]nmate reports his suicidal ideation is conditional upon placement in SHU.  This does not

24

eliminate suicide risk, but suggests *his motivation is more to avoid SHU placement than to kill himself.*" *Id.* (emphasis added).  He was again placed on suicide watch.  *Id.* at 16.

After his release from suicide watch, defendant seemed to entertain some hope for the future, based primarily on his desire to reconnect with his family:

> [D.W.] stated that he would not consider suicide currently because of his concern for his family's current well-being, and his wanting to reach them to know about their health.  He also reported that "I'm still young and I can work through my issues (referring to his reported abuse history.").

Gov't Ex. 403 (BOP Post Suicide Watch Report, May 13, 2013) at 23-24.

He was returned to the SHU.  *Id.* at 24.  Subsequent reports indicated that he would be "seen by Psychology Services every 30 days throughout the duration of his confinement to SHU." Gov't Ex. 403 (BOP Clinical Intervention-Clinical Contact Form, May 15, 2013) at 25.

At the MDC, D.W. has been diagnosed as having depressive disorder, anxiety, unspecified paranoid state, specified episodic mood disorder, and borderline personality disorder. Psychologists treated him with Divalproex (used in part to treat bipolar disorder), Setraline (anti-depressant and anti-anxiety), Trazodone, Depakote (mood stabilizer), and Remeron (anti-depressant). PSR at ¶ 99; Gov't Ex. 403 (BOP Suicide Risk Assessment, May 08, 2013) at 14-16; Gov't Ex. 403 (BOP Psychology Services Clinical Intervention-Clinical Contact Form, May 8, 2014) at 30 (also submitted as Ex. 40 to Def.'s Post-Hr'g Mem.).

He has continued to exhibit symptoms of depression and anxiety throughout his pretrial incarceration.  *See, e.g.*, Gov't Ex. 403 (BOP Psychology Services Clinical Intervention-Clinical Contact Form, May 8, 2014) at 30 ("Inmate [D.W.] indicated during the past couple of weeks he has been struggling with lack of sleep, poor energy, poor appetite, and recurrent nightmares and flashback regarding his physical and sexual abuse during childhood . . . . He indicated he sent several cop-outs to Health Services.  Psychology has been working with him, but it appears that

the psychotherapeutic interventions have been insufficient. Inmate [D.W.] has been struggling with lack of support from family & friends.  He feels abandoned, since his family has refused to talk to him."); Gov't Ex. 403 (BOP Psychology Services Suicide Risk Assessment, Nov. 10, 2014) at 31 ("[I]nmate [D.W.] wrote a letter to another inmate at another facility indicating that he had been sexually assaulted at a previous jail.  He also indicated he was feeling depressed and possibly suicidal as a result of his legal case and lack of family support."); Gov't Ex. 403 (BOP Psychology Services Clinical Intervention-Clinical Contact Form, Feb. 13, 2015) at 35 (reporting "trouble sleeping, irritability, nightmares and flashbacks."); Gov't Ex. 403 (BOP Psychology Services Clinical Intervention-Clinical Contact Form, Sept. 29, 2015) at 41 (reporting "increasing depression and anxiety").

### 2.    Disciplinary Issues

During his incarceration at the MDC, defendant had two disciplinary reports.  One resulted in a six month loss of phone privileges for allowing another inmate to use his prisoner's number in placing a telephone call.  Gov't Ex. 402 (BOP Incident Report Form, Oct. 21, 2015).

The other incident involved allegations related to the Prison Rape Elimination Act ("PREA").  *See infra* Part IV.A (providing an overview of PREA).  On June 11, 2013, a Special Investigative Services investigation concluded that D.W. had violated BOP rules and regulations by "engaging in sexual acts."  *See* Gov't Opp'n Post-Hr'g Mem., Ex. 401 (BOP Incident Report, June 11, 2013) at 1.  Defendant admitted to exposing his penis to another inmate, but stated "it was a mutual thing."  *Id*. at 5. Staff members also found letters in D.W.'s cell which "outlined [D.W.'s] sexual preference and what [D.W.] liked to do to various inmates."  *Id*. at 6.  The Discipline Hearing Officer ("DHO") placed D.W. in sixty days of disciplinary segregation and

restricted his "commissary and visits." *Id*. at 6-7.  He was determined to no longer be eligible for housing in the Special Programs Unit.  Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 159:06-20.

In a separate incident that did not result in disciplinary action, D.W. was found to have been writing sexually explicit documents. *See* Gov't Ex. 403 (BOP General Administrative Note, May 10, 2013) at 20; Gov't Opp'n Post-Hr'g Mem., Ex. 404 (Def.'s Handwritten Notes).  They included what appeared to be a journal entry describing a sexual fantasy with an eight-year old boy.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 166:23-167:01 (noting that there were no indications that defendant's handwritten note was intended to be sent and that it resembled "a diary type of reflection").   In the handwritten notes, D.W. described the young boy initiating and willingly participating in a sexual encounter involving oral, digital, and anal sex.  Gov't Opp'n Post-Hr'g Mem., Ex. 404 (Def.'s Handwritten Notes); Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 163:04-165:07.  There was no evidence that this note was sent; defendant was not subject to discipline. *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 164:14-165:12, 166:23-167:01, 195:09-196:09.

In June 2015, D.W.'s cellmate alleged that D.W. had made sexually suggestive comments to him. *See* Gov't Ex. 403 (BOP Sexual Abuse Intervention Report, June 1, 2015) at 37 (also submitted as Ex. 41 to Def.'s Post-Hr'g Mem.).  D.W. was accused of "attempting to speak to his cellmate about children in a sexual manner, making suggestive comments about gay pornography, and asking his cellmate personal sexual questions such as 'are you circumcised?'" *Id*.  Defendant denied the allegations.  He admitted to asking his cellmate if he was circumcised, but stated that this comment was taken out of context. *Id*.  The charges were investigated but not sustained.  D.W. was placed in the SHU pending the investigation.

In November 2015, an investigation was initiated when D.W. wrote a "drop note" stating that an inmate had been sexually assaulted by another inmate. Gov't Ex. 405 (BOP Mem. of Interview, Nov. 6, 2015). When interviewed, D.W. admitted to writing the note and stated that he "felt like [he] needed to report this incident because [he] was sexually assaulted when [he] was in the state jail and [did] not want to see this to happen to another inmate." *Id.* An investigation was conducted and the allegation was determined to be "unfounded." Gov't Ex. 405 (BOP Mem. for Timothy Geier, Nov. 6, 2015).

### 3. Lack of Family Support

Defendant's counsel indicated that D.W. has largely lost touch with his adoptive family:

> During the three years he has been at MDC, [D.W.] *has not received a single social visit*, despite the fact that his large adoptive family is based in New York City. He has had extremely limited contact with his mother and brother . . . the only one of his adoptive siblings [D.W.] has spoken with since his arrest. Despite repeated outreach efforts, they have never come to court, nor to defense counsel's office to discuss what clearly is an extremely serious case. In his contact with psychological services at MDC, *he has consistently cited the lack of support from his family as a cause for deep despair.*

Def.'s Post-Hr'g Mem. at 18-19 (emphasis added).

Although defendant has attempted to reconnect with his adoptive mother and brother, his efforts, so far, appear to have been unsuccessful:

> After [D.W.] wrote to his brother . . . to explain the abuse he was subjected to before going to live with [his adoptive family], [his brother] relayed to [D.W.] through defense counsel that the letter had touched both him and their mother, who he said had been moved to tears. But even in light of these revelations, [they] have continued to shut [D.W.] out of their lives, ignoring phone calls and never visiting or writing. For a while, [D.W.] held out hope that he could maintain a relationship with his family; that they would eventually come around. *But after three years of near silence on their end, whatever foundation there was for that ultimately false hope has crumbled. [D.W.] has been forced to give up on the family that raised him, after so many false starts in abusive foster homes.*

28

*Id*. at 19 (emphasis added).

In May 2014, it was reported by the MDC's Psychology Services department that D.W. "has been struggling with lack of support from family & friends.  He feels abandoned, since his family has refused to talk to him." Gov't Ex. 403 (BOP Psychology Services Clinical Intervention-Clinical Contact Form, May 8, 2014) at 30.

Defendant's lack of familial support is a factor that will need to be addressed in a reentry program upon D.W.'s release from custody.  *See* Order, Apr. 8, 2016, ECF No. 141, at 2-3 (noting that "[t]here is no present probability of family, companion, or other support available to defendant upon reentry, as there is in other cases before the court," and requesting the parties to address "what resources will probably be available to this defendant after he is released from incarceration that will result in adequate protection to the public as well as support his own appropriate development"); *see also infra* Part IV.E (addressing the community reentry plans suggested by the parties).

According to his counsel, defendant has renewed a relationship with one of his biological siblings since his incarceration.  Def.'s Post-Hr'g Mem. at 19.  They exchanged letters, and D.W.'s brother "has vowed to remain supportive and be a part of D.W.'s life going forward."  *Id*.  He has also been in contact "with an elderly woman in Pennsylvania, whom he began corresponding with while in State prison."  *Id*. at 20.  Although they have never met, he refers to her as his "grandmother."  The relationship appears to be supportive; she writes to him and contributes to his commissary account.  *Id*.

### G.     Sentencing

#### 1.     Offense Level, Category, and Sentencing Guidelines Range

The offenses D.W. pled guilty to carry a minimum term of imprisonment of fifteen years (180 months) and, if cumulated, a maximum term of fifty years (600 months).  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 8:09-9:10.

The applicable Sentencing Guidelines range was agreed upon by the parties and found to be 292 months (24 years) to 365 months (30 years) of imprisonment, based on an offense level of 37 with a criminal history category of IV.  *See id*. at 13:20-14:10.

Defendant's counsel sought a sentence no greater than the applicable mandatory minimum term of fifteen years.  *See* Def.'s Sentencing Mem. at 1.

The government argued for a sentence higher than the minimum, within the applicable Guidelines range (24 years to 30 years), but it took no position as to where within the range the sentence should fall.  *See* Gov't Sentencing Mem. at 1, n.1.

#### 2.     Victim Impact

The young boy identified as having been molested by defendant, *see supra* Part III.C, submitted a victim impact statement.  He stated:

> [D.W.] sexually abused me when I was younger.  He touched me in ways that I didn't feel comfortable.  If I would have been a little bit older, I would have been able to not let him touch me the way he did.  When I was with him by myself, I didn't like it.  What happened was not what was supposed to happen to me.
>
> When I was younger it affected me a lot because I thought about it a lot but never told anyone.  I sometimes had trouble sleeping because it was always on my mind.  I didn't like talking to people. I felt ashamed and very uncomfortable.  I didn't tell my mom because it didn't feel right talking about it, and I felt like there was nothing I could do about it.

> Now that I am older, I don't think about it because I have gotten into activities that help get my mind off of the sexual abuse.
>
> In my opinion, I think [D.W.] should go away for a long time. It wouldn't be right for him to come out and do the same thing to someone even younger than I was.

PSR at ¶ 23.

A sampling of the child pornography images collected from defendant was sent to the National Center for Missing and Exploited Children ("NCMEC"). Certain images depicted minors already known to law enforcement. *See id*. at ¶¶ 24-36. Some victims provided impact statements. *Id*. at ¶ 37. Three victims have submitted requests for monetary compensation from defendant. *See id*. at ¶ 38; Second Addendum to PSR, Apr. 25, 2016.

### 3.    Medical and Psychological Evaluations

In preparation for sentencing, an evidentiary hearing was conducted. *See* Order, Apr. 15, 2015, ECF No. 63. The parties were ordered to present experts on the "dangers presented by the defendant and recommendations for treatment and incarceration." *Id*.

The defendant submitted reports by Dr. Richard Krueger, M.D. and Dr. Robert Prentky, Ph.D. The government noted that it would introduce the testimony of Dr. N. G. Berrill. Because defendant did not wish to be interviewed by Dr. Berrill, the government did not ask him to submit a written report. Gov't Sentencing Mem. at 6, n.5. The government had also previously requested Dr. Barry Rosenfeld, Ph.D. to evaluate defendant. His evaluation was limited to the issue of whether defendant was mentally fit to stand trial. *See* Hr'g Tr., June 11, 2015, ECF No. 128, at 10:17-20.

The experts' reports are summarized below.

31

a)      **Dr. Richard B. Krueger, M.D.**

(1)      **Employment and Qualifications**

Dr. Richard Krueger, M.D., is a psychiatrist specialized in the diagnosis and treatment of sex offenders.  In addition to having a private practice, he is medical director of the Sexual Behavior Clinic at New York State Psychiatric Institute and associate professor of psychiatry at Columbia College of Physicians.  *See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 4:16-19.  A 1977 graduate of Harvard Medical School, Dr. Krueger was board certified in psychiatry at Boston University Medical Center in 1984.  *Id*. at 4:22-5:02.  He also is board certified in addiction psychiatry and forensic psychiatry.  *Id*. at 5:02-05.

Dr. Krueger has had extensive experience researching paraphilic disorders.  He was part of the committee that revised the American Psychiatric Association's diagnostic and treatment manual, and he participates in the work of the committee of the World Health Organization writing the criteria for the International Classifications of Disease manual, "revising the classification of paraphilic disorders, of disorders of sexual interest, patterns of sexual interest."  *Id*. at 6:08-25.

He is a member of the Association for the Treatment of Sexual Abusers, and, for the past twenty years, has been on the board of its New York chapter, the New York Association for Treatment of Sexual Abusers.  *Id*. at 7:20-24.  He also is a member of the International Academy of Sex Research and the International Association for the Treatment of Sexual Offenders.  *Id*. at 8:01-06.

An "essential part" of his work in evaluating and treating sex offenders is assessing their risk of re-offense.  *Id*. at 8:07-11.  He estimates that he has evaluated, treated, and prepared risk assessments for over a thousand sex offenders.  *Id*. at 8:12-15.  He describes his work in such evaluations as performing "a comprehensive . . . mental health assessment with the goal of

achieving whatever diagnosis there might be, of seeing what might be treatable, then a risk analysis and addressing that risk with a treatment plan or treatment recommendations." *Id*. at 8:16-24.

### (2)    Basis for Evaluation

At the request of defense counsel, Dr. Krueger carried out an evaluation of D.W.  *See generally* Krueger Report.  This evaluation was based on:

- Dr. Krueger's four-hour interview of defendant;

- Psychological and psychiatric testing;

- His review of the materials listed in his report, which included:

  o  extensive psychological and psychiatric records from D.W.'s childhood and from the treatment he received following his release from State prison;

  o  documents related to the offense conduct in the instant case, such as the criminal complaint and PSR; and

  o  the reports of Dr. Robert Prentky and Dr. Barry Rosenfeld.

*See id*. at 1-4.  His findings and recommendations were submitted to the court with defendant's sentencing submission of June 8, 2015.

### (3)    Results of Evaluation

Dr. Krueger utilized a number of tests aimed at assessing deviant and non-deviant sexual behavior, other psychiatric syndromes, personality functioning, and risk of re-offense.  *See id*. at 10-13.

He found that D.W. "had a command of language and interaction, which was far beyond his purported IQ of 70.  He was able to provide a very coherent history and he was quite open about his various sexual interests and experiences."  *Id*. at 13.  Defendant admitted to having a "pornography addiction . . . with inappropriate interest in images of minors" and being "willing to

engage in treatment." *Id.* at 14.  He noted that D.W. "had good insight, good judgment, and good impulse control." *Id.*

Dr. Krueger observed that defendant "has an extreme history of adverse childhood experiences with his ACE [Adverse Childhood Experiences] score of 9 out of 10 being *the highest I have encountered in my career*." *Id.* (emphasis added).  He determined that defendant continues to suffer from mental illness and "mild mental retardations":

> [D.W.] makes criteria for bipolar disorder II, for panic disorder without agoraphobia, and for posttraumatic stress disorder chronic. [D.W.] is on Depakote and Remeron to treat his bipolar disorder and is euthymic currently; he appears to be responding well to this treatment.  [D.W.] has had numerous suicide attempts in the past, none being extremely lethal; he appears to have stabilized currently and is not suicidal.  He has not received treatment for his post-traumatic stress disorder.  He also has a history of priapism [*i.e.*, prolonged erection] secondary to trazodone.  He also makes criteria for mild mental retardations, although his interaction and command of language during interviews suggests a much higher level of intelligence.

*Id.*

This psychiatrist determined that defendant "*makes [the] criteria for pedophilia*," as well as "for a paraphilia not otherwise specified or ephebophilia, with a dysfunctional interest in teenagers, and for a sexual disorder not otherwise specified, or hypersexual disorder characterized by pornography dependence." *Id.* (emphasis added).  His diagnoses are summarized in the following table:

| Axis | Description of Axis | Diagnosis in Instant Case |
|------|---------------------|---------------------------|
| Axis I | Describes major psychiatric syndromes that an individual has that may be occasioning his or her seeking treatment. | 1. Bipolar disorder II, depressed phase; <br><br> 2. Panic disorder without agoraphobia; |

| Axis | Description of Axis | Diagnosis in Instant Case |
|------|--------------------|--------------------------|
| | | 3. Posttraumatic stress disorder, chronic, severe; <br><br> 4. Priapism secondary to trazodone; <br><br> 5. Pedophilia; <br><br> 6. Paraphilia not otherwise specked or ephebophilia; <br><br> 7. Sexual disorder not otherwise specified or hypersexual disorder; <br><br> 8. Learning disorder not otherwise specified. |
| Axis II | Refers to an individual's personality or their stable way of interacting with others. | 1. ? Mild mental retardation. |
| Axis III | Involves a listing of medical conditions. | 1. History of priapism secondary to trazodone; <br><br> 2. Allergy to fish; <br><br> 3. History of heart murmur; <br><br> 4. Glaucoma, childhood onset; and <br><br> 5. History of exposure to lead paint. |
| Axis IV | Identifies psychosocial and environmental stressors. | Stressors—severe—current legal situation |
| Axis V | Offers a way to grade an individual's overall level of functioning on a scale of 100 (superior functioning over a wide range of activities) through 1 (severe disability and dysfunction). It asks that a judgment be made as to the best level of functioning over the past year and then over the past week. | Highest level of functioning past year was 20 <br><br> Highest level of functioning past week was 20 |

*Id*. at 15-16.

While Dr. Krueger found that defendant's "risk of sexual re-offense is high according to several instruments used to assess such risk," the expert indicated that the lack of evidence of him having abused any child since his initial State arrest in 2009 was a positive factor:

> Additionally with regard to [D.W.'s] risk of re-offense, I would add that the charges of sexual exploitation of a child are similar to what would be referred to as an "index cluster." Not infrequently, individuals who are arrested for sexual crimes against children will have many other crimes discovered or victims who come forth at the time of the index, or most recent arrest. In this case, *the crimes involving sexual exploitation of a child occurred during behavior that [D.W.] had engaged in the past, prior to his initial arrest.* The significance of this is the fact that *[D.W.] did not physically abuse a child after his first arrest*; the episodes of hands on abuse or exploitation of children perpetrated by [D.W.] occurred prior to his initial arrest and there have been none since. *From a point of view of assessing risk, this is important inasmuch as [D.W.] did not reengage in physical abuse of children following his initial arrest for such charges.* Further, in assessing risk what is most salient is the number of arrests an individual has had, not the number of victims.

*Id*. at 14-15 (emphasis added).

This expert concluded that "[d]espite his diagnosis and increased risk *[D.W.] . . . could be very well managed* under the usual conditions of outpatient treatment imposed by Federal Probation." *Id*. at 15 (emphasis added). He pointed out that sex offender treatment "should be delivered with the awareness that he had downloaded child pornography while under the supervision of New York State parole." *Id*. According to Dr. Krueger, although defendant has "a moderate-high or high level of risk for re-offense," he is "very capable of being managed in the community under strict and intensive supervision and treatment." *Id*. In this expert's opinion, "*a lengthy period of incarceration provides no additional benefit from a treatment perspective*." *Id*. (emphasis added).

36

Dr. Krueger ended his report by summarizing D.W.'s position, while criticizing available treatment in federal prisons:

> [D.W.] has a history of profound childhood trauma and a long history of sexual deviance involving mainly the use of child pornography. [D.W.'s] risk of re-offense is moderate high to high. [D.W.] relapsed using child pornography while under supervision of New York state parole, but was not subject to the tight conditions of Federal Probation during the time that he relapsed in his use of child pornography. These in my opinion would very substantially decrease his risk of recidivism going forward and could include polygraphy, computer and location monitoring, restriction of contact with children and intensive supervision by probation. Although [D.W.] *faces a substantial period of incarceration before release into the community, the therapeutic cost benefit of this is questionable.* On the one hand, *a longer sentence may have some deterrent effect. On the other hand his adaptive skills in living in society would in my opinion be adversely affected* (i.e. he would not have to work or care for himself). It has also been my experience that *the federal prison system offers little to such sexual offenders.* While there are sex offender specific programs that exist in the federal system, I have had several internet pornography offenders who report they have received absolutely no sex offender specific therapy while incarcerated.

*Id.* at 16 (emphasis added).

### b)      Dr. Robert Prentky, Ph.D.

#### (1)      Employment and Qualifications

Dr. Robert Prentky is a forensic psychologist specialized in the assessment of juvenile sex offenders. He is a fellow of the American Psychological Association and the Association for Psychological Science. *See* Prentky Report at 19. At the request of defendant's counsel, he examined D.W. in September 2013. He submitted a written evaluation. *See generally id.*

#### (2)      Basis for Evaluation

Dr. Prentky's findings and recommendations are based on:

- a four-and-one-half hour interview with D.W., conducted in the MDC's SHU;

37

- the Abel Assessment of Sexual Interest ("AASI"); and

- the documents listed in his report, which include:

  o extensive psychological and psychiatric records from D.W.'s childhood and from the treatment he received following his release from State prison; and

  o documents related to the offense conduct in the instant case, such as the criminal complaint.

*See id.* at 1-2.  His findings and recommendations were submitted to the court with defendant's sentencing submission of June 8, 2015.  At the time of his examination, the government had not yet learned that D.W. had molested an additional child in 2009.

### (3)    Results of Evaluation

Dr. Prentky detailed D.W.'s history of severe physical and psychological abuse, from when he was just a child to the time he was raped while in State custody.  *See id.* at 3-8.  According to Dr. Prentky "*to say that [D.W.] is 'a product of his upbringing' is tragically accurate.*"  *Id.* at 14 (emphasis added).  He described defendant's childhood in stark terms:

> [D.W.'s] developmental history was severely and chronically scarred by maltreatment, ranging from profound physical abuse (e.g., broken arm, forced ingestion of urine) and equally profound emotional abuse (frightened by many of his caregivers and/or their offspring) and neglect (e.g., denial of food – being "locked up in a basement pleading to eat" and hygiene – "smelling like a sewer rat") to highly intrusive sexual abuse, including oral, digital and anal penetration with early onset and by multiple perpetrators spanning years.

*Id.* at 14.

This expert emphasized the harsh difficulties that defendant faced upon his release from State custody; it included inadequate housing, inability to find work and feelings of abandonment. This lead to increased depression and his relapse into viewing child pornography:

> [D.W.'s] post-prison reintegration and adjustment was characterized by numerous challenges, such as being assigned to a

38

> shelter with other ex-offenders, as well as disappointments, most importantly not being allowed [to] return home (to [his] family). Roughly eight months before his arrest for child pornography, he started spiraling downwards. By May or June his depression and anxiety attacks were becoming serious. He began feeling increasingly frightened of the other ex-offenders in the shelter who were overheard remarking that sex offenders were "pieces of shit who should be killed." He was unable to find a job and his self-esteem was reported to be "below zero." He felt abandoned by [his adoptive family], the only family that he felt loved him. Suicidal ideation increased (e.g., "I just wanted to die. I wanted to not feel any more pain."). *Over a period of about six months, his depression went from mild to severe to suicidal.* The last straw, as he referred to it, was enduring Christmas without family. This was roughly 1 1/2 months before his arrest.

*Id.* at 15 (emphasis added).

Referring to his child pornography addiction, defendant told Dr. Prentky that "a lot of the stuff I watched, is stuff that happened to me. I don't know what drove me to go down this road, but it seemed like when I saw kids doing it to each other it wasn't rape, it wasn't forced." *See id.* at 10, 16. Dr. Prentky observed that such an "analysis" is "common for those with long histories of abuse." *Id.* at 16. This psychologist explained that as a victim of extreme childhood sexual abuse, D.W. may have been employing complex coping mechanisms to overcome the trauma he had experienced:

> Absent trauma therapy, which he has never been afforded, he was trying to gain mastery over his own abuse by viewing the "stuff that happened to me" as not really rape and not really forced. The fact that it comes at a pivotal time, a nadir of despair, depression, perceived abandonment, feelings of worthlessness, is critical to understanding *who* [D.W.] is. Had he been searching for child pornography during the "good times," or at least during average times, we might surmise that his interest in child pornography reflected a clear interest, if not "orientation," and was intended to gratify his sexual needs. It appears in his case, however, that searching for child pornography may have had two other possible motives: (1) His initial motive for accessing adult pornography may have been a coping response for his rapidly deteriorating mood (i.e., watching pornography initially took his mind off his troubles and, at least temporarily, provided some relief), (2) as noted, attempting

39

> to achieve mastery over a horrific sexual abuse history by "converting" those childhood experiences to something that was non-abusive (i.e., I'm looking at kids doing the same "stuff" and it doesn't seem forced; it doesn't seem like rape). If he could "wipe out" that entire part of his life, he can eliminate a major source of his depression.

*Id*. at 16-17 (emphasis in original).

Dr. Prentky observed that "[D.W.] is now a young adult *who has been failed by his birth parents and subsequently by the safety net of protections that are in place and intended for children like [him]*." *Id*. at 10 (emphasis added).

The "AASI test" was used by this expert to assess defendant's sexual interest, including any pedophilic attraction to children. This test "relies on visual reaction time in response to clothed models of children, adolescents, and adults to measure sexual interests." *Id*. at 11. It has two components: a lengthy questionnaire inquiring about "sexual thoughts, fantasies, and behavior," as well as a "computerized assessment of self-reported sexual interest in slides" depicting both children and adults. *Id*.

Dr. Prentky reported that "[D.W.'s] AASI profile, as noted, is complex and undoubtedly reflects what is known about him, a history of severe, protracted sexual abuse with multiple perpetrators resulting in confusion and fluidity of sexual interests." *Id*. at 12. While defendant's sexual preference is unlikely to be stable at this time, Dr. Prentky explained, defendant did appear to "*be struggling with sexualized interest in latency age children*." *Id*. at 14 (emphasis added).

In terms of the risk posed to the public, Dr. Prentky observed that defendant "*undoubtedly is one of the saddest cases of neglect that I have seen*. . . . I have evaluated numerous sex offenders, however, with far less traumatic histories but who posed far more of a risk than [D.W.]." *Id*. at 17 (emphasis added). He also concluded that, despite defendant's history of serious abuse, he

displayed no signs associated "with violence or chronic antisocial behavior." *Id.* at 18.  Dr. Prentky

summarized his positive evaluation of D.W. as follows:

> *[D.W.] is not, by any means, a "lost cause."*  Far from it.  In my
> opinion, based on my comments above, *[D.W.] is highly treatable*.
> In a secure holding environment with proper identification of risk
> and needs, a sound therapeutic regimen that targets his needs, a
> secure, supportive placement and job upon release, and reunification
> with members of his [adoptive] family, his prognosis is *good*.

*Id.* (emphasis in original; emphasis in first sentence added).

### c)   Dr. Barry Rosenfeld, Ph.D.

#### (1)   Employment and Qualifications

At the government's request, in April 2014 defendant was evaluated by a clinical

psychologist, Dr. Barry Rosenfeld, Ph.D.   *See* Gov't Opp'n Post-Hr'g Mem., Ex. 501

(Psychological Evaluation of D.W. by Barry Rosenfeld, Ph.D., Apr. 21, 2014) at 113-118.  Dr.

Rosenfeld is a professor in the Department of Psychology at Fordham University.  *See* Gov't

Letter, Apr. 4, 2014, ECF No. 37.

#### (2)   Basis for Evaluation

Dr. Rosenfeld's evaluation was based on:

- An interview with defendant;

- His review of defendant's prior psychological evaluations, as well as the charging
  documents in the instant case; and

- Psychological testing.

Gov't Opp'n Post-Hr'g Mem., Ex. 501 (Psychological Evaluation of D.W. by Barry Rosenfeld,

Ph.D., Apr. 21, 2014) at 113.

### (3)     Results of Evaluation

Dr. Rosenfeld reported that D.W.

> described numerous symptoms of depression and anxiety, including problems sleeping and nightmares several times each week, diminished appetite, and "panic attacks" approximately 3-4 times per week. . . . He also reported diminished energy, feeling bad about himself, and periodic thoughts of suicide.  He acknowledged having thought about suicide as recently as one week ago but stated that he has not informed his doctors about these thoughts.

*Id*. at 116.

Several psychological tests were administered, aimed at assessing D.W.'s cognitive effort (*i.e.*, "[his] motivation to perform to the best of his abilities").  *Id*. at 117.  Dr. Rosenfeld concluded that defendant was misrepresenting:

> [D.W.'s] current clinical presentation, coupled with the results of psychological testing, is suggestive of *deliberate exaggeration of psychiatric symptoms and/or cognitive limitations*.  To be sure, [D.W.'s] history is unequivocal in pointing to chronic behavioral problems and intellectual limitations.  Likewise, his report of prior physical and sexual abuse during childhood is consistent with the available records, and these experiences are no doubt related to his chronic behavioral problems.  However, notwithstanding the fact that some of his psychiatric symptoms and cognitive deficits are likely genuine, [D.W.] appeared motivated to exaggerate (substantially) the extent of his problems during the present evaluation.  Thus, while there is little doubt that [D.W.'s] actual intellectual functioning is below average (though not to the extent suggested by the current testing), the true extent of his psychiatric symptoms and intellectual limitations cannot be accurately gauged in the present evaluation due to the high likelihood of deliberate exaggeration.

*Id*. at 118 (emphasis added).

### 4.     Sentencing Hearing of June 2015

In June 2015, defendant's sentencing hearings commenced.  *See* Hr'g Tr., June 11, 2015, ECF No. 128.  A video recording was made.  *Id*.

This court observed that D.W. appeared "seriously troubled, exceptionally passive, and deeply depressed." *United States v. D.W.*, No. 13-CR-0173, 2015 WL 3892643, at *2 (E.D.N.Y. June 25, 2015). *Sua sponte*, the court asked the parties to address defendant's capacity to plead, as well as whether a sentence of fifteen years in this case would effectively increase punishment, given defendant's past abuse in prison and the probability of a sexual assault while incarcerated:

> COURT:  I am not satisfied with the plea.  I do not understand why there should be a plea to a 15 year minimum when he could be tried and receive the same sentence because it is quite clear I am not going above the 15 year minimum.  In addition, having studied the papers and read the presentence investigation report, as I understand it, the background is repeated rapes in prison on prior incarcerations. Correct?
>
> [DEFENDANT'S COUNSEL, HOYES]:  He was raped twice in prison.
>
> COURT:  What prison, federal or state?
>
> HOYES:  State.
>
> COURT:  If I sentence him to 15 years, there is a treatment program in Massachusetts which I visited.  Are you aware?
>
> [ASSISTANT UNITED STATES ATTORNEY, PAULSEN]:  I believe that's right, Your Honor.  I've read it from other cases.
>
> COURT:  The full treatment is about three years or a little less than that and then he is placed in general population.  Correct?
>
> PAULSEN:  I believe that's right, Your Honor.
>
> HOYES:  Judge, I'm not even a hundred percent sure that the treatment happens at the beginning of the period of incarceration.
>
> COURT:  I understand.  He may be in general population before and he certainly will be in after and although there are precautions that are taken at that facility, which I have visited in connection with the C.R. case, where I think rapes are much less likely because of the heavy supervision by psychiatrists and others, I am concerned about this case and I am not prepared to sentence.  I would like to set an evidentiary hearing in roughly 30 days or as long as it is necessary on the dangers presented to the defendant and recommendations for treatment and incarceration . . . .  In addition, . . . I want to know

43

> whether, given these circumstances and the possibility of other
> sentences, including treatment outside of prison for a defendant of
> this kind with this background and risks, a 15-year sentence, most
> of which will be served in the general system, with risks of abuse,
> sexual and otherwise, a young person who has had those abusive
> experiences, constitutes cruel and inhuman punishment making the
> . . . 15 year minimum challengeable on constitutional grounds.

*See* Hr'g Tr., June 11, 2015, ECF No. 128, at 4:16-6:16.

A further evidentiary hearing was ordered.  In a memorandum, the court directed the parties

to address: (1) defendant's capacity to understand the implications of his decision to plead guilty;

and (2) whether sentencing him to a fifteen-year mandatory prison term would amount to cruel

and unusual punishment in violation of the Eighth Amendment to the United States Constitution.

Specifically, the court raised the following five issues:

> *First*, why did this defendant decide to plead when that would
> necessarily result in incarceration for at least fifteen years in lieu of
> exercising his constitutional right to a jury trial?  Counsel were
> aware that an adverse jury verdict would have resulted in the same
> sentence as would a plea.

> *Second*, on June 11, 2015, as demonstrated by a video recording, the
> court observed defendant's passivity and depression.  In light of
> these observations, and any other relevant information, a withdrawal
> of defendant's guilty plea will be considered at the hearing.  The
> issue is whether the defendant is capable of responsibly forfeiting
> his right to a trial.

> *Third*, whether sentencing this defendant – who has been raped
> multiple times – to the statutory minimum sentence of fifteen years
> violates his right to be free from cruel and unusual punishment.

> The parties should inform the court of what protections or treatment
> are available, or are likely to be made available, to defendant in
> prison under a fifteen-year sentence.  Should the court take into
> account that protecting the defendant against sexual attacks may
> require solitary confinement?

> . . .

44

*Fourth*, in the event the court finds that sentencing this defendant to prison for fifteen or more years violates his constitutional rights under the Eighth Amendment, what types of appropriate alternatives to incarceration are available?  For example, should consideration be given to whether the prison authorities would place defendant in the residential sex offender treatment program such as the one at the Federal Medical Center Devens ("Devens"), an administrative security federal medical center with an adjacent minimum security satellite camp, located in Ayer, Massachusetts.  The court may lack effective control of incarceration conditions through sentencing.

*Fifth*, what are the attendant risks posed by defendant if released into society before or after having completed a course of treatment, such as that at Devens, or a full term of incarceration of fifteen years followed by a lifetime of supervised release and other conditions – or other possible sentences?

*See D.W.*, 2015 WL 3892643, at *3-4.

### 5.  Defendant's July 2015 Letter to Court

Shortly after the initial sentencing hearing, D.W. submitted a hand-written letter to the court.  He expressed his desire to take responsibility for his actions by pleading guilty and sparing his family the pain of a public trial.  He also stated his intention to accept a fifteen year term.  He feared a longer sentence from another judge, were the present judge not available after a possible reversal of a sentence under the applicable mandatory minimum term:

Dear Judge,

I am writing to you today to first thank you for all that you have been doing in my case[.]  I know you are trying to find the best solution for me in this case.  I feel that this letter will answer some of your questions and at the same time give me a chance to tell you how I feel about what has been going on.  First I never wanted a trial and still don't want one.  Because I know how these types of cases end up in the media and it puts my life out their [*sic*] for the public to see and my family's life out there as well and the public will judge not only me but my family for my mistakes[.]  My 2009 case was very public which made it impossible for my family to go anywhere and not feel that people were talking about them.  My little brother and sister [were] so embarrassed [*sic*], that they did not want to go to school.  I also do not want my victims to go through anymore hurt, pain, embarrassement [*sic*], I know how it feels and I wanted

45

to spare them as much as I could.  I am so sorry for all my actions that have caused so many people hurt and pain and embarressment [*sic*].

I also wanted not [to] go to trial and accept full responsibility for my mistakes and action and I felt by not going to trial I was accepting responsibility and that is the thing that I want to do.

I am also in the process of trying to rebuild my relationship with [my] family.  Since being in this trouble I was able to locate my biological brother . . . and I am trying to reconnect and start and build a relationship with him.

Second I want to say that I am fearful that if I don't get sentenced by you and I don't get sentenced to the mandatory minimum of 15 yrs [which] I feel scared of taking and getting the 15 yrs but *I am more scared that if you sentence me under the 15 yrs and it gets overturned the case would be taken from you and given to another judge and that judge would sentence me to more than 15 years.*  Yes I feel scared about spending 15 years in prison and don't want to be a victim again [and] I feel I can't take going through that again but I don't want to spend the rest of my life in prison.  *The way I see this is that you sentence me to the 15 years I won't have to gamble with my life.  I don't want to gamble and getting a sentence under 15 years and having it overturned is a gamble I am not willing to take.*

Your truly [*sic*]

[D.W.]

Letter of D.W. to the Court, July 6, 2015, ECF No. 74 (sealed, but now unsealed by this order) (emphasis added).

Defendant's counsel reported that "the defendant has no desire to withdraw his guilty plea, and has consulted with counsel on this issue.  The defense does not intend to press any issue concerning the guilty plea."  Letter from Def.'s Counsel, Nov. 19, 2015, ECF No. 93, at 1.

## H.    Evidentiary Hearings

Further evidentiary hearings were held on November 23, 2015, December 22, 2015, December 23, 2015, and February 3, 2016.

46

### 1.      Guilty Plea

At the start of the evidentiary hearings, the issue of defendant's guilty plea was addressed.

Defendant reaffirmed his plea, which was accepted by the court:

> COURT:  Now, is that your position, you do not wish to withdraw your plea of guilty?
>
> DEFENDANT:  Yes.
>
> COURT:  Have you discussed it thoroughly with your attorney?
>
> DEFENDANT:  Yes.
>
> COURT:  And you know that the mandatory minimum is 15 years?
>
> DEFENDANT:  I do.
>
> COURT:  Have you explained all the alternatives and why this might not be a wise decision from his point of view?
>
> [DEFENDANT'S COUNSEL, VON DORNUM]:  Yes, Your Honor, I've reviewed the pros and the cons of each of the decisions with [D.W.].
>
> COURT:  Are you prepared to explain to the Court why you're taking this position?  Did you advise him that he must plead guilty or he should plead guilty?
>
> VON DORNUM:  I did not, Your Honor.  I advised him as to what I saw in the evidence, the --
>
> COURT:  I don't want the details.  Do you want to tell me why you want to take this plea when you could plead not guilty and have a trial or work out perhaps some kind of arrangement with the government?
>
> DEFENDANT:  I've talked with my lawyers and, based on our discussions, I feel that I'm going to stand by my plea of guilty.
>
> COURT:  Well, can you explain that to me?  Why?
>
> VON DORNUM:  Your Honor, my concern here is that we're going to get behind the privilege and we're going to breach the attorney-client privilege if he discloses that.

COURT:   Well, he's not going to breach the attorney-client privilege, but there may be an independent privilege, but I'm not aware of it.  I have to approve the plea, do I not?

VON DORNUM: You do.

COURT:  Well, I'd like to know.  It seems a rather odd plea to plead guilty to a 15-year sentence when you might be able to work out something lower or even be acquitted.

VON DORNUM:  Your Honor, we have not been able to work out anything lower with the government.

COURT:  I understand.  Because, in part, I suppose, the defendant insists on pleading guilty.  Do you want to explain to the Court what your position is?  Before you start, the second problem that the Court posed is whether the defendant is capable of making the necessary choices here, and as to that your position, as I understand from Court Exhibit 1, is that he is capable.

VON DORNUM:  Correct, Your Honor.

COURT:   And that no hearing is required with respect to his capacity?

VON DORNUM:  Correct.

COURT:  And the government has no contrary view, I take it?

[ASSISTANT UNITED STATES ATTORNEY, PAULSEN]:  No, Your Honor.

COURT:  That's right, I stated your position?

PAULSEN:  You did, Your Honor.  You stated it accurately.  We have no contrary view.

COURT:  Okay.  What do you want to say, if anything?  You're not compelled to say anything.

DEFENDANT:  I want to take responsibility for my actions and I don't want to put my victims through anything more, re-victimizing them, making them relive everything over and over again by having to bring a trial.

COURT:  You've been in prison, haven't you, before?

DEFENDANT:  Yes, I have.

COURT:  Fifteen years is an awfully long time.

DEFENDANT:  I know.

COURT:  Well, the Court does not generally approve of self-punitive acts of defendants of this nature.  Its sentences are based on a number of criteria.

PAULSEN:  Your Honor, if I may.

COURT:  Yes.

PAULSEN:  In July of this year, the defendant did file a letter under seal with Your Honor, a handwritten letter, in which he did outline some of the reasons why he believed a plea made sense for him.

COURT:  How old are you now?

DEFENDANT:  Twenty-seven.

COURT:  How much time have you spent in prison?

DEFENDANT:  I came in, I was 23, 24.

COURT:  You've attempted to commit suicide a number of times, have you not?

DEFENDANT:  Yes, I have.

COURT:  And you've been raped in prison, have you not?

DEFENDANT:  Yes, in state.

COURT:  And you understand that those conditions and the crimes for which you are pleading guilty may well result in the department charged with incarceration keeping you in solitary confinement for your protection over a long period.  Do you understand that?

DEFENDANT:  Yes.

COURT:  So that your incarceration may be very difficult.  Do you understand that?

DEFENDANT:  Yes, I do.

COURT:  I cannot find any reason why I can reject this plea.  Let me see Rule 11 again.

PAULSEN:  Your Honor, we have it open in front of us.  (Handing.)

COURT:  Let me see the magistrate judge's minutes, please.  Do you understand the government can use any false statement against you?

DEFENDANT:  I do.

COURT:  You have the right to plead not guilty and to persist in that plea.  Do you understand?

DEFENDANT:  I do.

COURT:  You have a right to a full jury trial.  Do you understand that?

DEFENDANT:  I do.

COURT:  And at the jury trial, you have a right to counsel.  Do you understand?

DEFENDANT:  Yes.

COURT:  You have the most distinguished counsel we have available for pro se or nonpaying clients in this court, and if you don't like them we can appoint other counsel at any stage.  Do you understand that?

DEFENDANT:  I do.

COURT:  You have the right to confront witnesses against you if you go to trial, to be protected from self-incrimination, compelled, to testify and to present evidence and to compel the attendance of witnesses.  Do you understand?

DEFENDANT:  Yes.

COURT:  You waive all those rights and a limited right to appeal.  Do you understand?

DEFENDANT:  I do.

COURT:  And you've explained the nature of each charge, or had it explained to you?

DEFENDANT:  Yes.

. . .

COURT:  Is your plea voluntary?

> DEFENDANT:  Yes.
>
> COURT:  Did it result from force, threats or promises?
>
> DEFENDANT:  No.
>
> COURT:  I don't believe I need to make a further inquiry on the factual basis.
>
> VON DORNUM:  No, Your Honor.
>
> COURT:  I have examined the material earlier, we've had an earlier hearing, and the report is comprehensive.  The Court did not participate in any plea agreement  discussions. . . .
>
> How do you plead to Count One, guilty or not guilty?
>
> DEFENDANT:  Guilty.
>
> COURT:  How do you plead to Count Two, guilty or not guilty?
>
> DEFENDANT:  Guilty.
>
> COURT:  I don't see any basis for not accepting the plea.  I think it's unwise, but that's for the defendant to decide.  There's no basis to reject it on the ground of lack of capacity.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 3:01-17:05.

Even though the court considered the plea "unwise," it accepted defendant's guilty plea. "It is the defendant's, not the court's, decision on this issue that should prevail in the absence of the most unusual circumstances."  *United States v. C.R.*, 792 F. Supp. 2d 343, 357 (E.D.N.Y. 2011), *vacated and remanded sub nom. United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013).

### 2.    Witness Testimony

The parties offered extensive testimony.  They presented medical experts who testified about the risk posed by the defendant to the public, available treatment options, and the effect of a fifteen-year sentence on defendant's likely risk of recidivism.  *See infra* Part IV.D.  Bureau of Prisons ("BOP" or "Bureau") experts provided detailed information on the Bureau's policies and

practice with respect to the use of solitary confinement and the measures available to protect highly vulnerable inmates such as D.W.  *See infra* Part IV.A-B.

Defendant also introduced the testimony of Jason Lydon, national director of the organization Black & Pink, who discussed his organization's report on the experiences of incarcerated lesbian, gay, bisexual and transgender people ("LGBT") in the United States.  The proffered testimony of Galen Baughman, Open Society Foundation Soros Fellow with the Human Rights Defense Center in Washington, D.C., was not accepted by the court.  Details are included below.

### a)      Medical Experts

### (1)      Dr. Naftali G. Berrill, Ph.D

The government introduced Dr. Naftali G. Berrill "as an expert in matters related to sex offenders, specifically, risk assessment and treatment."  Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 101:19-22.  Currently, Dr. Berrill is a Forensic Psychologist and Executive Director of the New York Center for Neuropsychology and Forensic Behavioral Science, a private practice.  His work comprises evaluating and treating convicted sex offenders, including individuals charged and convicted of child molestation offenses.  *Id.* at 98:11-100:02; Curriculum Vitae of N.G. Berrill, Ph.D., ECF No. 87-1, ("Berrill CV") at 3, attached as App. 1 to Gov't Witness List, Nov. 6, 2015, ECF No. 87.

Dr. Berrill holds a Ph.D. in clinical psychology from Vanderbilt University and a Master's degree in clinical psychology from Long Island University.  Berrill CV at 1; Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 96:23-97:01.  Following his doctoral training, Dr. Berrill completed an ABA-approved clinical psychology internship at Sheppard Pratt Hospital in Maryland and a postdoctoral fellowship at Georgetown University Medical Center in neuropsychology.  He is

board certified in clinical psychology, neuropsychology and forensic psychology. Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 97:05-10. Before establishing a private practice, Dr. Berrill was the director and chief psychologist of a mental health services clinic in the Bronx Family Court. He also worked at Perkins Hospital, a maximum security forensic psychiatric setting in Maryland, where he treated violent offenders and sex offenders. *Id*. at 97:24-98:05.

Dr. Berrill's testimony was not based on a direct examination of D.W. because defendant declined, on the advice of counsel, to speak with him. *See* Gov't Witness List, Nov. 6, 2015, ECF No. 87. His testimony was instead predicated upon a review of relevant written materials, which included the PSR and FBI report in the instant case, D.W.'s State court proceedings, his criminal history report, and prior medical examinations. *See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 102:14-103:22; Gov't Ex. 501 (Documents Reviewed by Dr. Berrill) at 50-62, 113-18, 203-08. Dr. Berrill also reviewed the report provided by Dr. Krueger. Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 103:23-104:03.

### (2)      Dr. Richard B. Krueger, M.D.

Dr. Richard Krueger was proffered by defendant as an "expert psychiatrist in evaluating paraphilic disorders, treating paraphilic disorders and making risk assessment of sexual offenders." *Id*. at 9:21-24. His background and qualifications are set out at length in Part III.G.3, *supra*.

### b)      Bureau of Prisons ("BOP") Experts

### (1)      Phillip Wise, former BOP Warden and Assistant Director

Mr. Phillip Wise was formerly a Warden and Assistant Director of the BOP. Currently, he works as a consultant on BOP operations. *See* Def.'s Ex. Q (Resume of Phillip Wise). His experience includes working with vulnerable inmate populations, as well as devising and

implementing policies on the classification and management of inmates, particularly those suffering from mental illnesses.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 24:12-25:09.

Counsel for D.W. introduced him as an expert on BOP policies, procedures and programs, and on work with inmates with vulnerabilities.  *See id*. at 21:19-22.  Following a *Daubert*, Rule 702 Federal Rule of Evidence hearing, the witness was deemed "qualified as an expert on the issues he is expected to testify to by knowledge acquired through his profession, his experience, training and education and subsequent studies."  *Id*. at 27:22-28:02; *see also id.* at 28:04-14.

Mr. Wise testified about:  (1) the assessment and designation of vulnerable inmates; (2) the risks posed to them from other inmates and staff; (3) specialized sex offender units; and (4) the use of protective custody.  Def.'s Witness List, Nov. 6, 2015, ECF No. 86, at 2.

### (2)      Patricia Rodman, BOP Associate Warden

The government introduced the testimony of Patricia Rodman as an expert on PREA compliance in BOP facilities.  At the time of her testimony she held the position of Associate Warden of the MDC; she also was the PREA compliance manager for the facility.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 144:11-14.  Ms. Rodman has since retired.

Her testimony addressed: (1) the ways in which BOP facilities meet the program requirements of PREA; (2) the specific PREA-relevant actions that were taken with regard to the defendant while he has been housed at the MDC; (3) the protections available to defendant while incarcerated; and (4) BOP use of protective custody and solitary confinement.  *See* Gov't Witness List, Nov. 6, 2015, ECF No. 87.

Ms. Rodman acknowledged that her testimony was limited to her experience at the MDC and at Schuylkill, a Federal Correctional Institution.  Hr'g Tr., Nov. 23, 2015, ECF No. 101, at

198:14-17 ("Q.  So you are not competent here today to talk about violence against sex offenders in facilities outside of Schuylkill or the MDC?  A.  Correct.").

### (3) Brad Trate, BOP Correctional Services Administrator

The government also called Brad Trate, Correctional Services Administrator of the Correctional Programs Division of the BOP.  *See* Gov't Notice of Expert Witness, Dec. 30, 2015, ECF No. 103.  In that role, Mr. Trate is in charge of developing training and "the correctional services of the Bureau of Prisons as a whole."  Hr'g Tr., Feb. 03, 2016, at 9:19-10:06 ("I set up training for correctional supervisors, lieutenants, captains.  I do staffing analysis, compliment analysis, identifying how many correctional services officers,  how many supervisors are appropriate for different security levels.  I conduct training with those lieutenants, with those captains. I conduct training with regard to emergency preparedness, various issues.  I teach associate wardens training, and I teach wardens' training as well regarding security-related issues for the Bureau of Prisons.").

Mr. Trate is also "responsible for the security of the Special Housing Units throughout the nation."  *Id*. at 10:19-11:17.

Mr. Trate testified on: (1) the use of SHUs, including for protective custody; (2) current BOP statistics regarding the use of SHU and protective custody; (3) the BOP's implementation of PREA-related regulations; and (4) measures taken by BOP facilities to address the needs of potentially vulnerable inmates.  *See* Gov't Notice of Expert Witness, Dec. 30, 2015, ECF No. 103.

### (4) Nelson Aponte, BOP former Associate Warden, Chief Correctional Supervisor and Special Investigative Agent

The defendant relied upon the testimony of Nelson Aponte, a former Associate Warden, Chief Correctional Supervisor, and Special Investigative Agent for the BOP.  *See* Resume of

Nelson Aponte, ECF No. 102-1, attached as App. 1 to Def.'s Notice of Expert Witness, Dec. 11, 2015, ECF No. 102. He was qualified as an "expert on BOP practices and procedures, particularly, as applied to threats to inmates, investigations, and the use of protective measures." Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 133:24-134:03.

After spending twenty-five years working for the BOP, Mr. Aponte currently is a consultant regarding federal, state and private correctional systems. *See* Def.'s Notice of Expert Witness, Dec. 11. 2015, ECF No. 102. As Special Investigative Agent and Supervisor he was responsible for investigating incidents, including threats, assaults, and allegations of sexual abuse. Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 127:06-13. He made determinations of inmate need for protective custody and continuation of protective custody. *Id*. at 127:17-22. Mr. Aponte has also been involved in auditing the compliance of BOP institutions with BOP policies and procedures and applicable laws. *Id*. at 130:24-131:12.

His testimony focused on the effects of PREA, the use of protective custody in federal prison, and the risks faced in prison by inmates convicted of sexual offenses involving children as well as available means of protecting them.

In its post-hearing brief, the government urged the court to disregard or discount Mr. Aponte's testimony. *See* Gov't Opp'n Post-Hr'g Mem. at 45-51. It argued that "Aponte was neither candid nor honest with the Court in his testimony about his post-BOP employment." *Id*. at 48. The witness was asked about his demotion from his job with the Northeast Ohio Correctional Center, following allegations that he falsified documents. Mr. Aponte explained that he refused a demotion and resigned after he was adjudicated guilty of falsifying documents and after going through the appeals process. He testified that he did not remember what kinds of documents he was accused of falsifying. *Id*. at 49-50.

Mr. Aponte's testimony in this case was redundant.  His testimony is rejected.  *See* Fed. R. Evid. 403 (Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons); Fed. R. Evid. 702 (Testimony by Expert Witnesses).  The credible and reliable testimony of the remaining BOP experts—Mr. Wise, Ms. Rodman and Mr. Trate—is sufficient to aid the court in addressing the questions it posed to the parties.

### c)      Additional Witnesses

### (1)      Jason Lydon

Jason Lydon, national director of the organization Black & Pink, was called by defendant as an expert witness on the experience of LGBT people in prison.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 104:08-10, 105:10-12.  Black & Pink is "a nationally networked grassroots organization working with lesbian, gay, bisexual, transgender identified people who are currently incarcerated or affected by the criminal legal system."  *Id*. at 104:04-07.

In 2014, the organization published a report addressing the experiences of LGBT people who are incarcerated in the United States.  *See* Def.'s Ex. D (Coming Out of Concrete Closets: A Report on Black & Pink's National LGBTQ Prisoner Survey ("Black & Pink Report")).  The report was based on data collected through a survey sent to all of the organization's subscribers— approximately 7,000 federal and State inmates.  Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 107:05-18; *see also id*. at 110:12-18 (Mr. Lydon explained that survey respondents were "chosen through our membership, self-selected.  They are LGBT individuals who are incarcerated in prisons.  We reach prisons in every State across the U.S., and the respondents chose to answer the survey or not.").  About 1,200 responses were obtained, of which 1,100 were considered usable.  *Id*. at 107:21-23.

While Black & Pink's survey was stated to be "the largest ever survey of LGBT people in prison," Mr. Lydon acknowledged that it "was not a random survey." The respondents were not "representative or random," and it was not a "complete" survey of LGBT incarcerated individuals. *Id*. at 111:06-16. Approximately seventy-nine people out of the total 1,100 respondents included in the survey—*i.e.*, about seven percent—were federal inmates. *See id*. at 121:12-14, 130:09-11. This represents about 0.04 percent of all federal inmates (as of July 19, 2016, the BOP reported a total of 194,355 federal inmates, *see* Federal Bureau of Prisons, *Statistics*, https://www.bop.gov/about/statistics/population_statistics.jsp (last visited July 19, 2016)).

Prior to the hearing, the federal respondent data was sorted. *See, e.g.*, Def.'s Ex. V (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Questions 1, 5, 34), Ex. W (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Questions 70-76, 78-79, 81-84), Ex. X (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Question 77a), Ex. Y (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Question 85), Ex. Z (Excerpt from Black & Pink Report: Federal Respondent Answers to Survey Question 41a). Of these federal respondents, sixty-eight percent were gay or bisexual men. *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 109:14-17. Nineteen percent reported being "physically assaulted, either hit, punched, kicked, or beaten by prison staff." *Id*. at 112:08-10. Twenty-two percent stated they had experienced "unwanted touching by a prison staff person," and six percent reported being sexually assaulted or raped by prison staff. *Id*. at 112:17-22. Thirty-two percent stated they had been intentionally placed by prison staff "where they might be at high risk of being sexually assaulted [by] another prisoner." *Id*. at 113:01-04.

The survey was admitted into evidence, but with a finding that it did not meet scientific standards for such work. *Id*. at 112:01-02.

### (2)   Galen Baughman

Defendant sought to qualify Galen Baughman, Open Society Foundation Soros Justice Fellow with the Human Rights Defense Center in Washington, D.C., as an expert witness on "prison conditions including assault, sexual abuse, rapes, and solitary confinement in federal and state prisons."  Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 192:24-193:01.   In his position, Mr. Baughman is a "policy analyst and advocate" who focuses "on the issue of indefinite detention at . . . the federal and state [levels]."  *Id*. at 183:19-25.  Prior to his current position, he was incarcerated for nine years, of which four-and-a-half were spent in solitary confinement.  *See id*. at 191:08-09.  Most of his time was served in State facilities in Virginia.  *Id*. at 191:15-16.  This personal experience motivated him to "be a voice for change to help improve public safety through changing the way we treated people through our system."  *Id*. at 191:09-13.

The government objected to Mr. Baughman as an expert witness.  *See id*. at 193:22-194:22.  His testimony was excluded.  While Mr. Baughman "has extensive knowledge . . . he doesn't have the skill, experience, training or education to testify in a case under [Federal Rule of Evidence] 702."  *Id*. at 197:10-14 (statement of the court).  His testimony as a fact witness was also precluded.  *See id*. at 200:13-14 (finding that the proposed witness could not be qualified "by his personal history" since he never served in a federal prison); *see also id*. at 202:10-13 ("His knowledge is too narrow and it does not apply to the particular issues before us in the Federal Bureau of Prisons and the federal penitentiaries that we're concerned about . . . .").

## I.   Amicus Curiae Briefs

Two *amicus curiae* briefs have been submitted with the consent of the parties and the court.

Lambda Legal Defense and Education Fund, Inc. ("Lambda Legal"), the National Center for Lesbian Rights ("NCLR"), the National Center for Transgender Equality ("NCTE"), and the

Sylvia Rivera Law Project ("SRLP") have submitted a brief, in support of defendant, addressing the vulnerability of gay men generally, and the defendant in particular, to sexual abuse while in government custody. *See* Br. of *Amici Curiae* Lambda Legal, NCLR, NCTE, and SRLP, in Supp. of Def., Mar. 10, 2016, ECF No. 134.

The Washington Lawyers' Committee for Civil Rights and Urban Affairs ("WLC") has submitted a brief addressing the Bureau of Prisons' "overuse of solitary confinement and its failure to properly diagnose and treat mentally ill men and women subjected to solitary confinement." *See* Mem. of *Amicus Curiae* WLC, Mar. 10, 2016, ECF No. 135 ("WLC *Amicus Curiae* Mem."), at 1.

Both briefs are included in the record. Non-parties Lambda Legal, NCLR, NCTE, SRLP and WLC were added to the case as *amici*. *See* Order, Mar. 11, 2016, ECF No. 136.

## IV.    Sentencing Considerations

The main question presented is whether this defendant must be sentenced to the applicable statutory minimum term of imprisonment of fifteen years; or whether such a sentence, as applied, would amount to cruel and unusual punishment in violation of the United States Constitution.

Prison conditions requested by the court to protect the defendant and the public would permit a fifteen year sentence of incarceration. *See infra* Parts V.D, VI and VII (conditions requested by the court to avoid an Eighth Amendment violation).

Defendant has been convicted of a serious crime; the sexual abuse of a minor. As recognized by this court, this category of defendants "frequently represent[s] the worst and most dangerous type of offender." *United States v. R.V.*, No. 14-CR-0316, --- F. Supp. 3d ----, 2016 WL 270257, at *2 (E.D.N.Y. Jan. 21, 2016).

Substantial punishment is warranted.  First, and most importantly, the public needs to be protected against the possibility of any future acting out.  Incapacitation might be necessary.

Yet, while defendant has been a sex abuser, he has lived most of his life as a victim.  He requires medical treatment and protection.  *See supra* Part II.  The past sexual abuse he himself has suffered, together with the fact that he is gay or bisexual, has a mental illness and is a convicted sex offender, make him a prime candidate for victimization in prison, unless adequate, appropriate precautions are taken.  A sentence of fifteen years, without the protections suggested by the court, would likely be a condemnation to a decade and a half of unconstitutional physical, sexual, and psychological violence, as well as extended periods of debilitating solitary confinement.

Defendant's reentry into the community is also of concern.  As demonstrated following his release from State prison, without the support needed to readjust to society, defendant will continue to present a danger to himself and others.  The effect that a prolonged period of incarceration is likely to have on defendant's ability to reenter the community is vital in assessing the risks he probably will present to the public, and in devising an appropriate sentence and reentry conditions.

Ongoing medical and psychological treatment, including sex offender treatment, is needed.  Assistance with housing and employment must be provided.  Close and strict post-release supervision is imperative.  Support from family and friends is crucial.

The court has addressed these issues in sentencing hearings with the extensive aid of the parties and their experts.  Three sentencing options were presented by the court for the parties' and the experts' consideration:

- A sentence of time served followed by a ten-year period of strict supervised release with immediate and intensive treatment;

- A sentence of about sixty months comprising: about two years of time already served in pretrial detention; an additional twenty-eight to thirty months at a detention facility like the Federal Medical Center in Devens, Massachusetts ("FMC Devens"), providing

specialized sex offender treatment; six months in a halfway house; and a long period of strict supervised release; or

- A sentence of fifteen years to be served in the general population of a medium security prison, which would include credit for time served and allow for about twenty-eight months of treatment at an FMC Devens-type facility either at the beginning or end of the sentence; six months in a halfway house; and a long period of strict supervised release.

*See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 61:09-62:17.

Hearing testimony, documentary evidence, and memoranda were submitted. This section of the memorandum presents the evidence as it relates to the following sentencing concerns: (1) risk of harm to defendant while he is incarcerated (Part IV.A); (2) the BOP's use of solitary confinement to protect and punish inmates (Part IV.B); (3) the BOP's program for sex offenders (Part IV.C); (4) the possible risks posed by defendant to the public and relevant treatment options after release (Part IV.D); and (5) the resources available to defendant upon his reentry into the community to minimize the danger he poses to himself and others. (Part IV.E).

## A.     Risk of Harm to Defendant While in BOP Custody

The relevant BOP framework concerning the protection of vulnerable inmates and use of solitary confinement is set out below. The evidentiary record strongly indicates that the defendant in this case falls within a category of individuals exceptionally vulnerable to abuse while incarcerated. Due to his risk profile, it is likely that D.W. would spend a substantial amount of time in solitary confinement, unless adequate precautions are taken by the BOP.

### 1.     Designation to Medium or High Security Facility

While a sentencing court can make a recommendation to the BOP about where a defendant should serve his prison term, the recommendation is not binding on the Bureau. In imposing a prison term, therefore, the court cannot alone ensure that programs necessary to an appropriate

sentence will be available to a defendant.  In this case it believes cooperation from the BOP is

likely.  *See infra* Part VII.A.

After sentencing, inmates are designated to a correctional facility by the BOP's

Designation and Sentence Computation Center ("DSCC"), "a centralized location where the vast

majority of classification and designation decisions are made."  Alicia Vasquez & Todd Bussert,

*How Federal Prisoners are Placed*, 31 Crim. Just. 19, 20 (Spring 2016) ("Vasquez & Bussert").

The BOP utilizes "an objective classification system that's determined by an individual's security

level . . . ."  Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 64:02-03 (Testimony of Mr. Wise).  The

five available security levels are "minimum, low, medium, high, or Administrative Max . . . ."  *Id*.

at 64:04.  "An institution's security level assignment is based on its level of staff supervision

(inmate-to-staff ratio) and security measures, such as external patrols, towers, perimeter barriers,

and internal security."  Vasquez & Bussert at 19.

To determine the security level of an inmate, BOP officials focus mainly on the PSR

prepared by the Probation Department.  The determinative issues are whether the inmate is violent

and whether the offense is a violent one.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 93:23-25

(Testimony of Mr. Wise).  Once an inmate is assigned a security level, he or she is generally

designated to a facility that is within that level.  *See id*. at 64:02-08.  Some factors may override

the security level designation.  For example, as a convicted sex offender, D.W. would not be

eligible to be placed in camps—lower security facilities generally offering more programming

opportunities for inmates.  *See id*. at 64:09-16.  Application of a public safety factor or a

management variable may also affect an inmate's placement:

> The application of a [public safety factor], which is not confined to
> evidence of convictions, is intended to address information
> suggesting a need for greater security precautions.  Examples
> include sentence length, removable alien status, sex offender status,

and threat to a government official.  Management variables are grounded in the "professional judgment of bureau staff" and are used to effectuate an inmate's placement at a facility inconsistent with the inmate's scored security level.  This most commonly occurs when an inmate poses either a greater or lesser security risk than his or her assigned security level denotes or to facilitate program participation (e.g., permit completion of residential drug treatment despite a drop in security level).

Vasquez & Bussert at 21.

Also to be considered is the Judgment and Commitment Order—including any recommendation from the sentencing judge—and any applicable sentencing objectives.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 64:17-65:09 (Testimony of Mr. Wise).  Ms. Rodman testified:

> [Q.]   Does the BOP also try to incorporate judicial input on these issues?
>
> A.   Yes, we do.
>
> Q.   How does that work?
>
> A.   The judge would put the recommendations on the actual Judgment and Commitment order.
>
> Q.   Okay.  What kind of recommendations is the BOP receptive to receiving?
>
> A.   Programming or geographical location are ordinarily the ones that we get frequently.
>
> Q.   Can a judge also just highlight concerns he has?
>
> A.   Absolutely.

*Id*. at 179:02-13; *see also* Vasquez & Bussert at 20 (stating that "[t]he designation process begins when the case documents—the judgment and commitment order, the presentence report (PSR), and the marshals request for designation (USMS 129)—are uploaded to eDesignate and electronically transmitted to the [BOP's Designation and Sentence Computation Center]" and noting "the critical role that the PSR plays in the designation process").

64

Congress has directed the BOP to take into consideration any statement made by the sentencing court "concerning the purposes for which the sentence to imprisonment was determined to be warranted" or "recommending a type of penal or correctional facility as appropriate."  18 U.S.C. § 3621(b)(4).  While judicial recommendations are not binding, the Bureau strives to follow them where possible.  Recent BOP data indicates that "the *Bureau currently complies with 74 percent of recommendations*, wholly or in part."  Vasquez & Bussert at 21 (emphasis added).  Practical realities may sometimes limit the extent to which the BOP will implement a judge's recommendation:

> Although they are not binding, Congress has directed the BOP to account for judicial recommendations relative to placement and programming decisions.  The Bureau strives to follow all judicial recommendations where possible, recognizing that they "are carefully thought out and are important to" sentencing courts.  *According to BOP data, the Bureau currently complies with 74 percent of recommendations, wholly or in part.*
>
> Recommendations are usually set forth in the judgment and commitment order's imprisonment section. . . . Courts may wish to frame recommendations in terms of the reasons underlying them.
>
> . . .
>
> Despite best efforts, the Bureau may be unable to follow courts' recommendations due to conflict with policy or sound correctional management.  Reasons for not meeting recommendations vary.  For one, a recommendation may be for placement at an institution that is not commensurate with an offender's security level (e.g., to a low security prison where the offender qualifies for medium security) or at [an] institution without capacity to accept additional inmates at the time of designation.  There may also be security considerations, such as separatee issues (avoiding placement of an offender with a codefendant against whom he or she cooperated, or vice versa) or efforts to balance populations of known gang members through the system.  Finally, a recommended program may not be offered at the institution recommended . . . .

*Id.* (emphasis added).

This description of the Bureau's attempts to comply with judicial recommendations was

confirmed by Mr. Wise at the evidentiary hearing:

> Q. What role does that recommendation, or what weight [is] that recommendation given in the Bureau's designation?

> A. It's been my experience *it's always considered*. They'll look at that and they'll consider it. If it's within the realm of policy, their existing policy, if it's an appropriate designation, they'll try to satisfy that recommendation, but if it's outside their policy, their classification system, they generally won't follow the recommendation.

> Q. And are there other reasons why, in individual cases, a judge's recommendation is not followed?

> A. Sure. It could be population pressures, there may be no beds available at a particular facility, or it may be overcrowded . . . .

> There may be some overriding issues that would mandate a different kind of placement; for example, the Court might recommend a particular correctional facility, but the individual has medical problems that can't be addressed at that facility and has to go to a different kind for mental health problems.

> So there are other reasons for not following a judicial recommendation besides just that it's outside the custody level or security level . . . .

Hr'g Tr., Nov. 23, 2015, ECF No.101, at 65:10-66:07 (emphasis added).

Determinations as to which inmates will be housed in one of the BOP's nine Sex Offender

Management Programs (*see infra* Part IV.C.1) are also made by the BOP through its DSCC unit.

Access to intensive resident Sex Offender Treatment Programs is usually limited to the last three

years of an offender's sentence, and participation is voluntary:

> [C]ourts need not recommend sex offender treatment or placement in one of the Bureau's nine sex offender management programs (SOMPs). Inmate participation in sex offender treatment is wholly voluntary and limited to the final portion of an offender's sentence, that is, the last approximate three years depending on severity of

66

> need.  Further, determinations as to which inmates will be housed at a SOMP are made by DSCC officials.  It is often the case that certain sex offenders (e.g., an inmate convicted of possession of child pornography with no history of inappropriate contact with minors) will be housed in FCI general populations.

Vasquez & Bussert at 21-22; *see also infra* Part IV.C.

In the instant case, the parties agreed that D.W. is likely to be classified as either a medium or high security inmate.  *See, e.g.*, Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 67:03-12 (Testimony of Mr. Wise).  He would therefore be ineligible for designation to low-security facilities.  *Id*. at 67:13-22 (Mr. Wise explained that if D.W. "scores for medium security or high security, he's got to go, unless there's some really significant overriding reason, he's going to go to at least a medium-security facility"); *see also id*. at 67:24-68:04 (explaining that if D.W. were classified as a high security prisoner, he could potentially be assigned to a medium security facility; "because of some vulnerability issues that [the BOP] may perceive . . . even if he scores in the high security level they may drop him to a medium").

Medium or high security facilities are inherently more dangerous than lower security ones, as explained by Mr. Wise:

> As you get into the medium and high-security level institutions, *you're dealing with inmates with longer sentences, more sophisticated criminal backgrounds, greater histories of violence*. They know they're going to be there for a substantial period of time. [I]n the lower security levels, they may tolerate things for a while. In the higher security level institutions, *they know they're going to have to deal with this for a long time; and so, it's -- they're somewhat less tolerant*.

*Id*. at 71:14-22 (emphasis added).  The dangers faced by defendant are likely to be compounded by the overcrowding plaguing most BOP institutions.  *See Transforming Prisons, Restoring Lives*, Charles Colson Task Force on Federal Corrections Final Recommendations 15-17 (Jan. 2016) (describing the "overcrowding and poor conditions of confinement" in the federal prison system).

Overcrowding increases security risks and limits the availability of services such as medical treatment and other programs. *See id*. at 17 ("In addition to creating security problems, overcrowding undermines the BOP's ability to provide programs, health services, case planning, and treatment that can help those in prison successfully return to the community."); *cf. Brown v. Plata*, 563 U.S. 493, 517-26 (2011) (overcrowding in California State prison was primary cause of Eighth Amendment violations).

### 2.    Prison Rape Elimination Act ("PREA")

The government has long recognized that prison rape is a problem.  It has taken serious steps to tackle this pervasive issue.   Yet, despite its efforts, rape and other forms of sexual assault continue to occur in BOP facilities.

In 2003 Congress passed the Prison Rape Elimination Act ("PREA").  *See* 42 U.S.C. §§ 15601-15609 (2003).  PREA was a response to reports of the high prevalence of male rape in prison.

Congress found that although "[i]nsufficient research has been conducted and insufficient data reported on the extent of prison rape . . . experts have conservatively estimated that at least 13 percent of the inmates in the United States have been sexually assaulted in prison," with several inmates suffering "repeated assaults."  *Id*. at § 15601(2).  It was observed that inmates suffering from mental illness and young offenders were at greater risk of sexual victimization.  *Id*. at § 15601(3).

PREA recognized that inmates who experience sexual violence in prison are less likely to successfully reenter society.  The Act notes that "[v]ictims of prison rape suffer severe physical and psychological effects that hinder their ability to integrate into the community and maintain stable employment upon their release from prison."  *Id*. at § 15601(11).  Sexually assaulted inmates

68

are also more likely to commit crimes once they reenter their communities. *Id*. at § 15601(8) ("Prison rape endangers the public safety by making brutalized inmates more likely to commit crimes when they are released[.]").

Recognizing that "[t]he high incidence of sexual assault within prisons involves actual and potential violations of the United States Constitution," PREA created the National Prison Rape Elimination Commission ("NPREC"). *Id*. at §§ 15601(13), 15606. The NPREC was tasked with issuing a report on the impact of prison rape and recommendations as to national standards aimed at improving the "detection, prevention, reduction, and punishment of prison rape." *Id*. at § 15606(e).

A report and recommendations were issued in June 2009. *See* National Prison Rape Elimination Commission Report (June 2009), https://www.ncjrs.gov/pdffiles1/226680.pdf. Based in part on that report, the Department of Justice issued proposed rules in 2011, which were implemented the following year and are binding upon the BOP. *See* National Standards to Prevent, Detect, and Respond to Prison Rape, 76 Fed. Reg. 6248-6302 (Feb. 3, 2011); 28 C.F.R. § 115 (2012); 42 U.S.C. § 15607.

The rules address, among other issues: supervision and monitoring to protect inmates against sexual abuse; training of staff "on key topics related to preventing, detecting, and responding to sexual abuse;" the screening of inmates "for [the] risk of being sexually abused," providing that the "screening information be used to inform housing, bed, work, education, and program assignments," with the goal of keeping inmates "at high risk of victimization away from those at high risk of committing abuse;" the provision of medical and mental health care; and improved processes for the submission of grievances by inmates. *See* Gov't Opp'n Post-Hr'g

Mem., Ex. 701 (Executive Summary, National Standards to Prevent, Detect, and Respond to Prison Rape, Dep't of Justice Final Rule (May 2012)) at 4-9.

### a)      BOP PREA Program Statement

The BOP's Program Statement on Sexually Abusive Behavior Prevention and Intervention Program ("PREA Program Statement") provides a written policy implementing the rules adopted pursuant to PREA.  *See* Def.'s Ex. R (BOP Program Statement, Sexually Abusive Behavior Prevention and Intervention Program (June 4, 2015) ("PREA Program Statement")).  It provides guidelines to address sexually abusive behavior in BOP facilities, including between inmates, as well as between inmates and staff members.  Included is the binding language from the federal regulations and the BOP implementing instructions.  The purpose of the guidelines is to help detect incidents, prevent sexually abusive behavior, educate staff on how to timely and appropriately intervene, as well as document, report and investigate incidents, and discipline perpetrators.  *See id*. at 1.

Pursuant to the PREA Program Statement, all incoming inmates are to be screened "for risk of victimization and abusiveness" within 72 hours of entering an institution.  *Id*. at § 115.41.  "[A]t a minimum," the intake screening shall consider the following factors in order to determine an inmate's risk of being subjected to sexual abuse:

(1)      Whether the inmate has a mental, physical, or developmental disability;

(2)      The age of the inmate;

(3)      The physical build of the inmate;

(4)      Whether the inmate has previously been incarcerated;

(5)      Whether the inmate's criminal history is exclusively nonviolent;

70

(6)     Whether the inmate has prior convictions for sex offenses against an adult or child;

(7)     Whether the inmate is or is perceived to be gay, lesbian, bisexual, transgender, intersex, or gender nonconforming;

(8)     Whether the inmate has previously experienced sexual victimization;

(9)     The inmate's own perception of vulnerability; and

(10)    Whether the inmate is detained solely for civil immigration purposes.

*Id*. at § 115.41(d).

The guidelines expressly recognize that inmates may possess several characteristics rendering them vulnerable to sexual abuse while in prison:

> Some inmates are "at risk" for victimization due to one or a combination of factors such as physical appearance (small in stature, effeminate, etc.); demeanor (weak/nonassertive, anxious, depressed); special situations (e.g., high-profile, sexual activity with a child, first-time offender); or special needs (cognitive limitations, social inadequacy, developmental disability, etc.).

*Id*. An inmate's "risk of victimization or abusiveness" is to be reassessed "within a set time period, not to exceed 30 days from the inmate's arrival at the facility" as well as "when warranted due to a referral, request, incident of sexual abuse, or receipt of additional information that bears on the inmate's risk of sexual victimization or abusiveness."  *Id*. at § 115.41(f)-(g).

The information obtained through this initial screening process is then to be used to:

> inform housing, bed, work, education, and program assignments with the goal of keeping separate those inmates at high risk of being sexually victimized from those at high risk of being sexually abusive.

> Once an inmate has been identified as a victim or perpetrator, or as "at risk" for victimization or perpetration, Unit Management should review classification options.  These options may include transfer to a special treatment program (e.g., Sex Offender Management Program), transfer to a greater or lesser security facility (e.g., management variable), application of a [public safety factor] (e.g.,

71

> sex offender), or changes in housing units, cell assignments, work
> assignments, and/or education assignments.

*Id.* at § 115.42(a); *see also* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 148:21-25 (Ms. Rodman

testifying that the purpose of the provisions is "[t]o ensure the appropriate housing and program

and treatment options for inmates").  The information is also used to determine whether an inmate

should be referred to Psychology Services for treatment.  *See* Hr'g Tr., Nov. 23, 2015, ECF No.

101, at 149:25-150:06.

### b)      BOP PREA Intake Screening

In order to elicit this information, upon arrival to a BOP facility, an "intake screening form"

is filled out.  The form includes questions aimed at determining the risks associated with placing

the particular inmate in the general population.  An excerpt from the form is set out below:

```
******************   I N M A T E   I N T E R V I E W   ******************

DATE / TIME ARRIVED:  _____  _____       TIME INTERVIEWED:  _____

1)  DO YOU KNOW OF ANY REASON THAT YOU SHOULD NOT BE
    PLACED IN GENERAL POPULATION ?                       YES ___  NO ___

2)  HAVE YOU ASSISTED LAW ENFORCEMENT AGENTS IN ANY WAY ?  YES ___  NO ___

3)  ARE YOU A CIM CASE ?                                 YES ___  NO ___

4)  HAVE YOU TESTIFIED AGAINST ANYONE IN COURT ?         YES ___  NO ___

5)  ARE YOU A MEMBER/ASSOCIATE OF ANY GANG ?             YES ___  NO ___

6A) HAVE YOU EVER BEEN SEXUALLY ASSAULTED ?              YES ___  NO ___

6B) HAVE YOU RECENTLY BEEN SEXUALLY ASSAULTED ?          YES ___  NO ___

INTERVIEWER COMMENTS:  _____

_____

_____


CIRCLE ONE:
I HAVE / HAVE NOT  RECEIVED A BUREAU OF PRISONS "ADMISSIONS AND
ORIENTATION BOOKLET" DEFINING MY "RIGHTS AND RESPONSIBILITIES" AND THE
"PROHIBITED ACTS AND DISCIPLINARY SEVERITY SCALE".

DO YOU WISH TO SELF-IDENTIFY YOUR SEXUAL
ORIENTATION, GENDER IDENTITY, ANY DISABILITIES,
AND/OR SELF-PERCEPTION OF VULNERABILITY ?     YES ___  NO ___  N/A ___
```

Gov't Opp'n Post-Hr'g Mem., Ex. 103 (Current Inmate Intake Form).

As pointed out by Mr. Wise, the purpose of the form is to ascertain the risks to which a

particular inmate may be exposed:

> I won't go into a long history of the development of the form, but
> there is a long history in the Bureau of why we do this or why the
> Bureau does this.  It has to do with ensuring that it's safe to place an
> inmate in the general population when he first arrives at the
> institution before he is, in fact, placed in the general population.
>
> [T]he intake screening goes back decades, truly decades.  And a
> form like this, not this form but a form similar to this has been in use
> for a very long time in the Bureau.
>
> What they're trying to determine, number one, is if [the inmate] has
> testified against anybody in court that may be in that institution that

73

> might want to hurt him.  They want to know, number two, if there's
> anybody else in that population that might want to hurt him or that
> he might want to hurt.  And the third thing is, generally, are there
> any particular vulnerabilities that would make it dangerous to place
> this guy in the general population. That's the basic reason for the
> form.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 46:06-47:02.

At the time of intake, inmates are provided with a document that sets out the BOP's sexual abuse behavior prevention and intervention program.  *See* Gov't Opp'n Post-Hr'g Mem., Ex. 105 (Federal Bureau of Prisons, *Sexually Abusive Behavior Prevention and Intervention: An Overview for Offenders* (2014)).  The document provides an overview as to what amounts to sexually abusive behavior and includes details on how to prevent or report any incidents.  *See id*.

Once the intake form has been completed, an "objective screening instrument" is used by BOP officials to assess whether the inmate meets any of the risk factors identified in the PREA Program Statement, and whether a referral to Psychology Services is warranted.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 151:19-25 (Testimony of Ms. Rodman); Def.'s Ex. R (PREA Program Statement) at § 115.41(d) and Attachment A, reproduced below.

74

## Attachment A.   PREA Intake Objective Screening Instrument

**Instructions:** Intake screening in the Bureau of Prisons is completed according to the Program Statement **Intake Screening**. In accordance with 28 C.F.R. 115.41 of the Prison Rape Elimination Act regulations, staff use this instrument when conducting intake screening per the Program Statement. Any specific information must be noted in the comment sections of the Intake Screening Form. If none of the criteria below apply, staff must make an entry stating "No PREA criteria met," in the comment section applicable to victimization or abusiveness.

| RISK OF VICTIMIZATION | | |
|---|---|---|
| **Factor** | **Objective Criteria** | **Referral Guidance** |
| Answers to Intake Screening Form | Questions 1, 6a, 6b, concerning history of sexual assault and inmate perception of whether he can be housed in general population. | If inmate responds yes to any of the questions, refer to Psychology Services in all cases. |
| General Physical Appearance and Presentation | Inmate is under 21 or over 65; <br><br> Inmate has small physical stature (5'6, 120 lbs or under for males; 5'0 and 118 lbs or under for females). <br><br> Developmental/mental/medical disability, if apparent or identified as SCRN4-MH, SCRN3-MH, CARE4-MH, CARE3-MH, SCRN4, SCRN3, CARE4, CARE 3. <br><br> Inmate is or may be perceived to be gay, lesbian, bisexual, transgender, intersex, or gender-nonconforming, based on documentation received (e.g., PSR), or correctional judgment would indicate the inmate would have issues being placed in general population. | If inmate meets two or more criteria, leading staff to determine that the inmate is at risk, then consider a referral to Psychology Services. Please take institution security and mission into account in deciding to make the referral (e.g., older inmates with disabilities may not need to be referred at a medical facility). |
| Criminal history from available documentation | Inmate has not previously been incarcerated. <br><br> Inmate's criminal history is exclusively nonviolent. <br><br> Inmate has prior convictions for sex offenses against an adult or child. <br><br> Inmate is in custody solely under civil immigration detention. | Criminal history should be evaluated; however, the existence of only one of these factors alone may not warrant a referral to Psychology Services based on the security level of the institution and mission of the facility (e.g., SOMP sites). |
| **RISK OF ABUSIVENESS** | | |
| Documented history of abusiveness, from available documentation (PSR, incident reports, etc.) | Inmate has prior acts of sexual abuse. <br><br> Inmate has prior convictions for violent offenses. <br><br> Inmate has history of prior institutional violence or sexual abuse. | Referral to Psychology Services should be made if inmate previously perpetrated sexual abuse in community or in an institutional setting. Staff must notify Correctional Services of the inmate's history of predation to ensure that appropriate steps (investigation, documentation, CIMS concerns, etc.) have been taken. The Chief of Correctional Services also updates a current SENTRY STG assignment. |

### 3.  Limitations of PREA

According to Mr. Wise, PREA achieved three main objectives: (1) it eases reporting of issues by inmates and by staff and protects them when they do report; (2) it helps codify and ensure the identification of vulnerable inmates; and (3) it requires a substantial amount of reporting and recordkeeping, to "identify what is going on there and what may be causing sexual assaults."  Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 101:18-102:02.

The parties and experts agree that, although the BOP has made progress in addressing physical and sexual abuse in its facilities, the problem is far from being solved.  *See, e.g.*, Gov't Opp'n Post-Hr'g Mem. at 30 ("The defendant points out in his brief that, by certain measures, the rate of sexual assault in prison has not dropped since the imposition of PREA.  *This is true*.") (emphasis added); *id*. at 42 (noting that the collection of data mandated by PREA "clearly indicate[s] that sexual assault persists as a problem in the prison context to a certain degree").

Sexual assaults in prisons, including staff abuse of inmates, continue to be a reality.  Ms. Rodman acknowledged as much:

> Q.    You described a real comprehensive set of regulations and efforts to implement PREA.  But, unfortunately, although it was called the Prison Rape Elimination Act, it has not, in fact, eliminated sexual assaults in prison?
>
> A.    Correct.
>
> Q.    That continues to happen -- people get sexually assaulted?
>
> A.    They can.
>
>        . . .
>
> Q.    [PREA] hasn't eliminated staff abuse of inmates?
>
> A.    *I don't think anything will*.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 179:20-180:02 and 193:01-02 (emphasis added); *see also* Br. of *Amici Curiae* Lambda Legal, NCLR, NCTE, and SRLP, in Supp. of Def., Mar. 10, 2016, ECF No. 134 at 17 (noting that PREA's goals are "significantly unfulfilled, and abuse of vulnerable prisoners persists").

The Department of Justice's Bureau of Statistics noted that, comparing data from 2011 and 2012 to previous years, the rate of sexual victimization had not changed in a statistically significant way:

> Using the same methodology since 2007, *the change in rate of sexual victimization* among state and federal prison inmates over the three surveys (4.5% in 2007, 4.4% in 2008–09, and 4.0% in 2011–12) *was not statistically significant*. Among jail inmates, the rate of sexual victimization was nearly unchanged—3.2% in 2007, 3.1% in 2008–09, and 3.2% in 2011–12.

Def.'s Ex. NN (PREA Data from Bureau of Justice Statistics (2014)) at 3 (emphasis added). A further breakdown of the data is included in the table below:

**TABLE 2**
**Prevalence of sexual victimization across inmate surveys, by type of incident, National Inmate Survey, 2007, 2008–09, and 2011–12**

| Type of incident | Percent of prison inmates | | | Percent of jail inmates | | |
|---|---|---|---|---|---|---|
| | NIS-1 2007 | NIS-2 2008–09 | NIS-3 2011–12* | NIS-1 2007 | NIS-2 2008–09 | NIS-3 2011–12* |
| Total | 4.5% | 4.4% | 4.0% | 3.2% | 3.1% | 3.2% |
| Inmate-on-inmate | 2.1% | 2.1% | 2.0% | 1.6% | 1.5% | 1.6% |
| Nonconsensual sexual acts | 1.3 | 1.0 | 1.1 | 0.7 | 0.8 | 0.7 |
| Abusive sexual contacts only | 0.8 | 1.0 | 1.0 | 0.9 | 0.7** | 0.9 |
| Staff sexual misconduct | 2.9% | 2.8% | 2.4% | 2.0% | 2.0% | 1.8% |
| Unwilling activity | 1.7 | 1.7 | 1.5 | 1.3 | 1.5 | 1.4 |
| Excluding touching | 1.3 | 1.3 | 1.1 | 1.1 | 1.1 | 1.0 |
| Touching only | 0.4 | 0.4 | 0.4 | 0.3 | 0.4 | 0.3 |
| Willing activity | 1.7 | 1.8** | 1.4 | 1.1** | 1.1** | 0.9 |
| Excluding touching | 1.5** | 1.5** | 1.2 | 0.9** | 0.9** | 0.7 |
| Touching only | 0.2 | 0.3 | 0.2 | 0.2 | 0.2 | 0.1 |

Note: Detail may not sum to total because inmates may report more than one type of victimization. They may also report victimization by both other inmates and staff. See appendix table 10 for standard errors.
*Comparison group.
**Difference with comparison group is significant at the 95%-confidence level. (See Methodology for tests of significance.)
Source: Bureau of Justice Statistics, National Inmate Survey, 2007, 2008–09, and 2011–12.

Def.'s Ex. H (Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (May 2013)) at 10.

PREA's impact is also limited in that it only relates to sexual assaults; it does not cover other types of harm or physical abuse.  Ms. Rodman testified:

> Q.    PREA is about sexual assaults; right?
>
> A.    Right.
>
> Q.    But vulnerable inmates get beaten up; correct?
>
> A.    There are assaults in prison.
>
> Q.    A lot of assaults in the Bureau of Prisons?
>
> A.    There are a number.
>
> Q.    Right.  Thousands every year?
>
> A.    Yes.
>
> . . .
>
> Q.    Inmates get killed at times in the Bureau?
>
> A.    Yes.
>
> Q.    And inmates who are more vulnerable for a variety of reasons are more susceptible to being harmed . . . ?
>
> A.    Yes, and that's why we have regulations to ensure their safety.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 180:07-181:03; *see also id.* at 102:03-08 (Mr. Wise testified that while PREA helps, it only deals with sexual assaults; most assaults that occur in the BOP are not sexual).

### 4.    Characteristics Rendering Defendant Highly Vulnerable

The experts recognized that some inmates are more vulnerable than others and will have a particularly hard time adjusting to incarceration.  As acknowledged by the BOP, several factors render an inmate especially susceptible to abuse while in prison.  They include being perceived as gay, having been a victim of sexual abuse in the past, suffering from mental illness, and being a

known sex offender, particularly against children.  *See, e.g.*, Def.'s Ex. R (PREA Program Statement) at § 115.41(d).  An individual with *any one* of these characteristics is considered especially vulnerable to physical or sexual assault while incarcerated.

This is confirmed by the data in the table below, from the Bureau of Justice Statistics' 2011-2012 National Inmate Survey.  The table indicates a significantly higher incidence of sexual victimization among non-heterosexual inmates and inmates who reported having been previously sexually abused:

**TABLE 8**
**Prevalence of sexual victimization, by type of incident and inmate sexual characteristics, National Inmate Survey, 2011–12**

| Sexual characteristic | Prison inmates reporting sexual victimization[a] | | | Jail inmates reporting sexual victimization[a] | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of inmates[b] | Inmate-on-inmate | Staff sexual misconduct | Number of inmates[b] | Inmate-on-inmate | Staff sexual misconduct |
| **Sexual orientation** | | | | | | |
| Heterosexual* | 1,298,000 | 1.2% | 2.1% | 654,500 | 1.2% | 1.7% |
| Non-heterosexual[c] | 111,500 | 12.2%** | 5.4%** | 50,100 | 8.5%** | 4.3%** |
| **Number of sexual partners** | | | | | | |
| 0–1* | 227,500 | 1.1% | 1.2% | 106,900 | 1.5% | 1.1% |
| 2–4 | 173,300 | 2.3%** | 1.6 | 99,900 | 1.7 | 1.4 |
| 5–10 | 242,200 | 2.1%** | 1.5 | 127,800 | 1.6 | 1.2 |
| 11–20 | 218,500 | 2.5%** | 2.9%** | 117,100 | 1.8 | 1.6 |
| 21 or more | 491,700 | 1.9%** | 2.8%** | 234,600 | 1.8 | 2.9%** |
| **Prior sexual victimization** | | | | | | |
| Yes | 178,800 | 12.0%** | 6.7%** | 94,200 | 8.3%** | 5.1%** |
| No* | 1,262,500 | 0.6 | 1.8 | 625,800 | 0.6 | 1.3 |

Note: See appendix table 12 for standard errors.

*Comparison group.

**Difference with comparison group is significant at the 95%-confidence level.

[a]Percent of inmates reporting one or more incidents of sexual victimization involving another inmate or facility staff in the past 12 months or since admission to the facility, if less than 12 months.

[b]Estimated number of inmates at midyear 2011 and yearend 2011  in prisons and jails represented by NIS-3, excluding inmates under age 18. Estimates have been rounded to the nearest 100.

[c]Includes gay, lesbian, bisexual, and other sexual orientations.

Source: Bureau of Justice Statistics, National Inmate Survey, 2011–12.

Def.'s Ex. H (Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (May 2013)) at 18.

D.W. possesses nearly every factor of vulnerability identified by the BOP as well as the experts in the instant case.  He is young, identifies as gay or bisexual, suffers from mental illness,

has experienced repeated sexual abuse in the past, and is a convicted sex offender of children.  The

experts agree that his potential for victimization is compounded.  Mr. Wise explained:

> [D.W. is] young; he is identifiable as gay; he has been sexually
> assaulted in the past; and he's charged with a sex offense that
> involves children.   Those all make him *substantially more*
> *vulnerable than he might otherwise be*. . . . [H]e also has a mental
> health history.  That can also be a factor for vulnerability.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 35:14-20 (emphasis added).  Mr. Trate agreed that

defendant's characteristics make him particularly susceptible to abuse while in prison:

> Q.      [D.W.] is a sex offender?
>
> A.      Yes.
>
> Q.      He's young?
>
> A.      Yes.
>
>         . . .
>
> Q.      He has mental health issues?
>
> A.      Yes.
>
>         . . .
>
> Q.      He's been the victim of rape?
>
> A.      Yes.
>
> Q.      He's gay?
>
> A.      Yes.
>
> Q.      *And those are all specific characteristics that make someone*
>         *among the most vulnerable to both sexual and non-sexual*
>         *abuse; is that right*?
>
> A.      *Yes*.
>
> Q.      *And he exhibits all of those characteristics*?
>
> A.      *Yes*.

> Q.     *And those characteristics compound in terms of your rate of victimization?*
>
> A.     *Yes.*

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 112:09-113:08 (emphasis added).

Mr. Wise testified that other inmates would have no difficulty in finding out details about

D.W., including the fact that he had been on suicide watch at the MDC, his prior incident reports,

and the nature of his offense:

> [D.W. is] coming from another BOP facility so there are inmates at the current facility that he's at, know his history, know what's happened to him there.  They probably know he's been on suicide watch.  They probably know about the incident reports that he's had.  They also probably know his offense characteristics and they know the type of unit he's come down from when he transfers. . . .
>
> [I]nmates have an extraordinary grapevine and a way of getting information from one facility to the next.  It's either through inmates that may be transferred with him from Brooklyn, so that when they get to a transportation center in Oklahoma City they tell other inmates about him and that goes on with him to the next stop and eventually to his ultimate destination.
>
> They also talk to family, friends, people in the community and have them relay that information to somebody else in another institution [it] really is a pretty sophisticated network that works fairly well.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 72:02-19.  He explained that with this information readily

available to the prison population it would be easy for some inmates to recognize and exploit

defendant's vulnerabilities:

> Inmates are very, very good at reading vulnerabilities, both amongst themselves and with staff, and exploiting those vulnerabilities for their own reasons or purposes.  And they're just masters at recognizing and taking advantage of vulnerabilities.

*Id.* at 39:02-06.

This inmate focus would greatly increase D.W.'s risk of being assaulted.  According to Mr.

Wise, D.W. would likely face pressures from other prisoners to "check in"—meaning get out of

the general population and into protective custody.  *See infra* Part IV.B (describing the BOP's use

of segregated housing, including protective custody).  The pressure could take the form of veiled

threats or outright assault:

> Q.  And you spoke earlier about the factors that make [D.W.], in particular, vulnerable.
>
> What types of incidents do you believe he's vulnerable to?
>
> A.  I think he's vulnerable to receiving pressure to check in for -- to get him off the compound.  Keep in mind, that almost all the housing in the Bureau of Prisons is multi-man housing.  A lot of it is two-man cubicles or two-man cells.  There's some pressure on other inmates not to stay assigned to a cell with either a sex offender or a gay man for fear of being perceived as being supportive of those kinds of things.
>
> . . . . What generally happens is whoever he's assigned to bunk with will feel some pressure from the rest of the population not to bunk with him.  Either get in a different cubicle or a different cell.
>
> Eventually, he will -- he may, this is not addressed with [D.W.] specifically, but generally, somebody that's vulnerable may be told, basically, you need to check in, you need to get off the compound.
>
> Q.  And if he doesn't request protective custody?
>
> A.  Then it may escalate to veiled threats or to specific threats.  Those may be delivered to him, or they may be communicated to staff that if you don't get him off the compound something is going to happen.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 75:05-76:04.

The factors that make defendant uniquely susceptible to sexual and physical abuse in prison

are individually analyzed below.  According to *amici*, due to defendant's combination of

vulnerabilities, "a sentence of 15 years is a sentence to a decade and a half of torture and abuse."

*See* Br. of *Amici Curiae* Lambda Legal, NCLR, NCTE, and SRLP, in Supp. of Def., Mar. 10, 2016,

ECF No. 134 at 16.

a)      **Previous Sexual Victimization**

The fact that D.W. was previously raped, both while in State custody and in foster care,

places him at greater risk of sexual victimization in prison.  According to Mr. Wise, the same

factors that had rendered him a target in the past are likely to lead to abuse in the future:

> [T]he study done by the Bureau of Justice Statistics . . . on sexual victimization in prison shows pretty clearly that those previously assaulted in prison are more likely to be assaulted than the general population, as . . . gay inmates are more likely to be assaulted than straight inmates.
>
> And the kind of thinking about how does one inmate know that one was previously assaulted . . . if an inmate was sexually assaulted in the past, there was some trigger for that.  Either he was perceived as vulnerable, he was perceived as a target by some inmate somewhere else; and *the probability is that those same reasons for him being targeted before are still there and are likely to be perceived by inmates again in the future*.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 38:14-39:02 (emphasis added).

*Amicus* Washington Lawyers' Committee for Civil Rights and Urban Affairs explained

that having been previously sexually victimized renders prisoners more vulnerable to abuse:

> Indeed, studies have confirmed many of the factors that mark an incoming prisoner as a target for sexual assault.  Key among those is having been a victim of a prior sexual assault while imprisoned.  As Professor Sharron Dolovich observed: "Whatever method is used to force the victim to submit to sexual penetration, once this aim is accomplished, the victim is redefined in the prison culture as a 'punk.'  This experience of being 'punked' will signify only the beginning of his sexual victimization; as even the federal courts have recognized, '[o]nce raped, an inmate is marked as a victim and is subsequently vulnerable to repeated violation.'"  A rape victim would likely be forced to fight or submit to further sexual assault upon arrival at a BOP facility.  Studies have found that "sexual abuse victims are more often inmates who are unwilling to fight."  One of the consequences of this disturbing dynamic is clear: it is far more likely that an *already victimized inmate will continue to be sexually abused in prison*.

WLC *Amicus Curiae* Mem. at 14 (emphasis added) (footnotes omitted).

The data from the Bureau of Justice Statistics shows that for the 2011-2012 period, the sexual assault rate for inmates who were abused in the past was twelve percent, compared to six-tenths of one percent for inmates who had never been sexually assaulted. Def.'s Ex. H (Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (May 2013)) at 18. According to Mr. Wise, this "dramatic difference" is "probably based on the idea that whatever was triggering that earlier assault is still a part of that inmate and is still perceived by other inmates as a potential for assault." Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 41:03-07.

### b)      Sexual Orientation

The fact that D.W. identifies and is identifiable as gay or bisexual makes him more attractive to sexual predators. According to Mr. Wise, D.W.'s actual or perceived sexual orientation may be "misinterpreted as a message that he might be interested in sexual activity in prison." *Id*. at 36:03-06. The government recognized that gay inmates are at greater risk of assault. *See* Gov't Opp'n Post-Hr'g Mem. at 41-42 ("[A]ccording to studies done by the Department of Justice, the rates of assault of gay inmates are higher than those of heterosexual inmates.").

In its 2009 report, the National Prison Rape Elimination Commission stressed the vulnerability of LGBT inmates in prison due to, among other reasons, the existence of strict gender stereotypes and the risk that their consent to sexual activity may be presumed by officials:

> Research on sexual abuse in correctional facilities consistently documents the vulnerability of men and women with nonheterosexual orientations (gay, lesbian, or bisexual) as well as individuals whose sex at birth and current gender identity do not correspond (transgender or intersex) . . . . *The discrimination, hostility, and violence members of these groups often face in American society are amplified in correctional environments and may be expressed by staff as well as other incarcerated persons*.
>
> Men's correctional facilities tend to have very rigid cultures that reward extreme masculinity and aggression and perpetuate negative stereotypes about men who act or appear different. In this

> environment, gay, bisexual, and gender-nonconforming individuals are often the targets of sexual abuse precisely because the dominant "straight" males expect and demand submission.  Criminal justice research indicates that some *officials "erroneously assume that inmates who are homosexual or presumed to be homosexual are consenting to the sexual act," which may cause them to ignore those incidents*.

*See* National Prison Rape Elimination Commission Report (June 2009) at 73 (emphasis added).

Despite the passage of PREA, the Bureau of Justice Statistics indicates that non-heterosexual inmates continue to experience greater rates of abuse:

> *Inmates who reported their sexual orientation as gay, lesbian, bisexual, or other were among those with the highest rates of sexual victimization in 2011–12.*  Among non-heterosexual inmates, 12.2% of prisoners and 8.5% of jail inmates reported being sexually victimized by another inmate; 5.4% of prisoners and 4.3% of jail inmates reported being victimized by staff.

Def.'s Ex. TT (PREA Data from Bureau of Justice Statistics (2013)) at 2 (emphasis added).

According to the Bureau of Justice Statistics 2011-2012 survey, non-heterosexual inmates in "*each demographic subgroup* (sex, race or Hispanic origin, age and education) . . . *reported higher rates of inmate-on-inmate sexual victimization than heterosexual inmates*."  Def.'s Ex. H (Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (May 2013)) at 7 (emphasis added); *see also* Br. of *Amici Curiae* Lambda Legal, NCLR, NCTE, and SRLP, in Supp. of Def., Mar. 10, 2016, ECF No. 134 at 15 ("Despite the goals of PREA and the standards implementing the law, *rape is an additional punishment, beyond the term of incarceration itself, for overwhelming numbers of LGBT prisoners*.") (emphasis added).

### c)  Mental Illness

Individuals suffering from mental illness have been found to be at greater risk of sexual assault than other prisoners.  According to the Bureau of Justice Statistics, for the year 2011-2012 inmates suffering from mental illnesses reported higher rates of sexual victimization:

Inmates with a history of mental health problems reported higher rates of sexual victimization than other inmates in 2011–12.  Among inmates who had been told they had a specific disorder as specified in the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV), an estimated 3.8% of prison inmates and 2.9% of jail inmates reported that they were sexually victimized by another inmate.

Among state and federal prison inmates, an estimated 6.3% of those identified with serious psychological distress reported that they were sexually victimized by another inmate.  In comparison, among prisoners with no indication of mental illness, 0.7% reported being victimized by another inmate.

Similar differences were reported by jail inmates with and without mental health problems.  An estimated 3.6% of those identified with serious psychological distress reported inmate-on-inmate sexual victimization, compared to 0.7% of inmates with no indication of mental health problems.

Def.'s Ex. TT (PREA Data from Bureau of Justice Statistics (2013)) at 2.

LGBT prisoners suffering from mental illness were, in turn, more likely to be victimized by other inmates.  The Bureau of Justice Statistics found that, "[a]mong inmates with serious psychological distress, *non-heterosexual inmates* reported the highest rates of inmate-on-inmate sexual victimization."  Def.'s Ex. H (Bureau of Justice Statistics, Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12 (May 2013)) at 7 (emphasis added).

Mr. Wise testified that individuals such as D.W. suffering from bipolar disorder can face special difficulties if they do not take prescribed medications.  He explained that an inmate may not receive his required pharmaceuticals for a variety of reasons, including unavailability during transfer between housing units and because of the high pressures experienced by medical staff in critically overcrowded BOP facilities:

Q.   Now, I know you have a lot of experience in the provision of medical services and medication within the BOP.  What are the circumstances which would lead to an inmate not receiving his psychiatric medications? . . .

86

A.     [A]ny time you get moved, if he moves from his housing unit to another housing unit or into a special housing unit or transfer into another institution, those are all kind of key vulnerable points for medication failure, not getting him his medicine at the right dosage when he needs it. . . .

[T]he Bureau is pretty overcrowded right now and health services particularly is stressed with the load they carry. So it's entirely possible for and does happen occasionally, it's not routine and it doesn't happen all the time, but it does happen occasionally that a prescription will expire and it will be some time before they can get that renewed or get it back on the shelf and get it to the inmate.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 42:15-43:11.

In D.W.'s case, Mr. Wise explained, if D.W. were to not receive Depakote, the medication he is currently prescribed, he would "revert to the symptoms" of bipolar disorder. *Id*. at 43:17-21. This, in turn, may make him more susceptible to abuse or to confinement in segregated housing; other inmates may become irritated with his behavior, which may also give rise to incident reports:

[B]ipolar inmates are extraordinarily interesting in a correctional setting. As long as they're maintained on their medicine and they take it regularly and it's well-titrated and they're followed up by mental health staff, if all those conditions are met they do fine and they adjust okay.

The problem comes when they either get off their medications or the medication needs to be re-titrated to different levels or they need to be changed. Then problems, particularly with bipolar inmates, can develop. They often become very difficult with staff. They challenge everything with staff and the same with other inmates. They become very active. They may lose some discrimination in terms of judgment for disciplinary actions. They can be very energetic and engage in things they shouldn't be.

And that may involve other inmates, often does irritate other inmates. Again, they can't get away from this. *If this guy is off his meds and hyper and they get irritated with him and, again, they'll do what they need to make sure that he's out of their space.*

87

*Id.* at 41:20-42:14 (emphasis added); *cf.* Human Rights Watch, *Callous and Cruel: Use of Force Against Inmates with Mental Disabilities in U.S. Jails and Prisons* (May 12, 2015), https://www.hrw.org/report/2015/05/12/callous-and-cruel/use-force-against-inmates-mental-disabilities-us-jails-and (recounting the use of force by prison staff against prisoners with mental disabilities such as bipolar disorder, often in response to behavior symptomatic of the prisoners' mental health problems); *Plata*, 563 U.S. at 519 (in the context of suits brought by mentally ill California prisoners challenging their conditions of confinement, the Supreme Court determined that the "shortfall of [medical] resources relative to demand contributes to significant delays in treatment. Mentally ill prisoners are housed in administrative segregation while awaiting transfer to scarce mental health treatment beds for appropriate care. One correctional officer indicated that he had kept mentally ill prisoners in segregation for 6 months or more. Other prisoners awaiting care are held in tiny, phone-booth sized cages. The record documents instances of prisoners committing suicide while awaiting treatment.") (quotation marks and citations omitted); Eyal Press, *Madness*, New Yorker, May 2, 2016 (describing the severe physical and sexual abuse suffered by mentally ill inmates at Florida's Dade Correctional Institution, as well as the improper use of solitary confinement, and the pressures on inmates and medical staff not to report incidents of violence).

### d)      Sex Offender Status

As a person convicted of a sex offense involving children, D.W. is particularly vulnerable to attack by other inmates. The literature suggests that such sex offenders are at the bottom of the "prison hierarchy" and susceptible to both physical and sexual abuse from staff and inmates:

> [S]ex offenders are a distinct and disfavored category within prison populations, subject to heightened abuse from both corrections officers and fellow inmates. By many reports, sex offenders are

88

> themselves disproportionately likely to be the target of sexual assault in prison.

Alice Ristroph, *Sexual Punishments*, 15 Colum. J. Gender & L. 139, 159-60 (2006) (footnotes omitted); James E. Robertson, *A Clean Heart and an Empty Head: The Supreme Court and Sexual Terrorism in Prison*, 81 N.C. L. Rev. 433, 461-62 (2003) (stating that "[s]ex offenders, especially those convicted of victimizing children, . . . represent an anathema in inmate subculture" where "norms call for their savage beating") (footnotes omitted); *see also* WLC *Amicus Curiae* Mem. at 15-16.

Not unusual are instances of child pornography offenders being brutally beaten—even killed—in prison. *See, e.g.*, Def.'s Ex. O (Federal Tort Claim Notice, Dec. 26, 2013) (detailing the ferocious beating and killing of an elderly inmate convicted of viewing child pornography; he was attacked and murdered while in a transfer cell waiting to be moved to a different facility because of concerns with his safety); Emily Horowitz, *Growing Media and Legal Attention to Sex Offenders: More Safety or More Injustice?* 2007 J. Inst. Just. Int'l Stud. 143, 155-56 (2007) ("Sex offenders are aware that being a murderer is a much less threatening and offensive crime among prison populations. In a Massachusetts prison in 2003, defrocked priest John. J. Geoghan, an elderly convicted child molester, was beaten to death by another inmate while in protective custody.") (citations omitted).

Mr. Wise agreed that convicted sex offenders are more susceptible to abuse while incarcerated. He testified that other inmates would "try to get that offender off the compound, out of the general population." Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 37:06-08. For example, D.W. could be approached by other inmates and told to get himself off the compound. *Id.* at 37:12-17. To do so, D.W. would likely have to seek protective custody or otherwise try to get assigned to the prison's restrictive housing unit. Other ways inmates may try to get an offender "off the

compound" include veiled or overt threats of physical violence, or an "actual assault." *Id.* at 37:18-

21. The expert explained:

> A. [Sex offenders] are more the subject of harassment, abuse and assault by the inmates than are those with most other offenses.
>
> Q. And is that true as well of people who identify as gay, are they more frequently assaulted or victimized?
>
> A. They are. They're more frequently the subject of sexual assault . . . .

*Id.* at 37:24-38:05. Mr. Wise told the court that certain gangs present in medium or high security

facilities, such as the Aryan Brotherhood, "have a code that they absolutely do not tolerate child

molesters or people that are sexually involved with kids and they will drive them off the compound

for assault." *Id.* at 81:22-82:01.

The government's expert, Mr. Trate, acknowledged that there is a minority of sex offenders

who cannot adjust to life in the general population and may be more vulnerable to sexual and other

types of assaults while incarcerated:

> Q. There is a minority of sex offenders today in the Bureau of Prisons, given the current conditions and setup, who are not able to program in general population; is that right or wrong?
>
> A. That could be correct.
>
> Q. And there are certain factors that make you less likely to be able to program in the general population, even within the category of sex offenders?
>
> A. Yes.
>
> . . .
>
> Q. You've said that in general there's some people who are more vulnerable than others. So you can also say that there are some sex offenders who are more vulnerable to sexual assault than others?
>
> A. Yes.

90

> Q.     And you can also say that there are some sex offenders who are more vulnerable to other types of assault than others?
>
> A.     Yes.
>
> Q.     Nonsexual assault?
>
> A.     Yes.
>
> Q.     And to harassment?
>
> A.     Yes.
>
> Q.     And threats?
>
> A.     Yes.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 104:07-15, 105:06-19.


### B.     BOP's Use of Solitary Confinement to Protect and Punish

"Solitary confinement, generally speaking, is the practice of socially isolating a prisoner from the general inmate population and depriving him or her of most environmental stimuli." *Peoples v. Annucci*, No. 11-CV-2694, --- F. Supp. 3d ----, 2016 WL 1464613, at *2 (S.D.N.Y. Apr. 14, 2016).  It has long been used as a form of punishment.  Prisoner isolation is also adopted in response to safety concerns; inmates who are at risk of harm are segregated from the general population for their own protection.  Even though non-punitive, inmates in "protective custody"— as this form of isolation is known—experience the same deprivations as prisoners separated for punitive purposes.

The problem of sexual and physical abuse in prison and the overuse of solitary confinement go hand in hand:  often, the only means of protection available to vulnerable inmates is separation from the general population.  Recently, the government has recognized the need to reduce both the prevalence of sexual abuse in BOP facilities and the use of restrictive housing to protect vulnerable inmates.   As accurately stated by the government in its post-hearing brief:

> The *government's attention to the issue of protective custody is a necessary corollary to its attention to the issue of sexual assault*. The PREA Final Rule and the Program Statement both make clear that the BOP should not solve the safety issues of its inmates by housing them in the SHU.  In such a scenario, solving one problem (ensuring the safety of the inmate) would create a different problem (preventing the inmate from adjusting normally as a result of isolation).  Accordingly, as the government has tackled the problem of sexual assault, it has also had to address the *potential overuse of the SHU as a response to sexual assault*.

Gov't Opp'n Post-Hr'g Mem. at 22 (emphasis added).

Despite the passage and implementation of PREA setting limits on the use of solitary confinement, in the summer of 2015 the Department of Justice had to be directed by President Obama to review "the *overuse* of solitary confinement across American prisons."  *See* Press Release, The White House, Office of the Press Secretary, *Fact Sheet: Department of Justice Review of Solitary Confinement* (Jan. 25, 2016), https://www.whitehouse.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement (emphasis added). As recently as January 2016, announcing the results of that review, President Obama admitted to the continued use of solitary confinement for protective purposes:

> [The Department of Justice] found that there are circumstances when solitary is a necessary tool, such as when certain prisoners must be isolated for their own protection or in order to protect staff and other inmates.  In those cases, the practice should be limited, applied with constraints and used only as a measure of last resort.

Barack Obama, Opinion, *Why We Must Rethink Solitary Confinement*, Wash. Post (Jan. 25, 2016), https://www.washingtonpost.com/opinions/barack-obama-why-we-must-rethink-solitary-confinement/2016/01/25/29a361f2-c384-11e5-8965-0607e0e265ce_story.html.

In its report, the Department of Justice recognized that segregated housing continues to be necessary, especially as a protective tool: "[a]fter extensive study, we have concluded that *there are occasions when correctional officials have no choice but to segregate inmates from the general*

*population, typically when it is the only way to ensure the safety of inmates, staff and the public.*"

Gov't Opp'n Post-Hr'g Mem., Ex. 702 (Dep't of Justice, Executive Summary, Report and Recommendations Concerning the Use of Restrictive Housing (2016)) at 1 (emphasis added).  The report included a series of recommendations to limit the use of restrictive housing, which were adopted by the President.  *See* Press Release, The White House, Office of the Press Secretary, *Fact Sheet: Department of Justice Review of Solitary Confinement* (Jan. 25, 2016), https://www.whitehouse.gov/the-press-office/2016/01/25/fact-sheet-department-justice-review-solitary-confinement.

An overview of the use of solitary confinement in BOP facilities is provided below.  It distinguishes between punitive and administrative detention, explains the use of segregation for protective purposes, and addresses the likelihood that vulnerable inmates like D.W. will be trapped in a long-term cycle of punitive and non-punitive isolation.

For purposes of this memorandum, the terms "solitary confinement," "restrictive housing," "special housing" and "segregated housing" are used interchangeably to mean the following type of detention, as defined by the Department of Justice:

> Not all segregation is truly "solitary," and many prison systems, including the Bureau, often house two segregated inmates together in the same cell, a practice known as "double-celling."  For the purposes of this report, we define "restrictive housing" as any type of detention that involves: (1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another inmate; and (3) inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.

Gov't Opp'n Post-Hr'g Mem., Ex. 702 (Dep't of Justice, Executive Summary, Report and Recommendations Concerning the Use of Restrictive Housing (2016)) at 2.

### 1. Special Housing Units ("SHUs")

The BOP Program Statement on Special Housing Units ("SHU Program Statement")

defines Special Housing Units as follows:

> Special Housing Units (SHUs) are housing units in Bureau
> institutions where inmates are securely separated from the general
> inmate population, and may be housed either alone or with other
> inmates. Special housing units help ensure the safety, security, and
> orderly operation of correctional facilities, and protect the public, by
> providing alternative housing assignments for inmates removed
> from the general population.

Def.'s Ex. SS (BOP Program Statement, Special Housing Units (July 29, 2011) ("SHU Program

Statement")) at § 541.21. SHUs are the most common type of segregated housing in the federal

prison system, used in 109 out of the 122 BOP facilities. *See* WLC *Amicus Curiae* Mem. at 12;

U.S. Gov't Accountability Office, GAO-13-429, Report to Congressional Requesters, Bureau of

Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of

Segregated Housing (2013) ("GAO Report") at 59.

Inmates placed in the SHU are either in *disciplinary segregation* status or *administrative*

*detention* status. While only the former is considered to be punitive, the conditions of confinement

in the SHU are often the same. *See* WLC *Amicus Curiae* Mem. at 6 (citation omitted).

#### a) Disciplinary Segregation

Disciplinary segregation is "a *punitive* status imposed only by a Discipline Hearing Officer

(DHO) *as a sanction* for committing a prohibited act(s)." Def.'s Ex. SS (SHU Program Statement)

at § 541.22(b) (emphasis added). An inmate may be released from disciplinary segregation "after

satisfying the sanction imposed by the DHO." *Id*. at § 541.33(b). As explained by Mr. Trate:

> Disciplinary Segregation status is -- if a disciplinary hearing officer
> sanctions an inmate for a violation of a bureau regulation, the inmate
> could be sanctioned to, say, 60 days' loss of privileges, and
> Disciplinary Segregation status, where we could, you know, restrict

their property or restrict the time on the phone, or recreation, or so forth.

Ordinarily, if an inmate commits a violation and is found guilty of the violation and is sanctioned . . . *once the inmate serves their time in Disciplinary Segregation, they would, at that point, be entered into administration detention.*

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 20:06-16 (emphasis added).

### b)     Administrative Detention

Administrative detention, a form of segregated housing, is described as "non-punitive":

Administrative detention status is an administrative status which removes you from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities, or protect the public.   *Administrative detention status is non-punitive, and can occur for a variety of reasons.*

Def.'s Ex. SS (SHU Program Statement) at § 541.22(a) (emphasis added).

Generally, an inmate may be placed in administrative detention pending classification, transfer to a different facility, an investigation into a possible violation, or if there is a need to remove him or her from the general population for security reasons.  The SHU Program Statement explains these categories as follows:

a. **Pending Classification or Reclassification**.  The inmate is "a new commitment pending classification or under review for Reclassification. This includes newly arrived inmates from the Bus, Airlift, and U.S. Marshals Service."

b. **Holdover Status**.  The inmate is in "holdover status during transfer to a designated institution or other destination."

c. **Removal from general population**.  The inmate's "presence in the general population poses a threat to life, property, self, staff, other inmates, the public, or to the security or orderly running of the institution and":

   1. **Investigation**. The inmate is "under investigation or awaiting a hearing for possibly violating a Bureau regulation or criminal law;"
   2. **Transfer**. The inmate is "pending transfer to another institution or location;"
   3. **Protection cases**. The inmate "requested, or staff determined [the inmate] need[ed], administrative detention status for [his or her] own protection; or"

4. **Post-disciplinary detention**.  The inmate is "ending confinement in disciplinary segregation status, and [his or her] return to the general population would threaten the safety, security, and orderly operation of a correctional facility, or public safety."

Def.'s Ex. SS (SHU Program Statement) at § 541.23; *see also* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 19:19-20:03 (Testimony of Mr. Trate).

Upon the removal of an inmate from the general population, correction staff are required to fill out a form known as an Administrative Detention Order ("ADO").  This form is used to classify and track inmates placed in segregated housing for non-punitive purposes.  *See* Hr'g Tr., Feb. 03, 2016, at 12:19-14:08; Gov't Ex. 601 (BOP Administrative Detention Order Form).  As explained by Mr. Trate, individuals housed in the SHU in administrative detention may be classified as follows:

- Pending a hearing for a violation of BOP regulations;

- Pending an investigation of a violation of BOP regulations;

- Pending investigation or trial for a criminal act;

- To be admitted into Administrative Detention—either at the inmate's request for their own protection or at the staff's request for that individual's protection;

- Pending transfer or in holdover status during a transfer.  Mr. Trate clarified that the "holdover status" applies to inmates who are to be transferred to a different facility.  *See, e.g.*, Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 61:16-17 ("If that's not his facility he's designated to, he's pending holdover status.").

- Pending classification.  Mr. Trate testified that this may be used in instances where there may be "some confusion" as to what category an inmate may fit into.  *See id*. at 15:13-15.  For example, this category may apply to an inmate who arrives late at night and the facility does not yet have his central file.  He cannot be classified, because the staff do not yet know whether it is safe to place him in the general population.  *See id*. at 60:19-23, 61:17-22.

- "Terminating confinement in Disciplinary Segregation and has been ordered into Administrative Detention by the Warden's designee."

Gov't Ex. 601 (BOP Administrative Detention Order Form); *see also* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 13:20-14:08.

c)      **Protective Custody**

Administrative detention includes the placement of inmates in segregated housing for purposes of protection ("protective custody").  An inmate may request admission for his or her own safety.  Although technically considered "non-punitive," the conditions of confinement in protective custody are essentially the same as those applicable to inmates in disciplinary segregation.  *See, e.g.*, WLC *Amicus Curiae* Mem. at 6-8.  Mr. Wise explained:

> Q.     And when we say, "Protective custody," what's meant is the solitary, the SHUs?
>
> A.     It's the Special Housing Unit, it's not usually solitary.  We don't have enough space for everybody to have a single cell usually, though, sometimes they do but it's a Special Housing Unit.
>
> Q.     And it's the same physical location as the inmates who are there for disciplinary reasons?
>
> A.     Correct.  *One housing unit that has both sentences within the unit*.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 82:18-83:02 (emphasis added); *see also* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 57:10-24 (Mr. Trate testifying that even within the administrative detention category, the living conditions are essentially the same, regardless of whether an inmate is being separated on a protective custody basis).

Segregation from general population based on protective grounds may be either *voluntary—i.e.*, at the inmate's request—or *involuntary*, based on the risk assessment of staff.  As explained by Ms. Rodman:

97

> A.   Protective custody is a status in the Special Housing Unit. An inmate can either request protective custody, or . . . the bureau can place the inmate in protective custody.
>
> Q.   *So it can be a voluntary or involuntary*?
>
> A.   *Correct*.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 170:07-12 (emphasis added).

According to the BOP's SHU Program Statement, an inmate may be placed in segregated housing for protective purposes in the following circumstances:

a.   **Victim of inmate assault or threats**. If the inmate was a victim of an inmate assault, or was threatened by other inmates.

b.   **Inmate informant**. The inmate's "safety is threatened because [he or she] provided, or [is] perceived as having provided, information to staff or law enforcement authorities regarding other inmates or persons in the community."

c.   **Inmate refusal to enter general population**. The inmate "refuse[s] to enter the general population because of alleged pressures or threats from unidentified inmates, or for no expressed reason."

d.   **Staff concern**. "Based on evidence, staff believe [that the inmate's] safety may be seriously jeopardized by placement in the general population."

Def.'s Ex. SS (SHU Program Statement) at § 541.27.

### (1)   Involuntary Protective Custody Limited by PREA

PREA limits the use of *involuntary* protective custody to separate potentially vulnerable inmates from likely sexual abusers.  PREA is only concerned with sexual abuse; it does not address other types of physical violence.  The PREA Program Statement provides:

> (a) Inmates at high risk for sexual victimization shall not be placed in involuntary segregated housing *unless an assessment of all available alternatives has been made, and a determination has been made that there is no available alternative means of separation from likely abusers*.  If a facility cannot conduct such assessment immediately, the facility may hold the inmate in involuntary segregated housing for less than 24 hours while completing the assessment.

Inmates are placed in administrative detention in accordance with the Program Statement Special Housing Units.

(b) Inmates placed in segregated housing for this purpose shall have access to programs, privileges, education, and work opportunities *to the extent possible*.  If the facility restricts access to programs, privileges, education, or work opportunities, the facility shall document:

> (1) The opportunities that have been limited;

> (2) The duration of the limitation; and

> (3) The reasons for such limitations.

*When an inmate is placed in special housing involuntarily, access to programs, privileges, education, or work should not be interrupted, to the extent possible*.  If they are limited, the Chief of Correctional Services ensures that documentation exists reflecting the limitation, duration, and rationale for limitation.

(c) The facility shall assign such inmates to involuntary segregated housing only until an alternative means of separation from likely abusers can be arranged, *and such an assignment shall not ordinarily exceed a period of 30 days*.

(d) If an involuntary segregated housing assignment is made pursuant to paragraph (a) of this section, the facility shall clearly document:

> (1) The basis for the facility's concern for the inmate's safety; and

> (2) The reason why no alternative means of separation can be arranged.

When determining an appropriate method of safeguarding the inmate assigned "at risk" for victimization, the Warden ensures all options are considered by completing, signing, and dating form BP-A1002, Safeguarding of Inmates Alleging Sexual Abuse/Assault Allegation.  The Warden should evaluate the least restrictive methods for separation of the alleged victim and alleged perpetrator.

. . .

(e) Every 30 days, the facility shall afford each such inmate a review to determine whether there is a continuing need for separation from the general population.

The inmate's status is reviewed during weekly Special Housing Unit meetings.

Def.'s Ex. R (PREA Program Statement) at § 115.43 (emphasis added).

Form BP-A1002, titled "Safeguarding of Inmates Alleging Sexual Abuse/Assault Allegation" provides that: "[p]lacing an inmate in protective custody or transferring the inmate to another federal, state, or local correctional facility remain viable options to safeguard an inmate. However, staff must first consider other alternatives based on the circumstances of the allegation." Gov't Ex. 301 (Safeguarding of Inmates Alleging Sexual Abuse/Assault Allegation Form).  Ms. Rodman explained that the purpose of this language "is to ensure that inmates are not punished for reporting an assault or sexual abuse.  So they're not automatically placed in the Special Housing Unit."  Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 175:02-04.

### (2)     No Limits on Commonly Used Voluntary Protective Custody

While PREA restricts the amount of time an inmate can be held *involuntarily* in protective custody, it does not address *voluntary* protective custody.  *See id.* at 88:03-07 and 89:16-18 (Testimony of Mr. Wise); *see also* Def.'s Ex. R (PREA Program Statement); Gov't Ex. 301 (Safeguarding of Inmates Alleging Sexual Abuse/Assault Allegation Form).   Ms. Rodman acknowledged that voluntary protective custody is more common than forced segregation for at-risk inmates:

> Q.     . . . Are some inmates put in custody or in protective custody on their own consent?
>
> A.     Yes.
>
> Q.     Is that more common?
>
> A.     Yes.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 175:24-176:03.  She further explained that inmates generally seek protective custody in response to a threat:

> Q. Now, what sort of circumstances would result in an inmate voluntarily going into protective custody?
>
> A. There could be a threat made to the inmate, and the inmate decides that he wants to go to the lieutenant or report to any staff member that he is requesting protective custody. And then we would safeguard the inmate by placing him in protective custody and he would actually sign himself in.

*Id*. at 176:04-10.

### (3)    Investigation: Verified or Unverified Threats

As stated by Ms. Rodman, following an inmate's placement in the SHU for protective purposes, an investigation will take place in order to verify the reasons for the placement:

> Q. Okay.  Once an inmate signs himself in to protective custody, what steps does the BOP facility take then?
>
> A. We conduct an investigation.
>
> Q. Okay.  What does that investigation entail?
>
> A. The investigation is done by our special investigative services staff.  We obviously interview the inmate, interview any witnesses, interview our -- review any documentation to include bureau . . . records, telephone, mail system to determine if there's a threat.

*Id*. at 176:11-20; *see also* Def.'s Ex. SS (SHU Program Statement) at § 541.28.

In the event that the threat is *verified*, the inmate may either "remain in the SHU or be transferred to another institution where [his or her] status as a protection case may not be necessary, at the Warden's discretion."  Def.'s Ex. SS (SHU Program Statement) at § 541.29.  As explained by both Ms. Rodman and Mr. Trate, in cases of verified threats, either the victim or the aggressor may be transferred to a different facility or housing unit:

> Q.      Now, if as part of the review of a protective custody case it was determined that the individual's concerns were verified, what were the options that were available to the facilities you worked at?
>
> A.      At that point, we would either transfer the individual or transfer the threat.
>
> Q.      Was that commonly done?
>
> A.      Yes.

*See* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 37:06-13 (Testimony of Mr. Trate); *see also* Hr'g Tr.,

Nov. 23, 2015, ECF No. 101, at 177:03-05 (Ms. Rodman testifying that, in instances concerning

threats to specific persons, the BOP would sometimes deal with the aggressor rather than the

victim).

Pending transfer, an inmate may stay in the SHU—his or her designation at this point is

likely to change "from *protective custody* status over to *pending transfer* [status]":

> A.      If it's a verified threat, we would potentially do a "sims" assignment, a separtee assignment, for the individual, and then transfer them to another facility.  So, at that point, they would change *from protective custody* status over *to pending transfer* to another facility.
>
> Q.      Just to be clear, the category that lists pending transfer, that category would include some number of individuals who were verified protection cases but were in the process of being moved to a different facility?
>
> A.      Yes, it would.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 23:20-24:04 (Testimony of Mr. Trate) (emphasis added).

In the event that, following an investigation, the threat is *unverified*—*i.e.*, the correctional

staff are unable to determine whether the threat is well-founded—the inmate would be returned to

the general population.  *See* Def.'s Ex. SS (SHU Program Statement) at § 541.30; Hr'g Tr., Feb.

3, 2016, ECF No. 158, at 23:18-20 (Mr. Trate testifying that "[i]f it's [an] unverified threat, then,

102

at that point, we would ask the inmate to return to general population"). "Unverified" does not necessarily mean that the threat does not exist—just that staff were unable to validate it.

In 2014, CNA, a non-profit research organization, carried out a comprehensive audit of the BOP's use of segregated housing. *See* Def.'s Ex. J (CNA Analysis and Solutions, *Federal Bureau of Prisons: Special Housing Unit Review and Assessment* (2014) ("CNA Audit")) at i (explaining that the "report provides an independent, comprehensive review of the Federal Bureau of Prisons' operation of restrictive housing and identifies potential operational and policy improvements"). The CNA Audit is based on data collected during visits to the BOP's restrictive housing units carried out between November 2013 and May 2014. *See id.* It was found that a "significant portion" of inmates had "*legitimate protection needs*":

> 15 percent of those housed in SHUs system-wide as of June 2014 were there based on protection needs. The percent varies from institution to institution, with the percentage in the USP SHUs being significantly higher. An additional portion of inmates in SHUs are unverified protection cases who refuse assignment outside of the unit. Some of the protection claims are the result of the inmate's own behavior, while others are not validated. However, *a significant portion of these offenders have legitimate protection needs*.

*Id.* at 82 (emphasis added).

### (4)    From Protective Custody to Disciplinary Segregation

If, after a threat has been deemed unverified, the inmate refuses to return to the general population, he or she "*may be subject to disciplinary action*." Def.'s Ex. SS (SHU Program Statement) at § 541.30 (emphasis added); *see also id.* ("Inmates refusing placement in general population should be maintained in Administrative Detention status and, if appropriate, initiate disciplinary action."); Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 48:10-52:18 (Mr. Trate explaining the kinds of disciplinary violations that an inmate may receive if he refuses placement in the general population). As summarized by Mr. Trate:

> A.      If it's an unverified threat, potentially the individual could be issued an incident report, and now it could be pending a violation of a BOP regulation.  If it's a verified threat, now the individual, potentially, he's going to be transferred to a facility [commensurate] with that individual's security needs.
>
> Q.      So exactly what we were discussing earlier; that *that same individual who might have been in protective custody could be classified as disciplinary segregation or pending an action*?
>
> A.      *Yes*.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 91:09-19 (emphasis added).

An inmate may go from being housed in the SHU on an administrative basis, because of his or her alleged need for protection, to being there on a disciplinary—and punitive—basis, due to the inmate's refusal to return to the general population when the threat remains "unverified" following staff investigation.  This process could repeat itself, potentially exposing the inmate to long stints in solitary confinement:

> Q.      Let's focus on this scenario, which is someone who you believe can program in the general population.  They've refused to go back to general population; they've told you that they're in fear.  You then put them into Disciplinary Segregation.
>
> At the end of that period, are you more likely to take them seriously as to the threat?  Do they go back into protective custody status?  Or do you violate them again and give them extended Disciplinary Segregation?  It seems like, as a correction supervisor, you wouldn't know what category to place them in.
>
> A.      At that point, you would be issued an incident report for refusing programs.
>
> Q.      You did that.
>
> A.      *We would go through the process again, potentially*.
>
> Q.      *So this is someone with protection needs who is classified as long-term disciplinary status*?

104

> A.    *Potentially.*

*Id*. at 64:12-65:04 (Testimony of Mr. Trate) (emphasis added).

The receipt of multiple disciplinary sanctions could increase an inmate's security profile and cause him to be re-classified as a high security inmate.  This could lead to transfer to a different facility, likely of a higher security—and greater risk—level:

> Q.    If someone does have these protection needs -- let's back up to the pending transfer category -- at some point someone's going to get an idea that maybe we should transfer them to another facility; is that right?
>
> A.    Potentially, yes.
>
> Q.    How would you categorize that person on this menu of categories?
>
> A.    We would potentially transfer them under a disciplinary transfer through a sanction by the DHO, the disciplinary hearing officer.
>
> Q.    *That could potentially raise their security level as well*?
>
> A.    *It may*.

*Id*. at 66:10-22 (emphasis added).

As noted by *amicus* Washington Lawyers' Committee for Civil Rights and Urban Affairs, D.W. is likely to be particularly vulnerable to this cycle, leading to prolonged stays in solitary confinement:

> Refusing to obey any staff order (no matter how small) or "insolence" may be punished with three months of disciplinary segregation; six months if there are two or more violations within one year. . . . *[M]any of the characteristics that make [D.W.] more susceptible to abuse in prison will also likely increase the number of disciplinary infractions he might accrue* if, for example, he attempts to defend himself by fighting or carrying a weapon.  This, compounded with the evident overuse of solitary confinement as a punishment for minor infractions, even further increases the likelihood that [D.W.] will spend a substantial portion of his prison term in solitary confinement.

WLC *Amicus Curiae* Mem. at 28-29 (internal citation omitted) (emphasis added).

### (5)      Conditions of Confinement

The CNA Audit pointed out that most inmates in the SHU are being held "for investigation or protective custody" purposes, rather than on disciplinary grounds.   Their experience is equivalent:

> *The largest number of inmates being held in SHU are either there for investigation or protective custody.* Although the Bureau states in its policy that both statuses are "nonpunitive," this is clearly not the case when examining the units from an operational and program standpoint. *Inmates in protective custody and investigative status are housed in SHU experience the same living conditions as those placed in what is an explicitly punitive environment.*  As of 2014, there were 4,252 inmates in some form of investigation status and another 1,361 inmates in some form [of] protective custody.  Further another 1,802 inmates in the punitive SHUs awaiting some action by the BOP to either have a hearing for discipline, or transfer to ADX or SMU status or some other location. *Thus, over 80 percent of the SHU inmates have not been found guilty of disciplinary conduct.*

Def.'s Ex. J (CNA Audit) at 219 (emphasis added).  The Washington Lawyers' Committee for Civil Rights and Urban Affairs provided further details on the highly restrictive conditions of confinement experienced by inmates held in protective custody:

> Although the BOP considers Administrative Detention "non-punitive" under BOP policy, all inmates in the SHUs, including those placed there for protective custody, are exposed to the same general confinement conditions.   Such conditions may vary depending on the BOP facility, but the cells are often windowless and "contain a toilet, a shower, and a slot large enough for a guard to slip a food tray through."  All meals are eaten in the inmate's cell.  Inmates are confined to their cells for approximately 23 hours or more per day.   BOP policy only requires that inmates in SHUs receive five hours of out-of-cell exercise per week.  As these five hours can occur on different days, inmates can be confined to their cells 24 hours per day on at least two days a week.  Moreover, the out-of-cell "recreation" that inmates are allotted is often nothing more than "being escorted, frequently in handcuffs and shackles, to another solitary cell where prisoners can pace alone for an hour

> before being returned to their cell."  Severe restrictions are placed
> on segregated inmates' "ability to engage in even basic activities,
> such as reading, and to have contact, even by phone, with loved ones
> and friends."  The BOP only requires that inmates in the SHU be
> allowed one phone call per month.  In contrast, inmates in the
> general population can place numerous phone calls per month under
> BOP policies.

WLC *Amicus Curiae* Mem. at 6-8 (footnotes omitted).

The BOP's SHU Program Statement recognizes that, in disciplinary segregation status, "participation in programming activities, *e.g.*, educational programs, may be suspended."  Def.'s Ex. SS (SHU Program Statement) at § 541.31(n).  With respect to administrative segregation, the statement provides that inmates "will have access to programming activities *to the extent safety, security, orderly operation of a correctional facility, or public safety are not jeopardized*."  *Id.* (emphasis added).  In practice, access to programming is severely limited, even though segregation in such instances is supposed to be non-punitive.  As explained by Mr. Wise:

> Q.  And during the time he is in protective custody, are the
> inmates who are there for their protection locked down?
>
> A.  Yeah.  They're in those cells pretty much 23 hours a day.
>
> Q.  The same as the disciplinary segregation?
>
> A.  Time is the same.
>
> Q.  Okay.
>
> A.  They're both locked in 23 hours a day.  Some more
> privileges than administrative detention and disciplinary
> segregation, but they're both pretty much in their cells 23
> hours a day.
>
> Q.  Can you work if you're in protective custody?
>
> A.  No.
>
> . . .
>
> A.  You may be assigned as an orderly to mop the floors in the
> Special Housing Unit occasionally but that's it.

107

> Q.     Can you go to school?
>
> A.     No.  You can do some course work maybe but you can't
>        attend class or anything like that.  You are in that cell.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 84:12-85:04.

While the PREA guidelines provide that inmates placed in the SHU for purposes of

protective custody "*shall have access to programs, privileges, education, and work opportunities*

*to the extent possible*," Mr. Wise testified that access to such programs and privileges is in fact

restricted:

> The key there for the bureau is *to the extent possible*.  And they do
> limit access to programs, privileges, and everything else, and they
> document that in their institution supplements, how they have to and
> how they do it.  Yeah, *it is restricted*.

*Id*. at 98:14-18 (emphasis added); Def.'s Ex. R (PREA Program Statement) at § 115.43(b).

This testimony is confirmed by the CNA Audit.  One of the "key findings" in its December

2014 report is that "*[t]he Bureau does not have adequate non-punitive protective custody housing*

*units that have equivalent levels of programs and privileges as general population inmates*."

Def.'s Ex. J (CNA Audit) at iv (emphasis added).  As explained by the CNA:

> This raises the question of the appropriate way to manage inmates
> with verified protection needs.  Such inmates are presently housed
> in administrative detention, which is identified by Bureau policy as
> a nonpunitive status.  However, they are assigned to the same
> housing unit as inmates in punitive segregation.  Inmate movement
> procedures, including application of restraints, are the same; the
> frequency of recreation and telephone access is the same, as was the
> frequency of visits at all but two facilities visited.  With the
> exception of minor differences in personal property allowed and in-
> cell programming opportunities, the day-to-day conditions of
> confinement were not much different.  *Considering that one status*
> *is nonpunitive and that some individuals are included strictly as a*
> *result of being verified as requiring protection, serious*
> *consideration should be given to reevaluating the day-to-day*
> *conditions of confinement for individuals who have been verified as*
> *needing protection.*

*Id.* at 83 (emphasis added); *see also id.* at 217-18.

The Washington Lawyers' Committee for Civil Rights and Urban Affairs concluded that:

> There is little, if any, difference between the conditions in the BOP's punitive solitary confinement units and its protective custody solitary confinement units. *Both sections subject inmates to long periods of social isolation from human beings and delimit a prisoner's ability to engage in potentially rehabilitative or otherwise productive activities.* In so doing, *the BOP effectively creates a distinction without a difference between its punitive "disciplinary segregation" and its "administrative detention."*

WLC *Amicus Curiae* Mem. at 21 (emphasis added).

According to the CNA Audit, "[t]he application of the same security and operational restrictions to the protective custody population as to others in administrative segregation *is contrary to nationally accepted practices*." Def.'s Ex. J (CNA Audit) at 83 (emphasis added).

### d)     BOP Tracking of Inmates in SHU

The BOP tracks the total number of people housed in the SHU on any given day. What its system does not track, however, is how long a particular inmate has spent in the SHU and whether he was reclassified—for example, from protective custody to pending investigation to disciplinary segregation—throughout his stay in the SHU.

When placed in administrative detention, except in instances where the inmate is pending classification or in holdover status, the individual will receive a copy of the ADO with the reasons for the placement:

> The inmate would get a copy of the form ordinarily within 24 hours. Then the SHU application dashboard, the data's keyed into the SHU application, and that's how we track, kind of get a snapshot agency-wide, regarding our numbers and how the SHU is being utilized in each facility.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 14:19-24 (Testimony of Mr. Trate); *see also* Def.'s Ex. SS (SHU Program Statement) at § 541.25(a).

Once the form is filled out, the information is then "keyed into the system" and is collected through the "SHU Application Dashboard Report." Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 16:03-17:01 (Testimony of Mr. Trate); *see also* Gov't Exs. 602-607 (SHU Application Dashboard Reports). The Dashboard Reports are intended to track the total number of BOP inmates who are in the SHU on any given day, and for what reasons. The system does not, however, track SHU numbers over time. *See* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 88:01-07 (Mr. Trate testifying that although he "track[s] the numbers each day," he does not specifically "graph the trends in the changed numbers"). The categories in the Dashboard Reports mirror the administrative detention categories in the ADOs.

As noted by the Department of Justice, "[t]here are . . . limitations to the data collected by the SHU Application. At present, the SHU Application can only provide a 'snapshot' of all inmates in [the] SHU at a particular moment; it cannot track information about individual inmates." Gov't Opp'n Post-Hr'g Mem., Ex. 702 (Dep't of Justice, Executive Summary, Report and Recommendations Concerning the Use of Restrictive Housing (2016)) at 9. Specifically, the Dashboard Reports do not reflect the fact that the same individual could (1) potentially fit into more than one category; and (2) be re-classified without actually leaving the SHU. As acknowledged by Mr. Trate:

> Q.   So what this is saying is that the way the Dashboard Report is designed, it's simply impossible to tell whether it's the same person who is now in a different category; is that right?
>
> A.   It's saying that the SHU application can't differentiate for the exact reasons why an individual is house[d] in [the] SHU. For example, it can't break it down whether it's protective custody unverified or protective custody verified.
>
> . . .

> Q.      *But what this says is it's impossible to tell how long an inmate has been house[d] in segregation and whether an inmate's status in the SHU has changed over time?*
>
> A.      *Yes.*

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 97:20-98:12 (emphasis added).

For example, an inmate in protective custody could be re-classified and remain in the SHU under the category "pending investigation BOP violation" if he receives incident reports while in the SHU.  *See* Def.'s Post-Hr'g Mem. at 47; Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 57:25-59:17 (Testimony of Mr. Trate).  In such an instance, the Dashboard would show a decrease in the protective custody numbers, and an increase in the pending investigation ones.  It would not show that the same individual is still being held in solitary confinement under a different classification. As explained by defendant's counsel:

> Between November 10 and November 30, 2015, the protective custody population went down by 167 inmates.  During the same period, the pending action category went up by 123, and the investigation category went up by 229.  So, while the Dashboard report shows a drop in protective custody, there was in fact a net gain of 185 people in the SHU.

Def.'s Post-Hr'g Mem. at 51 (citing Def.'s Ex. ZZ (SHU Data: Nov. 10, 2015 - Jan. 29, 2016) and Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 89:02-90:17 (Testimony of Mr. Trate)).

Similarly, an inmate previously in protective custody and who the BOP has chosen to transfer to a different facility would be re-classified to a "Pending Transfer/Holdover" status category.  *See* Gov't Opp'n Post-Hr'g Mem. at 28 (stating that "it is not possible to determine the exact number of individuals that are currently in protective custody").

Apparent decreases in the number of protective custody inmates can be attributed, at least in part, to a re-classification of the inmates rather than a drop in the number of people held in the SHU.

The Dashboard Reports are also limited by the fact that they only track inmates who have been in the SHU for periods longer "than 30 days, 60 days, 90 days, 6 months or 364 days in *one [single] stretch*." *See* Def.'s Post-Hr'g Mem. at 52 (emphasis added). The Dashboards do not track the total amount of time individuals who enter and leave the SHU spend in segregated housing. *See* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 80:15-81:24 (Testimony of Mr. Trate); Def.'s Ex. CCC (Dep't of Justice, Final Report, Report and Recommendations Concerning the Use of Restrictive Housing (2016) ("2016 DOJ Report")) at 31 (noting that "*it is impossible to tell how long a particular inmate has been housed in segregation*") (emphasis added). As emphasized by the Department of Justice in its 2016 report, the Dashboards do not track how long an individual inmate has been housed in the SHU, the number of times that inmate has returned, or if that inmate's SHU status has changed over time from, for example, protective custody to disciplinary segregation. *See* Def.'s Ex. CCC (2016 DOJ Report) at 31; *see also* WLC *Amicus Curiae* Mem. at 8-9.

### 2. Lack of Alternatives to Protective Custody

Despite the considerable attention that has been given to the use and overuse of solitary confinement, few alternatives exist for at-risk inmates, especially if they are convicted sex offenders. This underscores the seriousness of the problem and the difficulties in addressing D.W.'s situation.

In 2014, the CNA concluded its review of the use of restrictive housing in BOP facilities by recommending that the Bureau "[e]xpand housing alternatives for inmates in verified protective custody status that have levels of programs and privileges that are equivalent to those for general population inmates." Def.'s Ex. J (CNA Audit) at 85. The BOP agreed, although it noted that it was constrained in its efforts by limited resources:

> We concur that it is desirable to provide inmates who are in verified protective custody the opportunities to participate in programs and privileges equivalent to what is available to general population inmates. We are looking for ways to expand such opportunities using our *existing limited resources*, in terms of staffing and space.

Federal Bureau of Prisons, *Special Housing Unit Review and Assessment Report Response: Response to Report by CNA Analysis and Solutions* 2 (2015) ("BOP Response to CNA Audit"), https://www.bop.gov/resources/news/pdfs/CNA_Response-V05a-saa.pdf (emphasis added).

Since then, the BOP has been working on developing alternatives to protective custody. For example, Mr. Trate explained that the BOP is in the process of developing and expanding Reintegration Housing Units ("RHUs"):

> WITNESS:   RHU, your Honor, Reintegration Housing Unit. The first one is based out of Oakdale, Louisiana, and it's where we take a continuous protective custody -- an individual that just does not want to program, does not want to walk in [the general population], and it gives us an opportunity to put them where they can walk safely in a general-housing population. They can program; they can watch TV; they can get a job. And that's currently going on right now. Actually, the agency as a whole is looking to expand. We're currently developing plans to expand the Reintegration Housing Unit anywhere from three to five more facilities throughout the nation.

> Q.   This is specifically for individuals that, for whatever reason, the BOP has had difficulty moving back into general population?

> A.   Yes.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 37:22-38:11. Mr. Trate identified RHUs as a viable alternative for inmates who have difficulty leaving protective custody and joining the general population:

> Well, if he's in protective custody status, the threat assessment's completed, and it's verified, now we're going to transfer the individual, ultimately in an attempt to get him to conform to a yard

113

the individual can walk on.  If it's unverified threat, he's going to probably be issued an incident report and sanctioned for a violation of BOP regulations.  At that point, that's where it comes into the RHUs, in trying to get guys to walk the yards throughout the country.

*Id.* at 91:21-92:04.

Little progress has been made in the development of RHUs since the CNA Audit of 2014. *See, e.g.*, Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 125:04-12 (Mr. Trate testifying that the BOP is currently in the process of  "[i]dentifying sites that are appropriate and in the planning phases, to look at sites in order to potentially expand [RHUs], you know, to three to five facilities throughout our various facilities across the country"); *id.* at 128:20-25 (confirming that the existing RHU has a limited number of beds which was recently decreased further).  Two years after the CNA Audit, in 2016, the Department of Justice recommended that the BOP "expand its RHU program, with the goal of eventually housing all inmates with a verified need for protective custody who cannot be housed in any other Bureau facilities."  Def.'s Ex. CCC (2016 DOJ Report) at 111.

Importantly, for present purposes, RHUs are not currently available to convicted sex offenders.  Def.'s Ex. J (CNA Audit) at 84 ("Those whose sex offender classification is the basis for placement in SHU will ordinarily not be assigned to the RHU."); *see also* Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 129:08-20; Gov't Opp'n Post-Hr'g Mem. at 26, n.9.

Were D.W. threatened or assaulted in prison he would likely be placed in an SHU in protective custody, at least until the conclusion of an investigation regarding the nature of the threat.  Mr. Trate acknowledged that, although in his experience the majority of sex offenders manage to adjust to the general population, there is a minority that is unable to do so:

> Q.    There is a minority of sex offenders today in the Bureau of Prisons, given the current conditions and setup, who are not able to program in general population; is that right or wrong?
>
> A.    That could be correct.

> Q.     And there are certain factors that make you less likely to be able to program in the general population, even within the category of sex offenders?
>
> A.     Yes.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 104:07-15; *see also id*. at 114:15-115:10 (Q.  And so there is a minority of sex offenders who were not able to program in the general population, and so you do your best, but *there are some inmates who are especially vulnerable* and need that protection? A. Yes.") (emphasis added).

These inmates are likely to spend longer periods of time in the SHU, in both administrative and disciplinary segregation, because of a refusal or inability to return to the general population. As both Mr. Wise and Mr. Trate explained, many of the same factors that render inmates vulnerable to assault also increase their likelihood of being placed in the SHU for extended periods of time.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 87:17-20 (Testimony of Mr. Wise); Def.'s Ex. J (CNA Audit).  Mr. Trate acknowledged this:

> Q.     And those same factors that we discussed that make someone more vulnerable to abuse in the general population are also the factors that would make someone more likely to remain in protective custody; is that right?
>
> A.     They could.
>
> Q.     And you said that those vulnerable inmates are, I think you said, a little bit more difficult to deal with?
>
> A.     From time to time, yes.
>
> Q.     But some of those vulnerable inmates have been in protective custody for years; is that a little more difficult?
>
> A.     Well, those are some of the challenges that we face as an agency in order to get those housed in protective custody and out into general population.  But I have seen the overwhelming majority, all walks, be able to be screened, processed, and walk into general population successfully for

> a sustained period of time in every facility that I have worked
> at.

Hr'g Tr., Feb. 3, 2016, ECF No. 158, at 120:04-19.

### a)      Transfer to Different Housing Unit

Eventually, if either the security threat to the inmate is verified or the inmate persistently refuses to leave the SHU because of fear of harm, the correctional staff is left with the possibility of transferring the inmate.  One option would be to transfer the at-risk or challenging inmates out of protective custody and into a different general population housing unit within the same facility. For example, Ms. Rodman testified:

> Q.   Okay.  So if BOP determines that there is a threat, say, it's a
>      real concern, what would BOP do?
>
> A.   In most cases, they would transfer the inmate, but there is
>      sometimes a possibility of releasing him back to general
>      population maybe into a different housing unit or different
>      programming.  It depends on the nature of the protective
>      custody investigation.
>
>      . . .
>
> Q.   Now, if there was a viable threat, and an inmate felt unsafe,
>      would [the] BOP leave that inmate in protective custody
>      indefinitely?
>
> A.   No.
>
> Q.   Why not?
>
> A.   Because we have rules and regulations that cannot keep an
>      inmate indefinitely in protective custody.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 176:21-177:12; *see also id.* at 88:08-15 (Testimony of Mr. Wise) (explaining that "if the threat comes with one specific inmate and it's not an overt threat, it's a general sort of thing, you may try and move him to a different part of the institution or his housing area . . .").

116

Yet, in practice, such options to cut short protective custody are likely to be limited:

> Q.     And, to your knowledge, within the Bureau of Prisons, are there general population protective units where vulnerable inmates can be held, or are there only these protective custody situations?
>
> A.     There's some institutions that are safer than other institutions for certain reasons, for example, the non-gang institutions. *They may have some institutions that have larger populations of sex offenders, so that sex offenders may be safer in numbers there.* But in terms of very special protective units, they're the witness security units but those are very specialized. And the others are just developed as best the institution can.

*Id.* at 85:10-85:22 (emphasis added); *see also id.* at 82:18-85:09; Def.'s Post-Hr'g Mem. at 40 (stating that while the BOP will often "attempt to separate the person [that needs protection] from the inmate or inmates who are a danger to them," in defendant's case "the threat comes from all sides. *It is not a problem with a specific inmate; it is a problem with the nature of prison hierarchies, which PREA did not alter*.") (emphasis added).

### b)     Transfer to Different Facility

Ultimately, an inmate who faces a verified threat or who refuses to leave protective custody is likely to be transferred to a different facility. If the inmate was disciplined for failing to leave the SHU, his security level might have increased, and he might be re-designated to a higher security—and a more dangerous—facility. Even if transferred, the issues that rendered an inmate vulnerable to abuse and exposed to prolonged periods in the SHU are likely to follow him to the next facility. As explained by Mr. Wise:

> Q.     But you did mention there are a variety of other ways in which inmates can be moved around . . . to different facilities or sent to other programs. Is that something you did while you were in charge of a facility?

> A.      It's not only something I did, it's something I received.  I
> would get inmates that had failed the general population in
> other institutions; and, unfortunately, *what often happened
> is the reason they failed in the other institution would also
> replicate in mine, and then I would send them on to
> somebody else*.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 99:07-17 (emphasis added).

### 3.      Effects of Solitary Confinement

#### a)      SHU Syndrome

> Solitary confinement is punishment taken to the extreme.  Rikers
> folklore has it that the term *Bing* was coined to describe the human
> brain under the strain of solitary—it goes . . . bing!  Whether this
> story is true is unclear, but it makes sense.  Solitary confinement
> induces the bleakest depression, plunging despair, and terrifying
> hallucinations.  The Mental Health Department looms large in these
> units, doling out antidepressants, antipsychotics, and mountains of
> sleeping pills.  If these inmates didn't have mental health issues
> before they entered solitary, they do now.  But even the most potent
> medications can only do so much, and when they give out—when
> human behavior deteriorates into frantic scenes of self-mutilation
> and makeshift nooses—we're called to a cell door.

Mary E. Buser, *Lockdown on Rikers: Shocking Stories of Abuse and Injustice at New York's Notorious Jail* viii (2015).

As recently stated by Judge Shira Scheindlin in her seminal decision approving a class-action settlement reducing the frequency, duration, and severity of solitary confinement in New York State prisons:

> [T]he delet[e]rious effects of isolated housing on inmates—
> especially to those assigned to long-term solitary confinement—are
> well-known and amply documented.  Indeed, the literature "is
> virtually unanimous in its conclusion: *prolonged supermax solitary
> confinement can and does lead to significant psychological harm*."
> This harm takes myriad forms.  After even relatively brief periods
> of solitary confinement, inmates have exhibited symptoms such as
> hypersensitivity to stimuli, perceptual distortions and
> hallucinations, increased anxiety, lack of impulse control, severe
> and chronic depression, appetite and weight loss, heart palpitations,

> sleep problems, and depressed brain functioning.  As one expert in the field noted, "[t]he restriction of environmental stimulation and social isolation associated with confinement in solitary are strikingly toxic to mental functioning"—even *causing "confusional psychosis" in some inmates*.

*Peoples*, 2016 WL 1464613 at *3 (emphasis added) (footnotes and citations omitted).  While this finding is limited to supermax prisons, the effects of being housed in the SHUs of medium and high security prisons is probably much the same.

Research has demonstrated that time served in solitary confinement can lead to serious mental illness in healthy individuals.  It significantly exacerbates the condition of those already suffering from emotional instabilities.  Dr. Stuart Grassian, a Board Certified Psychiatrist with extensive experience in evaluating the psychiatric effects of solitary confinement, explained that incarceration in solitary can cause either "severe exacerbation or recurrence of preexisting illness, or the appearance of an acute mental illness in individuals who had previously been free of any such illness."  Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 333 (2006) ("Grassian"); *see also* Alex Kozinski, *Worse than Death*, 125 Yale L.J.F. 230 (2016).

Dr. Grassian described how deprivation of external stimuli causes the onset of a phenomenon known as the "SHU Syndrome":

> [D]eprived of a sufficient level of environmental and social stimulation, individuals will soon become incapable of maintaining an adequate state of alertness and attention to the environment. Indeed, even a few days of solitary confinement will predictably shift the electroencephalogram (EEG) pattern toward an abnormal pattern *characteristic of stupor and delirium*.

Grassian at 330-31 (emphasis added).

He explained that the absence of external stimuli experienced in solitary confinement can cause an impairment of alertness leading to an inability to focus, a dissociative stupor known as a mental "fog," and an incapacity to shift attention, which can cause obsessional preoccupations:

> In solitary confinement ordinary stimuli become intensely unpleasant and small irritations become maddening. Individuals in such confinement brood upon normally unimportant stimuli and minor irritations become the focus of increasing agitation and paranoia. . . . [C]ountless individuals in solitary confinement . . . have become obsessively preoccupied with some minor, almost imperceptible bodily sensation, a sensation which grows over time into a worry, and finally into an *all-consuming, life-threatening illness*.

*Id*. at 331-332 (emphasis added).

Specifically, Dr. Grassian found that long-term solitary confinement often leads to an "acute organic brain syndrome – a delirium," the symptoms of which include: (a) hyper-responsivity to external stimuli; (b) perceptual distortions, illusions, and hallucinations; (c) panic attacks; (d) difficulties with thinking, concentration, and memory; (e) intrusive obsessional thoughts, including the emergence of primitive aggressive ruminations; (f) overt paranoia; and (g) problems with impulse control. *See id*. at 334-38.

While individuals with stronger cognitive functioning are likely to be less affected, anyone serving time in solitary confinement "will still experience a degree of stupor, difficulties with thinking and concentration, obsessional thinking, agitation, irritability, and difficulty tolerating external stimuli (especially noxious stimuli)," with many people suffering permanent harm as a result. *Id*. at 332.

Dr. Craig Haney, a psychologist and professor at the University of California-Santa Cruz, similarly concluded that "there is not a single published study of solitary or supermax-like confinement in which nonvoluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, that failed to result in negative

psychological effects."   Craig W. Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinq. 124, 132 (2003) ("Haney").

Anecdotal evidence supports the notion that very few are able to endure solitary confinement without suffering severe adverse mental effects.  Albert Woodfox, a former inmate in Louisiana State prisons, spent 43 years in solitary confinement.  He reported suffering "such intense claustrophobia that every time he lay down he felt he was being smothered.  So he took to leaning his mattress against the wall, wrapping himself in a blanket and sleeping sitting up."  Ed Pilkington, *Albert Woodfox Speaks after 43 Years in Solitary Confinement: 'I Would Not Let Them Drive Me Insane,'* Guardian (Feb. 20, 2016), http://www.theguardian.com/us-news/2016/feb/20/albert-woodfox-angola-3-first-interview-trump-confinement.  He recalled that

> [t]he panic attacks started with sweating.  You sweat and you can't stop.  You become soaking wet – you are asleep in your bunk and everything is soaking wet.  Then when the claustrophobia starts it feels like the atmosphere is pressing down on you.  That was hard.  I used to talk to myself to convince myself I was strong enough to survive, just to hold on to my sanity until the feeling went away.

*Id.*

In January 2013, Rick Raemisch, the then recently-appointed Executive Director of the Colorado Department of Corrections, volunteered to spend a night in solitary confinement.  *See* Rick Raemisch, Opinion, *My Night in Solitary*, N.Y. Times, Feb. 21, 2014, at A25.  A man with no history of mental illness, Mr. Raemisch found that the "[f]irst thing you notice is that it's anything but quiet.  You're immersed in a drone of garbled noise . . . I couldn't make sense of any of it, and was left feeling twitchy and paranoid. . . . For a sound mind, those are daunting circumstances."  *Id.*  After he had been locked in a seven-by-thirteen foot cell for about sixteen hours, furnished with only a metal bed, toilet, and sink all screwed to the floor, he broke a promise he made to himself and asked a staff member for the time.  What had been only sixteen hours felt

121

like days.  Mr. Raemisch recalled that "I felt as if I'd been there for days.  I sat with my mind.  How long would it take before [solitary confinement] chipped that away?  I don't know, but I'm confident that it would be a battle I would lose."  *Id.*

Such deleterious psychological effects are likely to be present in individuals who experience solitary confinement for protective purposes; they experience the same extreme isolation as people being separated on a disciplinary basis.  *See, e.g.*, Haney at 135; Stanley L. Brodsky & Forrest R. Scogin, *Inmates in Protective Custody: First Data on Emotional Effects*, 1 Forensic Reports 267 (1988).

### b)      Effects on Vulnerable Inmates

Reliable studies show that inmates with pre-existing mental illnesses are likely to suffer the most severe consequences from isolation.  The American Psychiatric Association, the American Public Health Association, the National Alliance on Mental Illness, the Society of Correctional Physicians, and Mental Health America, have all issued formal policy statements opposing the use of solitary confinement, especially with regard to mentally ill inmates.  *See Peoples*, 2016 WL 1464613 at *3; Am. Psychiatric Ass'n, *Position Statement on Segregation of Prisoners with Mental Illness* (2012); Am. Pub. Health Ass'n, Policy Statement No. 201310, *Solitary Confinement as a Public Health Issue* (2013); Nat'l All. on Mental Illness, *Public Policy Platform* ¶ 9.8 (11th ed. 2015); Soc'y of Corr. Physicians, *Position Statement: Restricted Housing of Mentally Ill Inmates* (2013); Mental Health Am., *Position Statement 24: Seclusion and Restraints* (2011).  As explained by Dr. Grassian, "in a situation of restricted environmental stimulation, preexisting central nervous system dysfunction is a major predisposing factor to the development of adverse psychiatric reactions and of overt delirium."  Grassian at 348.

122

Individuals suffering from ADHD, such as D.W., are likely to be "associated with a particular inability to tolerate restricted environmental stimulation." *Id*. at 350. According to Dr. Grassian "*[t]hose most severely affected are often individuals with evidence of subtle neurological or attention deficit disorder, or with some other vulnerability*." *Id*. at 332 (emphasis added); *see also* Herbert C. Quay, *Psychopathic Personality as Pathological Stimulation-Seeking*, 122 Am. J. Psychiatry 180, 180 (1965). Vulnerable individuals such as these, "suffer from states of florid psychotic delirium, marked by severe hallucinatory confusion, disorientation, and even incoherence, and by intense agitation and paranoia." Grassian at 332. Dr. Grassian concluded that "individuals with primitive or psychopathic functioning or borderline cognitive capacities, impulse-ridden individuals, and individuals whose internal emotional life is chaotic or fearful are especially at risk for severe psychopathologic reactions to [solitary confinement]." *Id*. at 348 (footnote omitted).

Similarly, Dr. Craig Haney found that "prisoners with preexisting mental illnesses are at greater risk of having this suffering deepen into something more permanent and disabling," and that those experiencing the greatest risk for further deterioration include "*persons who are emotionally unstable, who suffer from clinical depression or other mood disorders, who are developmentally disabled, and those whose contact with reality is already tenuous*." Haney at 142 (emphasis added).

### c)   *Post*-SHU Syndrome

The effects of solitary confinement do not end when an individual is released. The harm caused is likely to translate into greater risks for the public when a former inmate is unable to reenter his or her community even somewhat rehabilitated—the lasting consequence of prolonged isolation.

Experts point to solitary confinement as a form of "social death," and characterize a *post-SHU* Syndrome which "can lead to the permanent harm of 'a continued intolerance of social interaction' that prevents an inmate from reintegrating into the larger prison population and into society."   *See* Samarth Gupta, *From Solitary to Society*, Harv. Pol. Rev. (Feb. 7, 2016), http://harvardpolitics.com/united-states/solitary-society (emphasis added); *see also* Def.'s Post-Hr'g Mem. at 59.

This continuing effect is likely to intensify the risk of harm to the public posed by a newly released inmate who has served time in solitary confinement:

> Every year, prisons across the country send thousands of people directly from solitary confinement back into their communities.  An investigation by The Marshall Project and NPR found that 24 states released more than 10,000 people from solitary last year.  The actual total is higher, as 26 states and the federal Bureau of Prisons could not say how often it happens.

Christie Thompson, *From Solitary to the Street: What Happens When Prisoners Go from Complete Isolation to Complete Freedom in a Day?* The Marshall Project & NPR News Investigations (June 11, 2015), https://www.themarshallproject.org/2015/06/11/from-solitary-to-the-street#.AvKMQDCnz.

Many of these newly released inmates "suffer from mental illnesses that were either triggered or exacerbated in segregation [and] often cannot participate in the classes or services offered to other inmates approaching their release date. . . . *Those who make the jarring leap from solitary to the streets can easily end up jobless, homeless – or back in prison*."  *Id.* (emphasis added).

> People who have spent time in solitary . . . are often so overwhelmed and afraid of the outside world when they come home that they can barely leave their rooms.  "You take someone and systematically destroy their social skills and their productive capabilities . . . .  They just break down."

*Id.* (citing Expert Report of Terry A. Kupers, M.D., M.S.P., June 16, 2014, https://www.aclu.org/sites/default/files/field_document/expert_report_of_terrry_kupers_with_table_of_contents.pdf (evaluating the mental health impact of the conditions of confinement in the segregation units at East Mississippi Correctional Facility)).

### d)   Destructive Effects of Isolation on Defendant

D.W. has a documented history of trauma, mental disorders, and depression.  He repeatedly attempted suicide.  He was diagnosed with ADHD, borderline personality disorder, severe depression, and post-traumatic stress disorder.  He was prescribed, and continues to take, multiple psychotropic drugs.

Spending substantial time in solitary confinement will severely aggravate D.W.'s already brittle psyche.  Such conditions will substantially increase the probability of his death by suicide. At the very least, repeated stays in the SHU will further break the spirit of this highly traumatized person, making D.W.'s readjustment to society upon his eventual release from prison more unlikely, and increasing the risk he poses to the public.  *See, e.g.*, Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 43:18-44:06 (Testimony of Dr. Krueger).

### C.   FMC Devens; BOP Program for Sex Offenders

As testified by the experts, some facilities may be more or less safe for a defendant like D.W. depending on the programs available and the make-up of the prison population.  *See, e.g.*, Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 85:10-85:22 (Testimony of Mr. Wise).

Not all BOP facilities provide treatment programs for sex offenders.  Currently, some form of sex offender treatment is available at nine BOP institutions.  *See* Federal Bureau of Prisons, *Custody & Care: Sex Offenders*, https://www.bop.gov/inmates/custody_and_care/sex_offenders.jsp (last visited July 25, 2016).

One of these institutions is the Federal Medical Center in Devens, Massachusetts ("FMC Devens").  FMC Devens is a federal administrative facility capable of holding inmates in *all security categories*.  Federal Bureau of Prisons, *About Our Facilities*, https://www.bop.gov/about/facilities/federal_prisons.jsp (last visited July 25, 2016).

Its focus is on housing inmates who require long-term medical or mental health care.  The facility's Psychology Services provide specialized treatment, including sex offender treatment, as well as "assessment services, with a goal of enhancing insight, coping skills and overall functioning."  Carolyn Rickards Williams, *Final PREA Audit Report* 3 (June 15, 2016) ("Williams, Final PREA Audit Report"), https://www.bop.gov/locations/institutions/dev/DEV_prea.pdf.  The Psychology Department's pre-doctoral internship program at FMC Devens is accredited by the American Psychological Association; it features two post-doctoral fellowship positions in sex offender management and treatment.  *Id.*  Other programs include work, education, and vocational training.  *Id.*  Both a Sex Offender Management Program ("SOMP") and a residential Sex Offender Treatment Program ("SOTP-R"), which houses a smaller number of inmates separately from the general population, are offered.

"Because of the unique programming offered at FMC Devens, *sex offenders make up approximately 40% of the inmate population*."  *Id.* (emphasis added).  Inmates with a history of sexual offenses are enrolled in the facility's SOMP automatically.  The intensive SOTP-R is instead purely voluntary.  *Id.*

The court visited this institution on December 17, 2010 and studied its sex offender treatment programs.  *See C.R.*, 792 F. Supp. 2d at 476, 520-24 App. B.  There is no evidence that conditions and forms of treatment there have substantially changed.

## 1. Sex Offender Management Program ("SOMP")

According to the BOP, SOMPs are offered at designated institutions in order to "assist in the effective management of the Bureau's population of sexual offenders and to provide services that minimize this population's risk for sexual reoffense." BOP Program Statement, Sex Offender Programs, section 1.1 (Feb. 15, 2013), https://www.bop.gov/policy/progstat/5324_010.pdf ("Sex Offender Program Statement"). SOMP institutions are primarily concerned with "*reduc[ing] the need to place sexual offenders in protective custody*, and to create an institution climate conducive to voluntary participation in treatment." *Id*. at section 1.1.a. (emphasis added). To this end, "SOMP institutions will maintain a significant portion of sexual offenders in the population." *Id*.

The BOP indicates that "[n]ewly sentenced inmates with a sex offense history may receive initial designation to a SOMP institution to have access to program components available at those facilities." *Id*. at section 1.2.1. According to the Bureau, "[t]he target population for SOMP is inmates with a history of convictions for sexual offenses." *Id*. at section 1.2.5. Inmates may be redesignated to a SOMP institution in order "to meet the population target percentage of sexual offenders." *Id*. at section 1.2.4.

Inmates may be redesignated to a SOMP facility for a number of additional reasons, including if they volunteered for participation in sex offender treatment services. *See id*. at section 1.2.2. The BOP notes that this category of inmates is a "priority for redesignation at SOMP institutions" and "[i]t is expected that SOMP institutions will accommodate these referrals." *Id*. Importantly, "*[i]nmates with verified protective custody needs due to their sex offense history may be redesignated to SOMP institutions*." *Id*. at section 1.2.3 (emphasis added).

The SOMP at FMC Devens was described by an official there as "*a way of managing sex offenders in the general population*." *C.R.*, 792 F. Supp. 2d at 523, App. B (emphasis added). Participation in the program is not voluntary. It constitutes an alternative to housing individuals

127

in the SHU.  Inmates in the SOMP have access to general psychology services and are monitored in a "specialized way" by staff.  They are encouraged to join treatment and may be moved into the SOTP-R if they volunteer for the program.  *Id*.

## 2.     Residential Sex Offender Treatment Program ("SOTP-R")

An SOTP-R is a "high-intensity program designed for high-risk sexual offenders."  Sex Offender Program Statement at section 3.1.  Inmates participating in the program are housed in a separate unit, in order to create a "modified therapeutic community" which prepares them for reentry into the outside world:

> The Residential Sex Offender Treatment Program (SOTP-R) is a high-intensity program designed for high-risk sexual offenders.  It is a unit-based program with a cognitive behavioral emphasis.  The cohousing of SOTP-R participants permits the implementation of a modified therapeutic community.  This model has been proven effective in reducing inmate recidivism.  A modified therapeutic community in a prison setting stresses pro-social values and behaviors that are needed in the outside community.

*Id*.; *see also id*. at section 3.5.5 ("Living together in a unit allows all inmates to work together to create a community that supports pro-social attitudes and behaviors.").

Inmates are prioritized for placement in SOTP-R programs based on their projected release date; they must generally have at least twenty-seven months left in their sentence in order to complete the program.  *Id*. at section 3.3.1.b.  Once they complete the program, inmates will be expected to continue treatment upon transfer to a Residential Reentry Center.  *See id*. at section 3.7.1.

FMC Devens offers a voluntary and intensive SOTP-R.  The description below of the program is largely derived from the court's visit to the unit in 2010, and the report of that visit published as Appendix B to the memorandum and order issued in the case of *United States v. C.R.*

128

Participants in FMC Deven's SOTP-R reside in separate housing in the downstairs section of the facility's G-Unit.  Inmates must volunteer in order to participate.  The SOTP-R unit includes several staff offices, providing inmates with greater access to staff than they would have in general population.  There is a common room that is used for SOTP-R treatment sessions.  Half the inmates participate in treatment during the morning and half are treated in the afternoons.  Treatment consists of group and individual sessions for three-and-a-half hours per day, five days per week.  Each participant is assigned a primary clinician.  Most of the treatment consists of group sessions within a "cognitive behavioral treatment modality."  The amount of individual treatment sessions varies based on each inmate's needs.  *See C.R.*, 792 F. Supp. 2d at 520-522, App. B.

The program takes approximately twenty-seven months from entry to completion.  Some inmates can complete treatment in eighteen months if no additional psychological services are needed.  *Id*. at 523, App. B.

An FMC Devens official explained to the court during its 2010 visit that "a 30 month sentence is reasonable to get treatment in the program," if the defendant wishes to volunteer.  *Id*. At the time, there was a waitlist of about 188 inmates, many with long prison sentences.  The waitlist is adjusted based on the length of time of the inmate's sentence so that, for example, a prisoner who has a ten-year sentence participates in the SOTP-R during the last few months of his term.  A prisoner who has a shorter sentence, for example thirty to sixty months, will be moved to the top of the list so that he does not run out of time to complete the program.  *Id*.  The process for admitting a defendant into the SOTP-R at FMC Devens was described to the court as follows:

1)  The sentencing judge must sentence the defendant to at least 30 months.

2)  The sentencing judge must recommend incarceration at FMC Devens with treatment in the SOTP-R.

3)  Upon self-surrender or transport to the facility, the prisoner must volunteer for treatment.

4)  At intake, psychology services will meet with the inmate, describe the services available, and ask if he would like to participate.  If the inmate volunteers, he will be moved into the treatment unit.

*Id*. at 524, App. B.

With respect to the safety of the sex offenders receiving treatment in the prison, the Warden explained that there have been situations where other inmates have alleged that sex offenders "propositioned" them or tried to get magazines that are only available in the general population. There was some concern that general population inmates would make false accusations because they do not like the sex offender treatment inmates.  *Id*. at 523-524, App. B.

When there is a concern for safety, a sex offender inmate may be housed in the K–Unit ("Special Housing"), the facility's solitary confinement unit, while an investigation is conducted into allegations.  At the time of this court's visit, none of the facility's officials indicated that there was a substantial probability of abuse of the sex offenders either while in the program or when in the general population.  *Id*.

Following the conclusion of treatment, inmates stay in the unit for a short period of time, the intensity of services is reduced, and they are then transitioned to the general population.  After discharge from the program, past participants still have access to medical maintenance services such as group sessions and community meetings.  *Id*. at 524, App. B.

The physical conditions, trained personnel, and facilities observed by the court supported the conclusion that a prisoner with the defendant's characteristics would be much less likely to be attacked or put in solitary confinement if housed at a facility like FMC Devens than if he were in the general population of a medium or high security prison—the probable assignment were the court not to intervene at sentencing.

130

### 3.    PREA Compliance

A PREA compliance audit of FMC Devens was recently carried out by an outside agency, the Nakamoto Group Inc.  A report, authored in June, was published in July.  *See generally* Williams, Final PREA Audit Report.

The audit, based on a review of relevant files as well as an on-site visit, found the facility in compliance with all applicable PREA standards:

> When the on-site audit was completed, an "out-briefing" meeting was conducted.  In addition to the PREA auditors, the Warden, members of the executive staff and the Bureau of Prisons PREA/ACA Liaison were present.  The auditor was provided extensive and lengthy files prior to the audit for review to support a conclusion of compliance with the standards governing the Prison Rape Elimination Act.  There were no areas of concern during the audit.  Institution staff were found to be extremely courteous, cooperative and professional.  All areas of the facility were found to be extremely clean and well maintained.  At the conclusion of the audit, the auditor thanked FMC Devens staff for their work and dedication to the PREA process.

*Id*. at 4.

The report stated that the federal medical facility is not overcrowded: it had a design capacity of 1,066 inmates and then housed 1,051 people.  *Id*. at 2; *see also* Federal Bureau of Prisons, *FMC Devens*, https://www.bop.gov/locations/institutions/dev/ (last visited July 26, 2016) (reporting that FMC Devens was currently housing 1,031 inmates at the institution's federal medical facility).

The audit found that inmates are almost always *screened for risk of victimization and abusiveness* the first day of their arrival and then reassessed within thirty days.  Williams, Final PREA Audit Report at 12.  "*Housing and program assignments are made on a case-by-case basis* and inmates are not placed in housing units based solely on their sexual identification or status."  *Id*.  (emphasis added).  Inmates who disclosed prior victimization during the screening process

were offered a follow up meeting with a medical or mental health practitioner.  *Id*. at 23.  The same applied to all of the inmates who were perpetrators of sexual abuse.  *Id*.  The report states that "FMC Devens offers medical and mental health evaluation and as appropriate, *treatment to all inmates who have been victimized by sexual abuse*."  *Id*. at 24 (emphasis added).

The audit found that "[t]here were 14 allegations of sexual abuse and sexual harassment during the auditing period"—*i.e.*, the past twelve months.  *Id*. at 9.  The report specified that "[a]ll 14 allegations resulted in an administrative investigation," and that "[t]here were no administrative findings of inmate-on-inmate sexual abuse" as well as "no cases of staff and inmates engaging in sex during the past 12 months."  *See id*. at 9, 22.

The auditors reviewed the facility's use of *involuntary* protective custody.  FMC Devens has seventy-two SHU cells and thirty locked inpatient cells in its psychiatric unit, which house inmates in both administrative and disciplinary detention.  *See id*. at 13.  It was concluded that:

> There were no inmates at risk of sexual victimization held in involuntary segregated housing in the past 12 months for one to 24 hours awaiting completion of assessment.  Additionally, there were no inmates at risk of sexual victimization who were assigned to involuntary segregated housing in the past 12 months for longer than 30 days while awaiting alternative placement.

*Id*.

According to the audit, "[i]interviews with staff and an examination of the facility indicated that *there is a viable alternative to the placement of inmates in involuntary segregated housing*.  Staff consider separate housing of the victim/predator, to include transfer of the inmates."  *Id*. at 19 (emphasis added).

No details were included in the audit as to the use, if any, of *voluntary* protective custody.

132

### D.    Risk of Harm Posed by Defendant to the Public

The parties were asked to address the risks posed by defendant to the public.  *See* Order, June 25, 2015, ECF No. 73.

Protection of the public is a matter of vital concern.  Defendant is not only guilty of viewing and possessing child pornography.  He has also been convicted of the sexual exploitation of a child.  Prior to the instant convictions, he was found guilty in New York State court of having molested three children.  Although not involving rape or sodomy, his conduct sets him apart from the usual passive child pornography viewers before this court.  *See, e.g.*, *United States v. E.L.*, No. 15-CR-137, --- F. Supp. 3d ----, 2016 WL 2939152 (E.D.N.Y. May 19, 2016); *R.V.*, 2016 WL 270257.

D.W. also presents some indication of lying to treatment providers and evaluating physicians.  He resumed downloading and viewing child pornography while he was undergoing court-ordered treatment following his release from State custody.  He lied to Dr. Prentky about his past conduct, although this could have been due to a rational fear of self-incrimination.  At the time Dr. Prentky evaluated D.W., the government had not yet learned that he had molested an additional child.  Dr. Rosenfeld, the doctor hired by the government to administer an IQ assessment, determined he could not opine about the defendant's mental capabilities other than to note that the defendant's efforts were insincere.  *See* Gov't Opp'n Post-Hr'g Mem., Ex. 501 (Confidential Psychological Evaluation by Dr. Barry Rosenfeld, Apr. 21, 2014) at 113-18; *see also supra* Part III.G.3.  Defendant also arguably lied to Dr. Krueger when he indicated that he was only interested in adult females.  *See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 81:23-82:09.

This section presents the sentencing hearing testimony of the medical experts, Dr. Krueger and Dr. Berrill, concerning defendant's diagnosis, risk assessment, and treatment options.  Only Dr. Krueger evaluated defendant on this issue.  D.W. declined, on the advice of counsel, to speak

with Dr. Berrill.  *See* Gov't Witness List, Nov. 6, 2015, ECF No. 87, at 1; *see also supra* Part III.G.3 (detailing Dr. Krueger's credentials and the basis for his evaluation of defendant).  Dr. Berrill's testimony was based only upon a review of relevant written materials, including the report provided by Dr. Krueger.  Hr'g Tr., Dec. 22, 2016, ECF No. 105, at 102:09-104:03.

The experts largely agreed on defendant's overall diagnosis—pedophilia and child pornography addiction—and that he presents a "moderate high to high" risk of sexual re-offense. They also agreed on the most appropriate treatment plan.  Their views diverged, however, on D.W.'s amenability to treatment and the most appropriate timing for that treatment.

### 1.      Pedophilia and Pornography Addiction

Following his evaluation, Dr. Krueger concluded that defendant met the criteria for pedophilia.  Krueger Report at 14.  He was also addicted to pornography:

> [D.W.] makes criteria for pedophilia, for a paraphilia [*i.e.*, condition in which a person's sexual arousal and gratification depend on fantasizing about and engaging in sexual behavior that is atypical and extreme] not otherwise specified or ephebophilia [*i.e.*, sexual attraction to adolescents], with a dysfunctional interest in teenagers, and for a sexual disorder not otherwise specified, or hypersexual disorder characterized by pornography dependence.

*Id*.

Dr. Krueger noted that once he was released from State prison, defendant initially resisted his urge to view child pornography.  He then relapsed, in part due to "depressed feelings when he stopped caring about himself and which his use of pornography improved."  *Id.*

Dr. Berrill agreed that D.W. suffers from pedophilic disorder and is attracted to young and adolescent boys.  He described defendant's relapse into viewing child pornography as evidence of "the compulsive nature of his behavior."  He explained:

Q.      [W]hat conclusions did you draw from the defendant accessing child pornography after he had spent three years in prison?

A.      Well, the fact that he was released from prison for these hands-on sex crimes, and within several months seems to have directly begun to access vis-à-vis the Internet child pornography, I think speaks to the compulsive nature of his behave[ior], the lack of control.

And not only that, but his obvious and clear interest in young boys, I mean, I don't think that that can be questioned.  I think Dr. Krueger rightly pointed out that, you know, *he is suffering from pedophilic disorder.  He's attracted to young boys.  He's also attracted to adolescent boys and that's quite clear.*

Hr'g Tr., Dec. 22, 2015, ECF No. 105, 107:09-22 (emphasis added).

## 2.      Risk Assessment

Dr. Krueger administered several tests aimed at assessing defendant's general risk of "sexual re-offense."  Krueger Report at 14-15.  He concluded that D.W. presents a "*moderate high to high risk*" of re-offending.  *See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, 17:04-06 (emphasis added).

He explained the test results in his report:

[D.W.]'s risk of sexual re-offense is high according to several instruments used to assess such risk.  He receives a score of 21 out of 40 on the Hare Psychopathy Checklist, substantially elevated; such an elevation is associated with an increased risk of recidivism.  He receives a score of 6 out of 12 on the Static-99; this is in the high-risk range.  He has 9 out of 20 factors associated with an increased risk of re-offense on the SVR-20, and he receives a score of 8 on the SONAR, which is in the moderate high range.  Finally he receives a score of 16 out of 43 on the Level of Service/Case Management Inventory, which places him at substantial risk and substantial need for services.

Krueger Report at 14-15.  Dr. Berrill agreed that D.W.'s risk of re-offense was high.  He referred

to defendant's misrepresentations to his treatment providers and described a "compulsive need" to

be near children:

> Q.     You mentioned on a few occasions your agreement with
> what Dr. Krueger talked about in his report. What was your
> general impression of Dr. Krueger's report?
>
> A.     I think by and large it was a good report. . . . I think it was a
> very thorough, complete report, gave a lot of good tests,
> collected a lot of good data and arrived at a conclusion
> which, apart from what he thinks about sentencing and on,
> he clearly states in his report.
>
> I understand that this is a high-risk offender.  He gets it.  He
> states it pretty clearly and has said here this morning that he
> understands that that high risk reflects the possibility of
> physical touch or reflects the possibility of returning to the
> Internet, you know, to look at child porn.  He understands
> that this man is simply for a high risk for these things and
> regardless of what interventions have been tried, he also
> acknowledges that in essence this man has misrepresented
> and lied, you know, with respect to the manner in which he's
> filled out some of the questionnaires and moreover during
> the course of treatment, most recently when he was out, that
> he withheld very important information from his therapist.
>
> So he certainly demonstrates not only on the Hare
> Psychopathy Checklist, but also in real life in his real
> behavior, *he demonstrates a very clear penchant for
> misrepresenting his behavior and indulging those behaviors
> that were already described as his compulsive need to be
> near kids, to touch kids and to look at pictures related to
> children, sexual pictures*.  So, I mean, you know, in a sense,
> we are in agreement in that regard.

Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 115:10-116:16 (emphasis added).

At the evidentiary hearing, the experts were asked to analyze defendant's risk of sexual re-

offense by assessing the likelihood of his reengaging in a contact versus a non-contact sexual

offense.  Dr. Krueger explained that the tests he had administered do not take into account this

distinction.  *See id*. at 21:11-16 ("But these particular instruments don't partition the risk for

contact and noncontact.  They are just sort of a global sense.  In fact, most of them have been developed contemplating from contact, from large data sets that involve contact offenses."); *cf. C.R.*, 792 F. Supp. 2d at 430-32, 445-60 (discussing issues of bias and other problems in using tests to assess recidivism risk in the case of a defendant not charged with a contact sexual offense); Jed S. Rakoff, *Neuroscience and the Law: Don't Rush In*, N.Y. Review, May 12, 2016 at 31 ("[I]f there is one thing psychiatrists are not very good at, it is predicting future violence.  Indeed, in an amicus brief submitted to the Supreme Court in 1980, the American Psychiatric Association reported that its members were frequently no better than laypeople in predicting future violence.  The 'future danger' test, it argued, was therefore not a very useful one.").

Clinical analysis was therefore used to assess future risk.  Under this approach, "past behavior predicts future behavior."  Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 21:18-22.

Dr. Krueger pointed out that defendant's most recent known past sexual contact offense occurred in 2009.  This involved giving "wedgies" to three children and fondling two of them, for which defendant was convicted in State court, and molesting a young boy in the back of a car, which is part of the basis for the instant case.  *See supra* Part II.F and Part III.C.  Since then, defendant had been in prison on State charges, then in the community for nine to ten months, and then again in custody in the present case.  There is no evidence that, during the nine to ten months defendant was in the community, he engaged in any sexual contact with minors.  But, he did revert to downloading and viewing child pornography.

Dr. Krueger concluded that D.W.'s past behavior indicates that he is more likely to re-engage in the viewing of child pornography rather than in committing a contact offense.  He explained that D.W. has "gone from contact offenses with the wedgies and making child pornography to noncontact, to viewing pornography. He's always been involved with child

137

pornography, but he did not reengage in contact offenses in the time that he was in the community

for nine months."   Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 30:09-13.   According to this

defendant's expert, however, D.W.'s risk of committing either a contact or non-contact sexual

offense remained "moderate high or high":

> Since he's either in prison or he's in the community for a year, what
> he's done has been involving himself with child pornography, but
> not contact -- not contact issues.  This would [be] something that in
> his period at risk in the community for a year, he did not attempt, as
> far as we know, he did not attempt or was not charged with any
> contact offense involving a child.  *So it seems to me this would
> suggest that the enduring behavior would be more likely to be child
> pornography than it would be contact offenses, so to speak. So I
> would say, I would still say that his risk of a contact offense,
> according to these instruments is moderate high or high.  His risk of
> using child pornography I would say again is still moderate high or
> high*.

*Id*. at 22:06-19.

Dr. Krueger further explained that the greater risk of recidivism concerned the viewing of

child pornography:

> WITNESS:   But I think that he hasn't done this [contact sexual
> offenses] since 2009.  He has been at liberty for nine
> months.  I think that this, to me, would – he's also
> had this whole matter of the legal process and the
> consequences and so on.  *And I think that, you know,
> the greater risk would be for his viewing of child
> pornography, which has been a much more
> substantial habit for him*.
>
> COURT:   Well, you say "the greater risk." There is a risk of
> viewing in the future, substantially?
>
> WITNESS:   *There's a risk. There's a risk of both sexual contact
> and there's a risk of viewing pornography in the
> future going forward.  I think you have to address
> both of those.  I think that, you know, the more likely
> kind of event would be viewing of pornography as
> opposed to actually touching a person or producing
> pornography because it's been some time since he's
> done that and could have done that*.

*Id*. at 25:06-21 (emphasis added).

He then differentiated between types of contact sexual offenses, pointing out that defendant's behavior involved "some touching" but no "penetrative sexual behavior":

> *I think within the range of contact offenses, there's a whole variety of elements that you can look at from coercion, bribery to penetration to sadistic sexual acts of, you know, any nature.* So I think there's this dimension. From what I understand, his behavior with respect to these two or three boys *involved some touching, but no penetrative sexual abuse or other sexual abuse.* Again, I would fall back on past behavior predicts future behavior and I think that it's -- that I would be concerned about -- the concern would be that he might in some fashion coerce somebody, some such thing as that.

*Id*. at 24:17-25:03 (emphasis added). This doctor concluded, based on the nature of defendant's past contact offenses and other available information, that D.W. is at a greater risk of reengaging in an offense involving "light touching"—meaning masturbation or indirect touching, such as through social media—rather than "heavy touching" such as penetration. Yet, the risk of "heavy touching" could not be ruled out:

COURT:       Is there a risk of this kind of touching, either of a major kind, penetration, assault, as a major type of touching, and of [a] lighter type of touching, masturbation, indirect touching, socially?

WITNESS:     Yes.

COURT:       And his pulling of underwear, that's a form of touching. I don't like to characterize it as minor, because it's important, but it's less intrusive and dangerous than the penetration/assault-type of sexual touching, right?

WITNESS:     Yes, that's correct.

COURT:       All right. So we have subcategories there. I will call it light touching and heavy touching, just for purposes of the discussion. Heavy touching, what risk?

| WITNESS: | *It seems to me that his risk is going to be for light touching, not heavy touching. You can't entirely eliminate the risk of heavy touching, but I think that overall, the more substantive risk is toward non-touching or light touching, so to speak.* |
|---|---|
| COURT: | Well, again, you put your answer into terms "more or less than." *Is there a substantial risk here of any form of heavy touching*? |
| WITNESS: | *Yes.* |
| COURT: | *And of light touching*? |
| WITNESS: | *Yes.* |

*Id*. at 25:22-26:20 (emphasis added); *see also id*. at 28:08-12 ("But you could certainly make a gradient from light touching to heavy touching to, you know, sadistic touching, that kind of thing. And he clearly is at the light side of things, so to speak, with respect to his risk for touching.").

Dr. Berrill agreed that D.W.'s past behavior provided useful insight into risk.   He emphasized that this included both contact and non-contact sexual offenses:

| Q. | Now, those prior touching offenses, what . . . do those tell you about the future risks he might pose? |
|---|---|
| A. | Well, again, as Dr. Krueger rightly pointed out earlier, you know, if you want to take a guess or make a prediction about the likelihood of recidivism, you know, past behavior is a good place to start.  *So we know that in this case, this is not only a situation where [D.W.] was looking at child pornography or downloading it or obtaining it, but he has a history of touching and sexually abusing kids. So that's part of his behavior repertoire with respect to the kind of sex offenses he's capable of engaging in.* |

*Id*. at 106:23-107:08 (emphasis added).

### 3.    Significance of Fantasies

At the evidentiary hearing, the medical experts were asked to opine on the significance of relevant documents.

### a)  Letter Concerning Sexual Fantasy with Young Boy

Both experts were asked to evaluate the significance of the handwritten note found in D.W.'s belongings while he was at the MDC, in which he describes a fictional consensual sexual encounter with an eight-year-old boy at a water park.  *See* Gov't Ex. 404 (Def.'s Handwritten Notes); *see also supra* Part III.F.2.

According to Dr. Krueger, this note is reflective of D.W.'s pedophilia; it is a typical cognitive distortion that would need to be addressed through treatment:

> Q.  Now, in this particular document, the defendant fantasizes about meeting an eight-year-old at a water park at which point, I think it's fair to say the eight-year-old child seduces him rather than vice versa.  The eight-year-old child, they engage in various types . . . of heavy petting and then engage in oral and anal sex, with the eight-year-old child seemingly the individual who is initiating the contact.
>
> Now, in your review of pedophiles and individuals who desire to have sex with children, does the imagining that the child is the one who is actually steering the situation, is that something you commonly see?
>
> A.  Yes.
>
> Q.  And what does that reflect?
>
> A.  That would reflect his pedophilia.  I mean, these are, you know, typical fantasies of somebody who is a pedophile. . . . I think the issue is [would] these sorts of cognitive distortions be better addressed in a treatment program in the community or in a treatment program in a prison?  And I would say it's *better for him to be sort of in the community and dealing with real stimuli than in prison*.
>
> Q.  Does it change your risk assessment if you come to believe that the defendant believes his victims want what's happening rather than are being subjected to it?
>
> A.  No.  I mean, *it's an element of his cognitive distortions*, but the other risk assessment instruments are more controlling, so to speak, have more impact in terms of my opinion than this particular item.  I mean, pedophiles have cognitive

distortions.  That's one of the focuses of treatment.  He had
. . . a significant number of cognitive distortions.  So this is
*something you have to treat*.  But I think you could treat this
*in the community* instead of necessarily in prison.

Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 78:21-80:03 (emphasis added).

Dr. Berrill agreed that the note "is part and parcel of [D.W.'s] pedophilia."  He added that

it underscores defendant's risk of reengaging in a contact offense:

> Q.    So this will be the final topic I would like to cover with you
> on this area, the written statement from the prison that you
> reviewed.  What does it say to you that the defendant
> imagined the child in question not just being a participant,
> but being the initiator or somebody who drove the sexual
> conduct?
>
> A.    Well, again, as Dr. Krueger has suggested, this is part and
> parcel of his pedophilia.  But it's quite significant.  It's not -
> - you know, he is really seriously interested in having sex
> with kids.  And he does an interesting thing, which is even
> after having had two perhaps failed brushes with treatment,
> one in jail as I understand and one once he was released from
> prison in the community, he still finds a way of constructing
> fantasies which, again, sort of abrogates his responsibility,
> but instead looks at an eight-year-old boy as someone who
> has the agency to initiate [a] full-blown sexual encounter,
> you know, in a water park or an amusement park.
>
> And the fantasy that he indulges in is one that includes oral
> sex and anal sex.  And he sees the boy as, I don't think he
> would see him as the aggressor or the initiator of this sexual
> contact.  It gives you a hand of where his sexual fantasies are
> at and where his thinking is at and also in a qualitative sense
> supports the notion that he's a high-risk individual with
> respect to the possibility of re-offending.  As Dr. Krueger
> said, I agree with him that re-offending could likely be
> physical touching.  And it can also be re-offending with
> respect to accessing the Internet and looking at child porn.  I
> think it's both.  That's really both of the -- both things are
> part of his history, irrefutable, undeniable and in the record.

*Id.* at 114:04-115:08.

Dr. Berrill recognized that D.W.'s sexual fantasy, as well as his other symptoms including his addiction to child pornography, are likely to be linked to the extreme abuse he suffered as a boy:

> Q.    [I]n light of [D.W.]'s horrible abuse as a young boy, it would make sense to understand later symptoms such as viewing child pornography and writing a story like the one we're talking about in light of that prior childhood trauma; is that correct?
>
> A.    *Well, there's certainly some relationship between all of this. I don't doubt that. His early inappropriate exposure to sex, his being abused as a kid and traumatized, I'm sure it did lay the groundwork for his developing an interest in finding young kids sexually attractive.*
>
> What the specific mechanisms are, I don't know. As I said, I haven't talk[ed] to him, so I don't know how he constructs that. And I can only state from the outside, sure, there's some I would imagine relationship between all of these things.

Hr'g Tr., Dec. 23, 2015, ECF No. 104, at 240:15-241:04 (emphasis added).

### b)      Fictitious Bus Company Applications

The experts were asked about the significance of D.W.'s creation of a fictitious bus company, "Mike's Transportation," including his design of a questionnaire for potential "applicants." *See supra* Part III.A.2.

Dr. Krueger testified that the questionnaire "seemed to be kind of a fantasy construction" rather than a document that would be seriously handed out to others. *See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 88:08-12. He nonetheless explained that creating and distributing such a document would be "consistent with a pedophilic pattern" as well as with someone who scores high on the Hare Psychopathy score:

> Q.    Do you remember reviewing an application for Mike's Transportation?

A.      Yes.

Q.      What do you recall of that document?

A.      It was a strange document.  He developed some kind of interview schedule which could be apparently administered to various people which had questions involving somebody's sexual history and other such things.  It just, yes -- it appeared to have been borrowed somewhat from a template that he found online and otherwise.  What he did with this document I don't know.  It was just sort of an odd document that contained a lot of sexual questions, inappropriate questions.

Q.      And questions about children as well, do you recall?

A.      To my recollection, yes.

Q.      Now, would distributing that document, that false document, be consistent with some of the antisocial proclivities that you described before?

A.      Well, distributing, writing the document, it's not exactly an arrest or some such thing as that.  It's an odd thing.  It certainly could be consistent with a pedophilic interest pattern.

Q.      Let me rephrase.  Would pretending to be part of a company in order to find information or photographs about somebody's -- a stranger's sexual proclivities or behavior, would that be consistent with somebody who scores high on the Hare psychopathy score?

A.      Yes, sure.

*Id.* at 70:25-72:01; *but see supra* Part III.A.2 (defendant's counsel explaining the connection to D.W.'s childhood traumatic experience and his related desire to become a bus driver).

### 4.     Amenability to Treatment

#### a)     Defendant's Child Pornography Addiction

The experts testified as to the relevance of defendant's child pornography addiction on future activity. According to Dr. Krueger, defendant is amenable to treatment; his recognition of his addiction to child pornography is a first step in this direction:

> [D.W.] said that he was interested in treatment. He was insightful. He realized, he said he had a problem with pornography addiction, which I agree with, and he realized he had a problem with pedophilia and with atypical sexual arousal with paraphilia. So I think he's insightful. He realized that he wants treatment and he said that he's willing to engage in it.

Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 32:24-33:05.

Dr. Berrill initially testified that defendant's self-professed addiction to child pornography was a factor increasing his overall risk, because it indicated that defendant himself felt he had no control over his actions:

> Q.    The sixth issue I would like to ask you [about] is, what conclusions did you draw from the defendant's own statement that he's addicted to child pornography?
>
> A.    Well, you know, you use a term like "addiction," you are talking about locus of control. You can talk about "I'm attracted to" or "I like." But, you know, when you choose that word "addiction," what you are saying is, I am powerless to control my impulses or compulsivity to make contact with either child porn or kids or whatever the case may be.
>
> And this is how he sees himself. This is how he expressed his own desires for children, his own desires to be next to kids as an addiction. I need to see this stuff. I need to be around it. I need to look at it. I need to be turned on by it. *So it's troubling because the locus of control is sort of out of [the] window. It's totally external. He doesn't take any responsibility for or knowledge that he might be able to control that himself.*

145

> Q.      Did the defendant show[] signs or indicate[] that he didn't believe he has control over this, what does that say to you about his risk?
>
> A.      Well, it just increases the risk from a qualitative point of view.   Again, a lot of effort was made to point out the difference between psychometric risk assessment, that is to say, the scores one receives on psychological tests or behavioral tests.
>
> And then there's the qualitative dimension of what we do as psychologists and psychiatrists, which is to interview people and get a sense of who they are, what are their self-controls? What are their ego strings?  How do they operate in the world?  And *it's of concern that this guy*, you know, stated quite frankly that I just, *I'm helpless to control these impulses*.  I can't -- I can't control them.

*Id*. at 111:09-112:15 (emphasis added).

He then concluded that defendant's recognition of his child pornography addiction could be a sign of his acceptance of responsibility and "motivation to get better":

> Q.      [D.W.] also said that he recognized that he had a problem with pornography addiction, isn't that correct?
>
> A.      Yes.
>
> Q.      And that it was an inappropriate interest, isn't that correct?
>
> A.      Yes.
>
> Q.      And so, he raised the issue of addiction in connection with his need for him, isn't that correct?
>
> A.      I believe so.  *That he was interested in help, yes*.
>
> Q.      Isn't it important for purposes of treatment to acknowledge a problem?
>
> A.      Sure.
>
> Q.      And that, in fact, acknowledging a problem such as by using the words "pornography addiction," might indicate some lack of control at the moment, isn't that correct?

A.     Well, I guess that's what I was saying earlier that, of course, you're making a point I made earlier.

Q.     *But also of someone who wants to gain control*?

A.     *Yeah, that's what it would suggest.*

Q.     So it shows some honesty?

A.     Again, I don't know if it shows honesty.  It shows what he's saying about the situation.

Q.     *Motivation to get better*?

A.     *Motivation to get better.*

Q.     *And isn't that a first and an important step in treatment*?

A.     *I think it is. I think you have to acknowledge that there was a problem that needs to be addressed, of course.*

Q.     *And it's a way of taking responsibility for one's problem, too*?

A.     *To some degree it is, sure.*

Hr'g Tr., Dec. 23, 2015, ECF No. 104, at 259:02-260:07 (emphasis added).

Dr. Krueger gave significant weight to the fact that D.W. misled his prior treatment providers by not disclosing that he was viewing child pornography while in treatment following his release from State custody.  In Dr. Krueger's opinion, defendant's deception was consistent with his high score on the Hare Psychopathy test.  It represented a further challenge that the doctor believed could be effectively addressed through proper treatment:

Q.     Does that concern you in terms of his amenability to treatment?

A.     Yes.  I mean, he's somebody, he had a score of 21/22 on the Hare Psychopathy Checklist.  This is a significant score.  In interviewing him, he's a very -- he has a lot of street-wise sense about him.  I think you would have to be concerned about his, you know, his psychopathy, so to speak.  He doesn't fulfill the criteria for being a full psychopath which was a 25 or 30 out of 40.  And I think that psychopaths are

147

> treatable.  I think that the fact that you are aware that he has a score, has this history of misleading New York forensic that this could be well taken into account in future treatments for him.
>
> Q.      So that would be one of the challenges of treatment that a good program and good therapy could address; is that correct?
>
> A.      Yes.

Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 47:02-18.

### b)      Defendant's Empathy

Both experts agreed on the importance of empathy in the treatment of sex offenders, who are asked to relate to their victims in order to understand the wrongfulness of their conduct.  A lack of empathy is associated with a greater risk of sexual re-offense.  *See, e.g.*, Hr'g Tr., Dec. 23, 2015, ECF No. 104, at 244:14-245:09 (Dr. Berrill testified to the importance of empathy noting that the "lack of empathy . . . is correlated with recidivism and essentially dangerousness with respect to sex offending.").

Their opinions diverged, however, with respect to their assessment of defendant's ability to feel empathy.

Dr. Krueger believed that defendant's prior sexual victimization would allow him to empathize:

> Q.      . . . In the course of your personal evaluation of [D.W.], did you come to any conclusions about his capacity for empathy?
>
> A.      Yeah, I think that he's empathic.  I mean, I think that I read somewhere Dr. Berrill suggested that he wasn't empathic.  *I mean, this certainly is part of treatment of sexual offenders, of child porn sexual offenders*.  They are asked to try and empathize with their victims and try to come to some realization.  It's not clear this was -- this was administered to him, this sort of treatment was administered to him.

> But if you look at his history, *this is a man who had been incredibly sexually abused, physically abused and so on. And seems to me if anybody could empathize, he could. And in my interactions with him, I certainly felt that he could empathize, that he was capable of empathy and expressed some empathy.*

Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 87:09-25 (emphasis added).

Dr. Berrill disagreed. He considered defendant's continued resort to child pornography and sexual fantasies involving minors an indication of his yearning for that type of contact:

> Q.    [W]hat conclusions did you draw concerning the defendant's prior victimization?
>
> . . .
>
> A.    Yeah. Well, you know, it's obviously ugly and a terrible story. I read the background. I read several different reports, including Dr. Krueger. It's awful. But this is where I might differ from Dr. Krueger in the sense that he was suggesting that this enhances or did enhance the defendant's empathy. And I disagree with that. I don't think there was empathy. I think that his scores on the psychopathy index directly undercut that notion that he has empathy for the victims.
>
> *Number two, his compulsivity and inability to control those impulses do not reflect any empathy based on his own experience of having been victimized.* One could potentially be quite empathic given the idea they were victimized as kids. And you would then have to demonstrate how in actual life or how in their contact with kids, their interaction with others they demonstrate a sense of empathy. It's a construct. It's a psychological construct. And I don't see where that gets played out. *All I see is someone who continuously feeds and self-stimulates and luxuriates, is the word I would use, in the notion of having sex with kids and doesn't, I don't think he demonstrates any empathy. He's going to physically victimize, continuously access child pornography on the Internet. He continues even while in prison when he has no access to computers or access to electronics that could assist him with facilitating his acquisition of child porn, he then invents and writes stories about molesting eight-year-old boys and having a very rough kind of and a very physically – I forgot the exact word, light touch and heavy touch. Heavy touching with boys, that's part of the*

149

> *fantasy.  And that doesn't say empathy to me.  That says this*
> *is a fellow that craves that kind of contact with children.*

*Id*. at 112:16-114:03 (emphasis added); *see also id*. at 119:14-21 ("And as I said earlier, I really question the whole empathy issue.  I don't know that he does have well-developed appropriate, age-appropriate empathy for his victims or those children depicted in child porn who have been victimized.  I don't think he has it.").

The government's expert acknowledged that defendant's statements to the court, including his oral remarks at the November 23, 2015 evidentiary hearing and his letter dated July 6, 2015 did suggest a degree of empathy:

> Q.     Let's move from the studies on empathy to your testimony
>         that [D.W.] has not shown empathy.
>
>         In the first day of this hearing on November 23rd of 2015,
>         and I'm quoting from Page 5 of the transcript. . . .
>
>         I'm going to quote a question from the Court and an answer
>         from my client.
>
>         "THE COURT:  Okay.  What did you want to say, if
>         anything, you're not compelled to say anything."
>
>         "THE DEFENDANT:  I want to take responsibility for my
>         actions and I don't want to put my victims through anything
>         more revictimizing [*sic*], making them relive everything
>         over and over again by having to bring a trial."
>
>         Having heard that, doesn't that statement show empathy for
>         his victims?
>
> A.     It may.  I mean, you know, it seems empathic on face value.
>         It doesn't sound bad, it sounds like a good thing to say.  I
>         don't know how genuine it is. I don't know why he said it, I
>         have no way of knowing that just on face value.
>
> Q.     We don't know how genuine what anybody says [is]; is that
>         correct?
>
> A.     To some degree that's accurate.

Q.  To some degree, we have to rely on the words that people speak.

A.  You have to rely on the words people speak and look at it in the context of their behavior and try to reach some conclusion as to what might be real or what's not real.

Q.  And if we look at the words that he spoke on that occasion [do] show empathy; is that correct?

A.  *It suggests empathy, sure*.

Q.  [D.W.] sent a letter to the Court.  Are you aware of that letter?

A.  I think I am, yes.

    . . .

Q.  In that handwritten letter from [D.W.] to the judge he said that he was concerned about putting and I quote, "My family's life out there as well and the public will judge not only me but my family for my mistakes."

A.  Okay.

Q.  Now, in light of those written words of [D.W.] taken in and of themselves they show empathy, don't they?

A.  They show concern for the impact of this trial on his family.  I don't know if it demonstrates empathy per se, but I understand that he's showing some concern for how all this might play out to his family.

Q.  And to show concern for other people is one aspect of [empathy], isn't it?

A.  It is.

Q.  And showing concern for one's family is one aspect of empathy, isn't it?

A.  It could be, yes.

Q.  Now, later in that letter he wrote, and I quote, "I also do not want my victims to go through any more hurt, pain, embarrassment.  I know how it feels and I wanted to spare them as much as I can.  I am so sorry for all my actions that

151

> have caused so many people hurt and pain and embarrassment."
>
> Now, taking those words on face value, they show empathy, don't they?
>
> A.   On face value, they certainly suggest empathy.

Hr'g Tr., Dec. 23, 2015, ECF No. 104, at 245:15-248:06 (emphasis added).

Dr. Berrill also recognized that defendant's letter to the court and his actions upon his arrest

in the instant case indicated remorse for his crimes:

> Q.   And [D.W.] has also expressed remorse for his crimes, hasn't he?
>
> A.   I believe he has.
>
> Q.   In his letter to the Court, which I just quoted to you on Page 2, he said and I quote, "I also wanted not to go to trial and accept full responsibility for my mistakes and actions, and I felt by not going to trial I was accepting responsibility." The word not is crossed out. "I was accepting responsibility and that is the think [*sic*] that I want to do."
>
> That statement in [D.W.]'s handwriting to the judge also shows remorse, doesn't it?
>
> A.   Again, it would seem that it does.
>
> Q.   And in Dr. Krueger's evaluation, he stated that [D.W.] had expressed remorse for his crimes, isn't that in Dr. Krueger's report?
>
> A.   I believe so it is.
>
> Q.   And when [D.W.] was arrested he admitted to the agents that he had been sharing child pornography, isn't that correct?
>
> A.   I believe so, yes.
>
> Q.   He gave the agents permission for access to his GigaTribe account, isn't that correct?
>
> A.   Yes.

> Q.     And he acknowledged in a handwritten statement that he had shown child pornography to his victim in his 2009 case, isn't that correct?
>
> A.     I believe so, yes.
>
> Q.     And that all [this] is another way of expressing remorse, isn't it?
>
> A.     It might be.

*Id*. at 248:18-249:23.

### 5.     Effects of Incarceration on Defendant's Recidivism

#### a)     Empirical Research

At the evidentiary hearing and in their post-hearing briefs, the parties referred to studies on the relationship between incarceration and sex offenders' recidivism risk.  *See* Gov't Suppl. Mem. of Law in Response to the Court's Apr. 8, 2016 Request for Additional Briefing, Apr. 25, 2016, ECF No. 148 ("Gov't Suppl. Mem. of Law"), Ex. 801 (Roger Przybylski, *Adult Sex Offender Recidivism in* Sex Offender Management Assessment and Planning Initiative, Office of Justice Programs, Department of Justice, http://www.smart.gov/SOMAPI/sec1/ch5_recidivism.html ("Przybylski")), Ex. 802 (Kristin Budd & Scott Desmond, *Sex Offenders and Sex Crime Recidivism: Investigating the Role of Sentence Length and Time Served*, 58(12) Int'l J. of Offender Therapy & Comp. Criminology 1481 (2013) ("Budd & Desmond")); Def.'s Ex. EE (R. Karl Hanson *et al*., *High Risk Sex Offenders May Not Be High Risk Forever*, 29 J. of Interpers. Violence 1 (2014) ("Hanson *et al*., 2014")); Def.'s Ex. FF (Kevin L. Nunes *et al*., *Incarceration & Recidivism Among Sex Offenders*, 31 L. & Hum. Behav. (2007) ("Nunes *et al*.")); Def.'s Ex. GG (R. Karl Hanson *et al*., *Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies*, 66 J. of Consulting & Clinical Psychol. 348 (1998) ("Hanson *et al*., 1998")).

As stated in the 2013 study carried out by Kristin Budd and Scott Desmond, although there is an abundance of research on sex offender recidivism in general, "the literature on sentence length, time served, and sex offender recidivism" is "sparse." *See* Gov't Suppl. Mem. of Law, Ex. 802 (Budd & Desmond) at 1485.

Research on sex offender recidivism is subject to several limitations. Studies may measure recidivism rates differently or fail to account for different types of sex offenders, leading to seemingly inconsistent results. Gov't Suppl. Mem. of Law, Ex. 801 (Przybylski) at 3. Available studies also generally focus on contact offenses rather than child pornography non-contact crimes. An additional factor is that research indicates that sexual offenses are generally underreported, in particular when the victim is a child. *See, e.g.*, *id.* at 2, 7 (noting studies indicating that sex offenders were arrested for between one and five percent of the actual offenses they committed and that "the likelihood that a sexual assault will be reported to law enforcement decreases with the victim's age").

Relevant findings from the studies cited by the parties in the instant case are summarized below:

- Gov't Suppl. Mem. of Law, Ex. 801 (Przybylski): The study summarizes prior relevant research on the recidivism rates of convicted sex offenders. It notes that "[t]he measurement problems found in sex offender recidivism research no doubt have contributed to a lack of consensus among researchers regarding the proper interpretation of some research findings and the validity of certain conclusions." *Id.* at 1. The paper sets forth the following relevant research findings: (1) several studies found that sex offenders who undergo treatment are less likely to reoffend; (2) the observed recidivism rates of sex offenders tended to increase as post-release follow-up periods became longer ("[t]he observed sexual recidivism rates of sex offenders range from about 5 percent after 3 years to about 24 percent after 15 years"); (3) sex offenders are more likely to reoffend by committing a non-sexual crime than a sexual crime; (4)

different types of sex offenders have very different rates of recidivism; (5) with respect to child molesters, the research indicates that "the highest observed recidivism rates are found among child molesters who offend against boys." *See id*. at 9-10.

- Gov't Suppl. Mem. of Law, Ex. 802 (Budd & Desmond):  The Budd and Desmond study consisted of an analysis of 8,461 sex offenders released in 1994 from thirteen states. *Id*. at 1485.  The authors studied sex crime recidivism for rapists, perpetrators of sexual assault (excluding rape and child molesting), child molesters (defined as those sex offenders "having forcible or non-forcible sexual contact with a child up to and including intercourse"), and all sex offenders combined. *Id*. at 1486.  The authors used two different measures of recidivism: *rearrest* for a sex crime offense and *reconviction* for a sex crime.   The study found that when recidivism was measured as rearrest for an additional sex offense, there was no significant relationship between recidivism, sentence length and time served.  When recidivism was measured as an additional conviction for a sex offense, the researchers observed that "each additional month of incarceration was associated with a slight *decrease* in the odds of recidivism for child molesters." *Id*. at 1493 (emphasis in original).  Each additional month of incarceration was instead associated "with a slight *increase* in the odds of sex crime recidivism for rapists, sexual assaulters, and all sex offenders combined."  *Id*. (emphasis in original). The study also found an association between age and sex crime recidivism: "[f]or each additional year a sex offender ages in prison before release, the odds of recidivating with a new sex crime after release from prison decreases by approximately 2% for rapists, 3% for sexual assaulters, and 3% for child molesters, holding all other variables constant."  *Id*. at 1489.

- Def.'s Ex. EE (Hanson *et al*., 2014): The study analyzed sex offender recidivism over a twenty year period.  It found that "the risk of sexual recidivism was highest during the first few years after release, and decreased substantially the longer individuals remained sex offense-free in the community."  *Id*. at 1.

- Def.'s Ex. FF (Nunes *et al*.):  This was a study of 627 Canadian adult male offenders.  It investigated the relationship between incarceration and recidivism.  The offenders

were eighteen years or older at the time of their "hands-on sexual offense against an adult or a child." It concluded that "[s]entencing sexual offenders to terms of incarceration appears to have *little, if any, impact* on sexual and violent recidivism following release." *Id*. at 305-06 (emphasis added).

- <u>Def.'s Ex. GG (Hanson *et al*., 1998)</u>: The study observed low rates of sexual offense recidivism. It found that "the strongest predictors of sexual recidivism were factors related to sexual deviance. . . . With the exception of personality disorders, psychological maladjustment had little or no relationship with any type of recidivism. A negative clinical presentation (e.g., low remorse, denial, low victim empathy) was unrelated to sexual recidivism but showed a small relationship with general recidivism." *Id*. at 357. Failure to complete treatment "was a significant predictor of both sexual and nonsexual recidivism." *Id*. "Even if we cannot be sure that treatment will be effective, *there is reliable evidence that those offenders who attend and cooperate with treatment programs are less likely to reoffend than those who reject intervention*." *Id*. at 358 (emphasis added).

### b)      Expert Testimony

At the evidentiary hearing, Dr. Krueger was asked about the conclusions drawn in the Nunes study. *See* Def.'s Ex. FF (Nunes *et al*.) (concluding that "[s]entencing sexual offenders to terms of incarceration appears to have little, if any, impact on sexual and violent recidivism following release"). He testified that, in general, he agreed with the determination that incarceration has little effect on sex offender recidivism:

> Q.      And you agree with the main conclusion as summarized at the end of the abstract that sentencing sexual offenders to terms of incarceration appears to have little, if any, impact on sexual and violent recidivism following release; is that correct?
>
> A.      Yes.
>
> Q.      And that's consistent also with your clinical practice [and] your experience from your clinical practice and your research; is that correct?

156

A.     Yes.

Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 90:16-25.

Yet, he explained that the effect of incarceration on D.W. was likely to be more intense,

potentially increasing his risk of recidivism, because of his unique vulnerabilities:

> Well, I think that this is one study that, you know, that suggests that recidivism -- that incarceration is not related to recidivism. I think that -- I don't know the characteristics of the individuals in this article that they have -- the database has been arrested for sexual offenses.  Beyond that, we don't have any detail[ed] information. What I do have is detailed information about [D.W.] and a detailed analysis.  And this is what leads me -- his, you know, how many individuals, for instance, were raped while in prison?  How many individuals had an adverse childhood experience[] an [a] score of nine out of ten?  We just don't know that. *I know that with respect to [D.W.] and my sort of computation, I think that his risks of exposure to incarceration would be most likely greater because of his prior traumas, prior rape history and so on than the bulk of these*.

*Id*. at 77:05-20 (emphasis added); *see also id*. at 78:06-11 ("I do know that [D.W.] has an extreme

case and it doesn't seem implausible that his is so extreme that he would be different from any of

these.  But I don't know specifically that beyond that, I don't know specific details of this. It's just

my basic analysis of [D.W.].").

A custodial sentence of fifteen years, would, in Dr. Krueger's opinion, increase D.W.'s

recidivism risk.  In prison, D.W. would have limited treatment opportunities, his adaptive skills

would deteriorate, and his links to outside supportive networks would suffer:

> WITNESS:     . . . But looking at the specific question, is he going to sort of *go[] away for 12 or 15 years, I think this would overall in my judgment increase his risk* as opposed to decrease his risk when he is reintroduced into the community.
>
> . . .
>
> COURT:     Excuse me.  Let me think about that.  I'm not sure I understand that.  If he's in prison for roughly 15

years, will that increase his risk of recidivism?  We have just been through that and we saw, I thought it's neutral.

WITNESS:     All right.   According to that article, there is no impact.  I'm offering my own sort of specific analysis with respect to . . . somebody like [D.W.].  And I think in his case, *it would do more harm than good*.

COURT:       More harm, you mean it would increase the risk of his recidivism?

WITNESS:     That's my opinion, yes.

Q.           And in what way do you think it would do more harm than good?

A.           Well, I think right now you have got [D.W.] who is at high risk.  You basically now want to incarcerate him for 15 years or for whatever the remaining amount of time is.  What is this going to do?  I think that is he going to get treatment?  It's unlikely.  I mean, I have had many child pornography offenders who have gone to federal prison and received no treatment at all.

There is a program that would offer, I guess intensive treatment for maybe two years before he would be discharged.   I think that even such a treatment program has limits, extreme limits.  I think that if he is incarcerated for, let's say, another ten, years, what is going to happen?  He's going to be in prison mo[st of] the time not receiving treatment.  He will age which will decrease his risk when he's reintroduced into the community.

But he also, what good does this do?  He's going to have, let's say an atrophy of his adaptive skills now that would help him live in the community.  He's not particularly close to his family, from what I understand, but he clearly will close the door on any development of support, family support.  I think that he would be, *given his history of having been raped on two occasions severely, and his other history of sexual abuse, he's going to be at increased risk for being sexually abused in prison*.

*Id*. at 39:21-41:14 (emphasis added).

158

Dr. Krueger explained that he regularly interviews and evaluates individuals who have served time in prison and who have been sexually abused while incarcerated. *See id.* at 41:21-42:18. Based on this experience, he testified that likely abuse in prison and prolonged stretches in solitary confinement would exacerbate D.W.'s post-traumatic stress disorder and overall mental problems, negatively affecting any prospects of successful treatment upon release:

Q.  So your testimony is that based upon your psychiatric research including your clinical interviews, that someone who has experienced rape in past incarceration is at [a] much higher risk of rape in future incarceration?

A.  Yes, sure.

Q.  And I take it you don't see any therapeutic value to [an] inmate being raped in prison; is that correct?

A.  Correct.

. . .

Q.  What effect do you think someone experiencing rape in prison has on their risk of future recidivism?

A.  Well, I mean, he has a -- he has now -- he has answered being raped twice. He has post-traumatic stress disorder. I think if he were subject to further rape in prison, this would exacerbate his post-traumatic stress disorder. It would not be helpful in terms of his therapeutic prospects, so to speak. I think it would be an adverse -- have an [ad]verse effect on him.

If he were placed in solitary confinement to protect him, he's somebody who has [a] major psychiatric disorder. He has four or five suicide attempts. I reviewed the literature, some of the literature with respect to solitary confinement. There's clearly an increased risk of suicide, suicide attempts in individuals who are placed in solitary confinement. I think that he has bipolar II disorder, major psychiatric disorder. If he's placed in solitary confinement, the literature suggests that individuals in solitary confinement can have, particularly those with serious mental illness can decompensate extremely. This would be a risk. And overall, it would not be a beneficial experience for him, so to speak,

159

> a therapeutic experience which ultimately would decrease
> his risk.

*Id*. at 42:20-44:06.

This expert explained that any treatment of D.W. would be significantly more effective if

provided in the community rather than in the context of incarceration:

> Q.   We were talking about the effects of incarceration on both
> treatment and recidivism risks.   Are there any other
> downsides to incarceration from those perspectives?
>
> A.   Well, I think that, let's say if he were to experience treatment
> while incarcerated, this is treatment which occurs in a
> context of incarceration.  It does . . .  not occur in the context
> of a human being in the community in which he would
> ultimately reside.  So the sorts of issues and experiences that
> he would have to deal with would be extremely limited.  It
> would be much better if he could experience treatment if he
> were in the community.
>
> For instance, in the community, he would have some
> freedom, subject to all sorts of stimuli involving children,
> pornography, child pornography, whatever.  This would not
> be present in an institutional environment.  It would be much
> better to treat him in the community.
>
> Q.   And I take it when you refer to the exposure to such stimuli
> that that exposure to that stimuli is important in order to treat
> how someone reacts to that and gets control of their
> impulses; is that correct?
>
> A.   Yes. . . . You know, again, initially I think if you remove him
> from the community, you remove him from the possibility
> of beginning to establish social networks, social supports,
> perhaps reunite with his family, sort of eliminate that.
>
> Q.   And does it have an effect, in your judgment, in terms of his
> employability and how that relates to his prospects for
> treatment and the risks of recidivism?
>
> A.   Yes.  It's going to, you know, remove him from the
> employment market.  You know, I think that generally it's,
> you know, and mental health, we have the least restrictive
> alternative, to try to keep people in the community if at all
> possible, sort of an axiom.  I think that as far as treatment,

that would still obtain with respect to his sexual diagnosis and other diagnosis.

*Id.* at 44:14-45:24.

Dr. Krueger testified that sentencing defendant to a period of incarceration of fifteen years was the "riskiest" sentencing alternative, because of the harm he would likely be subject to while in prison:

> I think that's the riskiest. . . . [F]irst of all, how . . . are you going to keep him in general population?  The guy is subject to rape.  He has been repeatedly raped.  What he's going to have to do?  He's going to have to be placed in some sort of special protective situation.
>
> Additionally, it has all the adverse effects that I discussed of removing him from the community.  I mean, again, I don't think he's subject to, you know, this is not [a] civil commitment proceeding, but if one were to draw an analogy with the New York State civil commitment law, he would be found at high risk for someone sexually dangerous, for instance.  But then the question would be to keep . . . him under SIST, strict and intensive supervision and treatment in the community, or to commit him to an inpatient facility for a period of time.
>
> In my opinion, clearly he's subject to management in the community under strict and intensive supervision and treatment which we are discussing here.

*Id.* at 62:18-63:10.

He concluded that the least risky sentencing option would be a sentence of time served plus a long period of supervised release.  *See id.* at 61:03-12.  He explained that a long incarceratory sentence would make defendant more dangerous to the public upon his reentry; he could be better treated and managed in the community:

> A.    I think [a sentence of fifteen years] would increase his risk. It would be adverse.  It would be contrary to [sound] therapy. It would not be a good thing.  I think it would make him a much worse situation.  I think it would be much better now, much better to decrease risk overall to the community if he were allowed to be treated in the community under the plan that we have just discussed.

161

Q.  And do you believe that with treatment and strict supervision, that his recidivism risk could be reduced dramatically?

A.  I think that his -- that this is a way of addressing his high risk. *And it's my best medical judgment that this would offer very substantial protections to the community.  I think that it's a way of reducing -- of addressing this high risk.*  I think that in my judgment, this would be well within the parameters of what could be managed in the community without undue risk to individuals.

*Id.* at 57:06-24 (emphasis added).

Dr. Berrill disagreed with Dr. Krueger's conclusions regarding the impact of incarceration on defendant's likelihood to reoffend and noted the protective effect of incapacitation:

Q.  Now, you appear to agree with the analysis.  What about Dr. Krueger's conclusion at the end that the defendant, despite being a high risk, that the best course would be for him to be released sooner and be integrated with the community now rather than after --

A.  Yeah, I don't know if I necessarily agree with that opinion.  I don't think I agree with the idea that his remaining in prison -- and by the way, let me say for the record, I'm not trying to hold myself out as an expert on sentencing and I usually steadfastly stay away from those kinds of issues.  But I did hear Dr. Krueger say that he thought the longer he stayed in the higher likelihood was that he would then gain recidivistic . . . behavior.  That I don't understand, really.

We heard the results of an article which doesn't reflect that finding at all.  I can tell you this.  *Certainly the longer he's in prison, the less likely it is that any child will be victimized by him.*  I can say that much, but that has nothing to do with treatment.  That has nothing to do with my discussing the treatment.  That's from a community perspective.

*Id.* at 116:17-117:12 (emphasis added).

162

### 6.    Proposed Treatment Plan

The experts were asked to opine on the most appropriate treatment plan available to defendant upon his release from custody that would help him readjust to the community and be protective of the public.  Dr. Krueger and Dr. Berrill largely agreed on the elements of this plan, set out below.

### a)    Individual and Group Therapy

A central feature of a treatment plan tailored to D.W.'s needs would include one-on-one sessions with a therapist.  Individual therapy would help defendant establish appropriate relationships, deal with stress and integration into the community, and monitor his progress.  Dr. Krueger explained the likely features of such individualized treatment as including assistance with social skills development, the establishment of appropriate relationships, use of cognitive behavioral therapy and the "containment model" to develop techniques to help avoid relapse, as well as use of "masturbatory satiation" and "covert sensitization" to address his atypical sexual interests:

> Q.    [O]ne component of that treatment plan [is] individualized therapy?
>
> A.    Yes, sure.
>
> Q.    And what role would that play?
>
> A.    This would involve, these are sort of more or less industry standards, kind of practice standards.  You would have him seen by an individual therapist who would interact with him, monitor him, support him, guide him as he is in the community, help him with establishing appropriate relationships, sexual relationships with adults, deal with stressful issues, other kinds of issues.
>
> Q.    And what kind or kinds of individual therapies might be most appropriate or effective for someone like [D.W.]?

A.     Again, we discussed the sorts of therapies that are currently given.  There is something called cognitive behavioral treatment which was developed in the field of substance use and abuse and has been imported into taking care of sexual offenders.  This would involve trying to identify situations in which somebody would relapse, potentially relapse.

You give them techniques involving -- specific techniques to try and help them avoid such a relapse.  You would in an alternative sense try and contain them, so to speak.  There's something called the containment model.  You would -- there are behavioral techniques that would try and decrease his atypical sexual arousal, his pedophilic arousal and increase his arousal towards adults.

There are techniques called masturbatory satiation and covert sensitization which would, masturbatory satiation would try and decrease his deviant arousal pattern.  And covert sensitization would try and make it aversive for him to engage in deviant sexual thoughts or activities.

*Id*. at 48:09-49:15.

He explained that individual therapy would also address D.W.'s mental health diagnoses

and help treat his depression through medication:

Q.     Is one of the issues that would be addressed in individual therapy the treatment of depression?

A.     That's another element and a substantial element.  He has a history of bipolar disorder.  His offenses [are] basically contact offenses when he was producing child pornography and giving wedgies, he was extremely depressed.  He lost a job.  When he got out of prison and used child pornography, he was extremely depressed.

I think that, thus, depression would be something a risk factor that one could treat and if it's treated, it reduces risk and individual treatment, pharmacologic treatment for depression would be another element of his treatment plan.

Q.     So part of the treatment plan would include medication, psychopharmacological treatment?

A.     Yes.

*Id*. at 50:12-51:01.

164

In addition to individual therapy sessions, D.W. would also be required to participate in group therapy, which would help provide support:

> Q.   In addition to the individual therapy and a treatment plan, would you include group therapy, and if so, what role would that play?
>
> A.   Yeah.  I mean, I think group therapy is a sort of standard modality in sex offender treatment programs.  It can offer another sort of venue to reality test somebody, to encounter somebody, to support somebody.  It's part of what's the industry standard.

*Id*. at 51:02-09.

Dr. Berrill agreed that individual and group therapy are standard components of any treatment plan:

> Again, I think what Dr. Krueger said is accurate. If you are going to design a treatment program for him, you would have an individual component. You would have a group component. The group therapy would be psychoeducation, probably, to really do some training around issues relating to sex offending. You would have possible medications if the person's compulsivity was such that it needed to be controlled with meds.

*Id*. at 120:22-121:04.

### b)   Outside Controls

Both Dr. Krueger and Dr. Berrill testified that outside controls should be integrated in defendant's treatment plan.  They explained that strict supervision, carried out by the court's Probation Department, should likely include home visits, computer monitoring, polygraphs, limitations on contacts with minors, curfews and electronic monitoring.  *Id*. at 51:10-52:06, 121:06-20.

### c)      Educational Training

Educational assessment and job training should be a part of the treatment plan to help defendant reintegrate and find purpose in his community.  Dr. Krueger noted that defendant has potential to succeed, if provided with proper support:

> [H]e graduated from high school.  He rapidly flunked in college, but he certainly had some ambition.  He had tried to have a number of jobs.  He was able to afford a car.  I think that he should have an assessment in terms of his reading ability, his educational ability. He should have job training.

*Id*. at 52:07-15.

### d)      Outside Support

Helping defendant reconnect with his family and build an outside support network would be an important component of a treatment plan.  According to Dr. Berrill, to the extent that social support "is available in the community," treatment may help defendant "access that social support" so that he can "rely on friends and family to shore up [his] defenses and [his] behavior and add a little bit of help [in] trying to cope out in the world."  *Id*. at 120:21-122:01.

Members of D.W.'s adoptive family, who raised him lovingly, might still be within reach. Dr. Krueger noted the significance of this possibility, and how the goal of any treatment plan should be to "enhance their presence in his life and otherwise help him to develop a supportive network."  *Id*. at 52:24-53:01.

### E.      Community Reentry Plan

The parties submitted thoughtful and detailed post-hearing memoranda following the end of the evidentiary hearing.  The court noted that it

> is now presented with a critical sentencing question: what resources in the community will be available to defendant upon his release from prison, so that his risk of re-offending will be minimized; and

what will be the effect of a long incarceratory sentence, as opposed to a shorter term, on defendant's reentry into the community. . . .

As stated by the defendant's counsel in their brief, the "question of [defendant's] release is not one of if but of when." Whatever incarceratory sentence this court imposes, defendant will eventually reenter the community. The questions of how defendant's possible threat to the public upon his release is to be managed, and how defendant's post-release adjustment will be impacted by a long period of incarceration, are key factors that bear on the determination of an appropriate sentence.

Order, Apr. 8, 2016, ECF No. 141, at 1-3 (citation omitted).

The question of defendant's reentry in the community is particularly pressing given the stringent conditions imposed on sex offenders, which often act as a barrier to obtaining proper housing and employment. *See, e.g.*, Andrew Denney, *Sex Offenders' Suit Challenges Continued State Imprisonment*, N.Y.L.J., June 27, 2016 at 1, 7 (people convicted of sex offenses filed a class action suit challenging New York State for continuing to hold them past their release date based on restrictions imposed upon their residency by the Sexual Assault Reform Act, which prohibits convicted sex offenders from living within 1,000 feet of school grounds).

The parties were told they could submit briefs addressing:

(1) what resources will probably be available to this defendant after he is released from incarceration that will result in adequate protection to the public as well as support his own appropriate development; and (2) how will a term of incarceration of fifteen years or more, as compared to a sentence below the fifteen year minimum, affect defendant's reentry.

Order, Apr. 8, 2016, ECF No. 141, at 3.

Both parties submitted helpful memoranda on these issues. *See generally* Gov't Suppl. Mem. of Law; Def.'s Reply to Gov't Mem. in Opp'n. Defendant's counsel and the government largely agreed on the measures available to protect the public while helping defendant reintegrate into the community upon his release. Defendant's counsel indicated that the Social Work

Department of the Federal Defenders of New York would be involved in devising and assisting with a reentry plan. *See* Def.'s Reply to Gov't Mem. in Opp'n at 2 and Ex. 45 (Federal Defenders of New York Reentry Plan). Both parties identified the key role that the court's Probation Department should play in both supervising the defendant upon his release, as well as referring him to a relevant network of supporting organizations offering assistance with treatment, housing and job training. *See also* Def.'s Post-Hr'g Mem., Ex. 9 (Mem. re the Treatment and Supervision of Sex Offenders by the Probation Department of the Eastern District of New York, Nov. 30, 2010).

The table below provides an overview of the main items included in the reentry plans submitted by the defendant and the government. Where one party did not address a specific item in its proposed reentry plan, the term "N/A" is used.

| Measure | Defendant | Government |
|---|---|---|
| **Supervision and Monitoring** | | |
| Electronic Monitoring | Electronic monitoring will provide public safety by allowing the defendant to move throughout the community only with Probation's permission and knowledge and under its close supervision. | Probation can use GPS devices to track the whereabouts of the defendant. Probation uses "passive" GPS monitoring— meaning that Probation will learn about the defendant's location at some point after the defendant's movements are made rather than contemporaneously. Probation can use the GPS to designate areas where the defendant may not travel, also known as "exclusion zones," if there are specific locations of concern to the court (such as the house of a victim, for example). Such exclusion zones, however, cannot be used to designate |

168

| Measure | Defendant | Government |
|---|---|---|
| | | general areas of temptation, such as all schools or playgrounds. |
| Curfew | A curfew will protect public safety by ensuring that the defendant takes responsibility for following a daily schedule of productive activities when he is in the community. | N/A |
| Computer monitoring | If the defendant is allowed to use electronic devices, they will be installed with software and hardware that allow the FBI and Probation to monitor his activity to ensure that he is only engaging in appropriate, safe communication and recreation. | Probation can install software on the defendant's computer to monitor his internet activities, subject to certain limitations. Probation would likely request that the defendant's use of a smartphone be prohibited, as Probation does not currently have the capability to monitor usage on such devices. |
| Treatment Monitoring | Probation will monitor the defendant's treatment and medical records, having pre-approved his medical providers, such as his primary care physician and hospital, with consents signed by the defendant.

This approach will ensure that the defendant is maintaining his physical health and provide another layer of supervision. | N/A |
| Polygraph Monitoring | Probation would include polygraphy testing at periodic intervals as one method of encouraging compliance with release conditions. | N/A |
| Home Visits by Probation | Probation can conduct both random and scheduled visits that will allow officers to search the defendant's home | Probation can visit the defendant on a regular basis to ensure compliance. |

| Measure | Defendant | Government |
|---|---|---|
| | and person and allow for observation of his living conditions and potential needs. | |
| Home Visits by Family and Community Members | Members of defendant's community, both family members and service providers, can conduct both scheduled and unscheduled visits with the defendant. They can check on his well-being and serve as additional support to ensure that he is maintaining his treatment schedule and engaging in appropriate social relationships. | N/A |
| Sex Offender Registry | N/A | Probation will ensure that the defendant's information with the sex offender registry is kept up to date. |
| **Treatment** | | |
| Psychological Treatment | The defendant listed the names of several treatment providers that could offer him any needed medication as well as therapeutic intervention. Treatment would include both individual and group therapy to address his three major mental health problems: pedophilia, chronic depression, and post-traumatic stress disorder. | Probation would likely request that the court refer the defendant to a treatment facility. This treatment facility would address the defendant's psychological needs in several ways, utilizing individual therapy, group therapy, mental health outreach and (if necessary) medication. |
| **Housing** | | |
| Residence Approval | N/A | Probation will likely request the standard release condition requiring the defendant to seek approval from Probation prior to making living arrangements. |

| Measure | Defendant | Government |
|---|---|---|
| | | This would enable Probation to restrict the defendant from living in locations that, for example, allow inappropriate proximity to children. |
| Halfway House | Upon release, the defendant may reside at Brooklyn House, the Eastern District of New York's Residential Reentry Center ("RRC"). Staff there would monitor him while Probation would also keep him under close supervision. He would initially have permission to leave the RRC only for preapproved appointments related to his treatment and supervision. Later, he would gradually earn permission to move around more, but only after he progresses in treatment and begins to seek educational and vocational training as well as employment. Location monitoring devices as well as surveillance cameras at the RRC can help monitor his movement into and out of the RRC. | In light of the defendant's estrangement from his family, Probation would likely recommend that the court add a special condition releasing the defendant to the care of a halfway house at the end of his mandatory minimum sentence. Such a placement would likely help the defendant acclimate back into society. The court could, for example, order the defendant to stay at the halfway house for a period of six months, or allow the defendant to leave the halfway house once he found a suitable new residence (subject to approval by Probation). This latter approach would provide housing stability for the defendant while ensuring that his placement in the halfway house was not perceived as a punishment. |
| **Employment** | | |
| Job Training | The defendant provided a list of organizations that offer vocational training as well as job opportunities for formerly incarcerated individuals with different levels of education. | Probation would also refer the defendant to one of the job training institutions that work with EDNY defendants, such as Workforce One and the Fortune Society. These institutions, among others, provide vocational training and reentry skills to individuals like the |

| Measure | Defendant | Government |
|---|---|---|
| | | defendant.  These institutions often work with sex offenders. |
| **Additional Outside Support** | | |
| Reentry Organizations | The defendant noted that organizations such as the Fortune Society and the Federal Defenders of New York could provide additional support for his reentry into the community. | The government also identified the Fortune Society as an organization that could assist defendant with job training. |
| Family and Community Support | While incarcerated, defendant has reconnected with some family.  He will continue to work towards repairing and strengthening these relationships.  His connection to family and community supports will serve as an additional protection and point of supervision. | N/A |

*See* Def.'s Reply to Gov't Mem. in Opp'n, Ex. 45 (Federal Defenders of New York Reentry Plan); Gov't Suppl. Mem. of Law at 2-4.

## V.    Law

### A.    Statutory Mandatory Minimum

Defendant pleaded guilty to a two-count superseding information charging him with sexual exploitation of a child, in violation of section 2251 of title 18, and possession of child pornography, in violation of section 2252(a)(2) of title 18. The former of these two counts carries a fifteen year mandatory minimum sentence.  18 U.S.C. § 2251(e) ("Any individual who violates, or attempts or conspires to violate, this section shall be fined under this title and imprisoned not less than 15 years

nor more than 30 years . . . .").  The latter carries a ten year mandatory minimum sentence, due to defendant's prior State convictions.  *See* 18 U.S.C. § 2252(b)(2); *see also* Gov't Opp'n Post-Hr'g Mem. at 11, n.8.

### B.    Sentencing Commission Guidelines

A district court must determine the applicable sentencing range pursuant to the Sentencing Guidelines.  *See United States v. Dorvee*, 616 F.3d 174, 180 (2d Cir. 2010) (citing *Gall v. United States*, 552 U.S. 38, 49 (2007)).  Although no longer mandatory, the Guidelines' sentencing ranges continue to function as "the starting point and the initial benchmark" for sentencing proceedings.  *Gall*, 552 U.S. at 46, 49 (noting that the Guidelines are presumed to be "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions"); *United States v. Booker*, 543 U.S. 220, 245, 264 (2005).

The Guidelines must be given "respectful consideration" by the sentencing court. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citations omitted).  A sentencing court should then perform an "individualized assessment" of the situation.  *Gall*, 552 U.S. at 50.  This analysis is guided by "[r]easonableness" and an "individualized application of the statutory sentencing factors" listed in section 3553(a) of the United States Code, title 18.  *Dorvee*, 616 F.3d at 184 (citing *Gall*, 552 U.S. at 46-47); *Kimbrough*, 552 U.S. at 113 (Scalia, J., concurring) ("[T]he district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due consideration) the advice of the Guidelines.").

A sentencing court shall "state in open court the reasons for its imposition of the particular sentence."  18 U.S.C. § 3553(c).  If the sentence is not of the kind prescribed by, or is outside the range of, the Sentencing Guidelines referred to in section 3553(a)(4) of title 18, the court shall

indicate the specific reasons for imposing a different sentence.  *See* 18 U.S.C. § 3553(c)(2).  These "reasons must also be stated with specificity in a statement of reasons form."  *Id*.

In view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society, and our economy, parsimony in incarceration is to be prized.  *See, e.g*., 18 U.S.C. § 3553(a) ("The court shall impose a sentence sufficient, but not greater than necessary"); National Research Council of the National Academies, The Growth of Incarceration in the United States, Exploring Causes and Consequences 8 (2014) ("*Parsimony*: The period of confinement should be sufficient but not greater than necessary to achieve the goals of sentencing policy.").

## C.    Restitution

Pursuant to section 2259 of title 18, victims of certain child exploitation offenses, including possession of child pornography, are entitled to mandatory restitution.  The order of restitution "shall direct the defendant to pay the victim (through the appropriate court mechanism) the full amount of the victim's losses."  18 U.S.C. § 2259(b)(1).  This includes:

> [A]ny costs incurred by the victim for --(A) medical services relating to physical, psychiatric, or psychological care; (B) physical and occupational therapy or rehabilitation; (C) necessary transportation, temporary housing, and child care expenses; (D) lost income; (E) attorneys' fees, as well as other costs incurred; and (F) any other losses suffered by the victim as a proximate result of the offense.

18 U.S.C. § 2259(b)(3).

In *Paroline v. United States*, the Supreme Court outlined how to determine the proper amount of restitution that "a possessor of child pornography must pay to the victim whose childhood abuse appears in the pornographic materials possessed."  134 S. Ct. 1710, 1716 (2014). The Court held that "[r]estitution is  . . . proper under § 2259 only to the extent the defendant's

offense proximately caused a victim's losses." *Id*. at 1722. In a case in which a defendant possesses images of a victim and the

> victim has outstanding losses caused by the continuing traffic in those images but where it is impossible to trace a particular amount of those losses to the individual defendant[,] . . . a court applying § 2259 should order restitution *in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses*.

*Id*. at 1727 (emphasis added).

The *Paroline* defendant possessed two images of the victim seeking restitution; he was one of potentially thousands of people possessing her images. Although any award should not be "a token or nominal amount," the Court declared that in such instances restitution "would not be severe . . . given the *nature of the causal connection between the conduct of a possessor like Paroline and the entirety of the victim's general losses from the trade in her images, which are the product of the acts of thousands of offenders*." *Id*. (emphasis added).

 In directing how a restitution award should be calculated, the Court concluded that "[t]his cannot be a precise mathematical inquiry and involves the use of discretion and sound judgment." *Id*. at 1728. A court should "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader causal process that produced the victim's losses." *Id*. at 1727-28. As a starting point, district courts should "determine the amount of the victim's losses caused by the continuing traffic in the victim's images," and "then set an award of restitution in consideration of factors that bear on the relative causal significance of the defendant's conduct in producing those losses." *Id*. at 1728. District courts take into consideration a variety of factors, including:

> [T]he number of past criminal defendants found to have contributed to the victim's general losses; reasonable predictions of the number of future offenders likely to be caught and convicted for crimes

> contributing to the victim's general losses; any available and
> reasonably reliable estimate of the broader number of offenders
> involved (most of whom will, of course, never be caught or
> convicted); whether the defendant reproduced or distributed images
> of the victim; whether the defendant had any connection to the initial
> production of the images; how many images of the victim the
> defendant possessed; and other facts relevant to the defendant's
> causal role.

*Id*.

The Court cautioned that "[t]hese factors need not be converted into a rigid formula, especially if doing so would result in trivial restitution orders." *Id*. Rather, the factors are to serve as "rough guideposts for determining an amount that fits the offense." *Id*.

### D.    Eighth Amendment

The current federal criminal sentencing regime is limited by the Eighth Amendment, which proscribes punishments that are "cruel and unusual." The Cruel and Unusual Punishment Clause provides that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. It prohibits "inherently barbaric punishments under all circumstances." *Graham v. Florida*, 560 U.S. 48, 59 (2010). An "essential principle" under Eighth Amendment jurisprudence is that "the State must respect the human attributes even of those who have committed serious crimes." *Id*.

To determine whether a punishment is constitutionally cruel and unusual, "courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a mature society.'" *Id*. at 58 (quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976)).

### 1.    Proportionality Analysis Applicable to Sentencing

The Eighth Amendment proscribes sentences that are both unusual and grossly disproportionate to the crime committed. *Solem v. Helm*, 463 U.S. 277, 284 (1983) ("The final

clause prohibits not only barbaric punishments, but also sentences that are disproportionate to the crime committed."); *Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991) (Eighth Amendment prohibits "extreme sentences that are grossly disproportionate to the crime") (quotation omitted); *Graham*, 560 U.S. at 59 (providing that the "concept of proportionality is central to the Eighth Amendment"). "Embodied in the Constitution's ban on cruel and unusual punishments is the 'precept of justice that punishment for [the] crime should be graduated and proportioned to [the] offense.'" *Graham*, 560 U.S. at 59 (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).

The Supreme Court's analysis of sentence proportionality falls within two general classes: (1) challenges to the length of term-of-years sentences, given all the circumstances in a particular case; and (2) categorical rules to define Eighth Amendment standards. *Id*. at 59. It is the former category that is relevant to the present case. Under this classification, "all of the circumstances of the case" are considered in order to "determine whether the sentence is unconstitutionally excessive." *Id*.

The proportionality principle has been declared by the Court to be "narrow." *Id*. at 59-60. The Eighth Amendment "does not require strict proportionality between crime and sentence," but rather "forbids only extreme sentences that are 'grossly disproportionate' to the crime." *Harmelin*, 501 U.S. at 1001 (Kennedy, J. concurring in part and concurring in judgment) (quoting *Solem*, 463 U.S. at 288) (upholding life sentence without the possibility of parole for defendant convicted of possessing more than 650 grams of cocaine); *see also Ewing v. California*, 538 U.S. 11, 28-31 (2003) (rejecting Eighth Amendment challenge to prison term of twenty-five-years to life under California's "three strikes law" for a recidivist who was convicted of stealing golf clubs worth $1,200).

While it was previously unclear to lower courts whether the proportionality requirements of the Eighth Amendment were applicable outside the capital context, it is now established that they do govern non-capital sentences. *Compare United States v. Polizzi*, 549 F. Supp. 2d 308, 362 (2008), *vacated and remanded on other grounds*, 564 F.3d 142 (2d Cir. 2009) ("Whether proportionality analysis applies in non-capital cases such as those involving mandatory minimum sentences is unclear.") *with Graham*, 560 U.S. at 48 (applying proportionality analysis to invalidate sentence of life without parole for individuals who committed non-homicide offense before age eighteen).

"Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel v. Estelle*, 445 U.S. 263, 272 (1980) (holding that a sentence of life in prison with the possibility of parole as applied to a three-time offender is constitutional); *Harmelin*, 501 U.S. at 994 ("Proportionality review is one of several respects in which we have held that 'death is different,' and have imposed protections that the Constitution nowhere else provides.") (citations omitted).   For non-capital cases, it is only an "extraordinary case" where "the gross disproportionality principle reserves a constitutional violation." *Lockyer v. Andrade*, 538 U.S. 63, 77 (2003); *see also Solem*, 463 U.S. at 277 (holding unconstitutional a sentence of life imprisonment for passing a bad check by a convicted felon); *Weems*, 217 U.S. at 349 (invalidating a sentence of twelve years' imprisonment in chains and at hard labor for the crime of falsifying a public document); *Humphrey v. Wilson*, 652 S.E.2d 501 (Ga. 2007) (finding cruel and unusual a ten-year sentence for a seventeen-year-old having consensual oral sex with a fifteen-year-old).

The Court has "not established a clear or consistent path for courts to follow" in applying the proportionality analysis. *United States v. Cunningham*, 191 F. App'x 670, 673 (10th Cir. 2006)

178

(quoting *Lockyer*, 538 U.S. at 72).  In 1983, *Solem* established a three-part test for determining

whether a sentence is unconstitutionally disproportionate:

> [A] court's proportionality analysis under the Eighth Amendment
> should be guided by objective criteria, including (i) the gravity of
> the offense and the harshness of the penalty; (ii) the sentences
> imposed on other criminals in the same jurisdiction; and (iii) the
> sentences imposed for commission of the same crime in other
> jurisdictions.

*Solem*, 463 U.S. at 292.

The Court subsequently refined its approach to proportionality in *Harmelin*.  Although

there was no majority decision, seven Justices agreed that the Eighth Amendment's cruel and

unusual language included a proportionality principle.  *See Harmelin*, 501 U.S. at 994-96.  Since

*Harmelin*, courts have generally applied Justice Kennedy's analysis in his concurrence.  *See, e.g.*,

*United States v. Angelos*, 433 F.3d 738, 753 (10th Cir. 2006) ("Justice Kennedy's opinion in

*Harmelin . . . sets forth the applicable Eighth Amendment proportionality test.*") (quoting *Hawkins*

*v. Hargett*, 200 F.3d 1279, 1282 (10th Cir. 1999)) (emphasis added).  Justice Kennedy first

identified "common principles that give content to the uses and limits of proportionality review":

> All of these principles—[1] the primacy of the legislature, [2] the
> variety of legitimate penological schemes, [3] the nature of our
> federal system, and [4] the requirement that proportionality review
> be guided by objective factors—inform the final one: The Eighth
> Amendment does not require strict proportionality between crime
> and sentence. Rather, it forbids [5] only extreme sentences that are
> "grossly disproportionate" to the crime.

*Harmelin*, 501 U.S. at 998, 1001 (quoting *Solem*, 463 U.S. at 288).  Justice Kennedy then applied

a modified *Solem* test:  A court must initially consider the nature of the crime and its relation to

the punishment imposed.  Only if that analysis gives rise to an inference of disproportionality

should a court then consider the punishment for other offenses in its jurisdiction and the

punishment for similar offenses in other jurisdictions:

> The controlling opinion in *Harmelin* explained its approach for determining whether a sentence for a term of years is grossly disproportionate for a particular defendant's crime.  A court must begin by comparing the gravity of the offense and the severity of the sentence.   "[I]n the rare case in which [this] threshold comparison . . . leads to an inference of gross disproportionality" the court should then compare the defendant's sentence with the sentences received by other offenders in the same jurisdiction and with the sentences imposed for the same crime in other jurisdictions.   If this comparative analysis "validate[s] an initial judgment that [the] sentence is grossly disproportionate," the sentence is cruel and unusual.

*Graham*, 560 U.S. at 60 (citations omitted); *see also Harmelin*, 501 U.S. at 1005 (declining to perform any comparative jurisdictional analysis because the gravity of the adult prisoner's offense—possessing more than 650 grams of cocaine—was not grossly disproportionate to his sentence of mandatory life in prison without possibility of parole; the Court explained that "intrajurisdictional and interjurisdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality").

Courts are reluctant to invalidate sentencing schemes under the proportionality principle; an overly aggressive approach is not consistent with our scheme of federalism or of division of powers within the federal government.  *See Harmelin*, 501 U.S. at 999-1000.  Both states and the federal government must have considerable freedom to experiment in matters of criminal policy.  *See id*.  Holding a sentencing law unconstitutional involves a rejection of the judgment of a legislature, which may entail rejecting the moral judgment of the community it represents.  *See id*. at 1006; *see also Arizona v. Berger*, 134 P.3d 378, 385 (Ariz. 2006) (en banc) (noting that *Solem*, in which the Supreme Court invalidated a judicially-imposed sentence, did not involve the "traditional deference" that courts must afford legislative policy choices).  "Courts must show restraint when wielding the powerful disproportionality sword."  *C.R.*, 792 F. Supp. 2d at 492.

### a)  Length of Sentence

The Court of Appeals for the Second Circuit has found that "[l]engthy prison sentences, even those that exceed any conceivable life expectancy of a convicted defendant, do not violate the Eighth Amendment's prohibition against cruel and unusual punishment when based on a proper application of the Sentencing Guidelines or statutorily mandated consecutive terms." *United States v. Yousef*, 327 F.3d 56, 163 (2d Cir. 2003).  "[I]n a noncapital case, it is exceedingly rare to uphold a claim that a sentence within the statutory limits is disproportionately severe." *United States v. Caracappa*, 614 F.3d 30, 44 (2d Cir. 2010) (internal quotation marks and emphasis omitted); *see also United States v. Adams*, 768 F.3d 219, 225 (2d Cir. 2014) *cert. denied*, 135 S. Ct. 1726 (2015); *United States v. Martin*, 180 F. App'x 301, 302 (2d Cir. 2006) (finding that "the sentence is not unconstitutionally disproportionate to the crime [the defendant] committed, even in light of his physical disability").

### b)  Mandatory Minimum Sentences

The cruelty of some statutorily imposed mandatory terms of imprisonment has been recognized.  *See Polizzi*, 549 F. Supp. 2d at 360.  Judges, legal scholars and practitioners, as well as community activists, among others, have expressed increasing concern over rigid application and expanded use of mandatory minimums.  *See, e.g.*, *Mandatory Minimum Sentencing Provisions under Federal Law, Public Hearing before the United States Sentencing Comm'n*, 15 (May 27, 2010) (statement of Michael Nachmanoff, Federal Public Defender for the Eastern District of Virginia)    http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20100527/Testimony_Nachmanoff.pdf ("The routine use of mandatory minimums as a system of carrots and sticks has desensitized us to what, just twenty five years ago, was viewed as a dangerous threat to the exercise of constitutional rights.").

181

Sixty-two percent of the judges who participated in a recent survey conducted by the United States Sentencing Commission declared that mandatory sentences were generally too high across all cases. *See* U.S. Sentencing Comm'n, *Results of Survey of United States District Judges January 2010 through March 2010*, 5 table 1 (2010) ("Survey of Federal Judges"), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/surveys/20100608_Judge_Survey.pdf; *see also* Erik Luna & Paul G. Cassell, *Mandatory Minimalism*, 32 Cardozo L. Rev. 1, 1 n.2 (2010) (citing numerous instances of federal judges "voicing dismay at the excessive sentences they were required to pronounce and affirm").

In a speech to the American Bar Association, Justice Kennedy noted that he could "accept neither the necessity nor the wisdom of federal mandatory minimum sentences. In too many cases, mandatory minimum sentences are unwise and unjust." Hon. Anthony M. Kennedy, Assoc. Justice, Supreme Court of the United States, Address at A.B.A. Annual Meeting (Aug. 9, 2003) (suggesting the Association urge Congress to repeal mandatory minimums).

Congress seems poised to agree on the necessity of reconsidering mandatory minimums. The 2010 Fair Sentencing Act eliminated the five-year mandatory minimum sentence for simple possession (without intent to distribute) crack cocaine. This law marks the first time since 1970 that Congress has repealed a mandatory minimum sentence. *See* Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010) ("Fair Sentencing Act").

Recent legislative initiatives aim to reduce or eliminate mandatory minimums for nonviolent drug offenders. In the Senate, the Sentencing Reform and Corrections Act of 2015, if passed, would reduce mandatory minimum sentences for nonviolent drug offenders and provide greater access to programs in prison aimed at reducing recidivism. *See* Sentencing Reform and Corrections Act of 2015, S. 2123, 114th Cong. (2015). A similar bill is currently pending in the

House of Representatives.  *See* Sensenbrenner-Scott Over-Criminalization Task Force Safe, Accountable, Fair, Effective Reinvestment Act of 2015, H.R. 2944, 114th Cong. (2015).  Both bills presently include exclusions for people convicted of federal sex offenses pursuant to section 16911 of title 42 of the United States Code—an extremely broad category of offenders that encompasses individuals convicted of offenses such as distributing or producing child pornography.

The Department of Justice has reformed its charging practices in order to avoid unnecessary application of lengthy mandatory minimum prison terms.  The Smart on Crime Initiative, launched by then Attorney General Eric Holder in 2013, provided that low-level nonviolent drug offenders would no longer be charged with offenses triggering severe mandatory sentences:

> As a start, the Attorney General is announcing a change in Department of Justice charging policies so that certain people who have committed low-level, nonviolent drug offenses, who have no ties to large-scale organizations, gangs, or cartels will no longer be charged with offenses that impose draconian mandatory minimum sentences.  Under the revised policy, these people would instead receive sentences better suited to their individual conduct rather than excessive prison terms more appropriate for violent criminals or drug kingpins.  Reserving the most severe penalties for serious, high-level, or violent drug traffickers will better promote public safety, deterrence, and rehabilitation – while making our expenditures smarter and more productive.

U.S. Dep't of Justice, Smart on Crime: Reforming the Criminal Justice System for the 21st Century, 3 (Aug. 2013), https://www.justice.gov/sites/default/files/ag/legacy/2013/08/12/smart-on-crime.pdf.

Attorney General Holder explained in a department-wide memorandum that

> In some cases, mandatory minimum and recidivist enhancement statutes have resulted in unduly harsh sentences and perceived or actual disparities that do not reflect our Principles of Federal

183

> Prosecution.   Long sentences for low-level, non-violent drug offenses do not promote public safety, deterrence, and rehabilitation.

Mem. from Eric Holder, Attorney General, on Department Policy on Charging Mandatory Minimum Sentences and Recidivist Enhancements in Certain Drug Cases, 1 (Aug. 12, 2013) ("Holder Memo"),   https://www.justice.gov/sites/default/files/ag/legacy/2014/04/11/ag-memo-drug-guidance.pdf.

Discussing the Smart on Crime Initiative, he emphasized that mandatory minimums may not contribute to public safety:

> We need to ensure that incarceration is used to punish, deter and rehabilitate – not merely to convict, warehouse and forget . . . . [M]andatory minimum sentences breed disrespect for the system. When applied indiscriminately, they do not serve public safety. They have had a disabling effect on communities. And they are ultimately counterproductive.

Dan Roberts & Karen McVeigh, *Eric Holder Unveils New Reforms Aimed at Curbing US Prison Population*, Guardian (Aug. 12, 2013), https://www.theguardian.com/world/2013/aug/12/eric-holder-smart-crime-reform-us-prisons (internal quotation marks omitted).

In a hearing before the Senate Judiciary Committee, the Chair of the United States Sentencing Commission agreed that statutory changes to mandatory minimum legislation were warranted:

> The bipartisan seven-member Commission unanimously agrees that mandatory minimum sentences in their current form have led to unintended results, caused unwarranted disparity in sentencing, and contributed to the current crisis in the federal prison population and budget. We unanimously agree that statutory changes to address these problems are appropriate.

*Reevaluating the Effectiveness of Federal Mandatory Minimum Sentences, Hearing Before the S. Comm. on the Judiciary*, 113th Cong. 1 (Sept. 18, 2013) (statement of Judge Patti B. Saris, Chair, United States Sentencing Commission),

http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-

reports/submissions/20131126-Letter-Senate-Judiciary-Committee.pdf.

Although increasingly recognized as cruel, statutory mandatory minimum sentences are

not unusual.  *See generally Polizzi*, 549 F. Supp. 2d at 398-99 (discussing mandatory minimums

historically and today); *id.* at 488, App. C (listing federal statutory provisions with mandatory

minimums); *see also* Christopher Wimmer *et al.*, *Sentencing in the United States*, *in* Current

Trends in Criminal Procedure and Evidence: A Collection of Essays in Honor of Professor Eliahu

Harnon 1, 6-25 (Anat Horovitz & Mordechai Kremnitzer eds., 2009) (relevant history of

sentencing in the United States).

Because of their commonality, ours is "a world of statutorily fixed mandatory sentences

for many crimes," *Blakely v. Washington*, 542 U.S. 296, 331 (2004) (Breyer, J., dissenting),

"[s]evere, mandatory penalties may be cruel, but they are not unusual in the constitutional sense,

having been employed in various forms throughout our Nation's history." *Harmelin*, 501 at 994-

95; *see also Polizzi*, 549 F. Supp. 2d at 360.

In *Harmelin*, the Supreme Court rejected a challenge to a sentence because of its mandatory

nature.  It explained that "[i]t is beyond question that the legislature has the power to define

criminal punishments without giving the courts any sentencing discretion[.]" *Harmelin*, 501 U.S.

at 1006 (quotation omitted).  "Since the beginning of the Republic, Congress and the States have

enacted mandatory sentencing schemes." *Id.*  The Court noted that "[w]e have never invalidated

a penalty mandated by a legislature *based only on the length of sentence*, and, especially with a

crime as severe as this one, we should do so only in the most extreme circumstance." *Id.* at 1006-

07 (emphasis added).  It recognized the legislature's power to require minimum sentences—

subject to constitutional limitations:

> Mandatory sentencing schemes can be criticized for depriving judges of the power to exercise individual discretion when remorse and acknowledgment of guilt, or other extenuating facts, present what might seem a compelling case for departure from the maximum. On the other hand, broad and unreviewed discretion exercised by sentencing judges leads to the perception that no clear standards are being applied, and that the rule of law is imperiled by sentences imposed for no discernible reason other than the subjective reactions of the sentencing judge. The debate illustrates that, as noted at the outset, arguments for and against particular sentencing schemes are for legislatures to resolve.

*Id.* at 1007.

## 2.    Impact of Conditions of Incarceration on Sentence Proportionality

The Supreme Court has declared that conditions of incarceration affect decisions on Eighth Amendment violations. *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678, 685 (1978) ("Confinement in a prison or in an isolation cell is a form of punishment subject to scrutiny under Eighth Amendment standards.").

> Courts must be sensitive to the State's interest in punishment, deterrence, and rehabilitation, as well as the need for deference to experienced and expert prison administrators faced with the difficult and dangerous task of housing large numbers of convicted criminals. Courts nevertheless must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners. Courts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration.

*Plata*, 563 U.S. at 511 (quotation marks and citations omitted).

In *Rhodes v. Chapman*, the Court explained that the principles governing Eighth Amendment jurisprudence "apply when the conditions of confinement compose the punishment at issue. Conditions must not involve the wanton and unnecessary infliction of pain, nor may they be grossly disproportionate to the severity of the crime warranting imprisonment." 452 U.S. 337, 347 (1981). The Court further specified that "[n]o static 'test' can exist by which courts determine

whether conditions of confinement are cruel and unusual, for the Eighth Amendment 'must draw its meaning from the evolving standards of decency that mark the progress of a maturing society.'" *Id*. at 346 (citation omitted).

In *Wilson v. Seiter*, Justice White, concurring, emphasized that the Court's prior decisions "have made it clear that the conditions [of confinement] are themselves *part of the punishment*, even though not specifically 'meted out' by a statute or judge."   501 U.S. 294, 306 (1991) (emphasis in original).  The Court recently declared in *Brown v. Plata*,

> As a consequence of their own actions, prisoners may be deprived of rights that are fundamental to liberty.  Yet the law and the Constitution demand recognition of certain other rights.  Prisoners retain the essence of human dignity inherent in all persons.  Respect for that dignity animates the Eighth Amendment prohibition against cruel and unusual punishment. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man.

563 U.S. at 510 (quotation marks and citation omitted); *cf*. Ken Strutin, *Pain, Punishment and the Path Forward*, N.Y.L.J., July 19, 2016 ("Pain is the unwanted companion of every inmate.  It is at the heart of retribution and the meaning behind punishment.  But there must be limits to the grotesqueries of penal confinement.  Education about the reality and effects of pain can cast a light on the unseen and unquantified suffering of imprisonment.").

The Eighth Amendment places a constitutional duty on prison officials, who must provide humane conditions of confinement and take reasonable steps to protect inmates' health and safety:

> In its prohibition of cruel and unusual punishments, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners. The Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates[.]

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and quotation marks omitted).

The duties of prison officials include protecting prisoners from assault or other forms of abuse by fellow inmates. As emphatically put by the Court, being violently attacked in prison does not advance any legitimate penological objective and is not part of the penalty that offenders should pay for their criminal conduct:

> Having incarcerated persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course. Prison conditions may be restrictive and even harsh, but gratuitously *allowing the beating or rape of one prisoner by another serves no legitimate penological objectiv[e]*, any more than it squares with evolving standards of decency. *Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay* for their offenses against society.

*Id*. at 833-34 (quotation marks and citations omitted) (alterations in original) (emphasis added).

In *Farmer v. Brennan*, the Supreme Court addressed the "deliberate indifference" standard applicable to civil suits challenging conditions of confinement under the Eighth Amendment. *See id*. at 837-38. While *Farmer* concedes that prison conditions bear on the constitutionality of punishment, its focus is on the standard applicable to civil rights suits brought by incarcerated individuals. It does not apply to the proportionality analysis governing sentencing. The "deliberate indifference" standard outlined in *Farmer* is not applicable to the instant case.

Although subject to Eighth Amendment scrutiny, the extent to which a defendant's likely future conditions of incarceration may impact the constitutional proportionality of his or her sentence is not clear. As noted by Justice Kennedy, "there is no accepted mechanism" for a sentencing judge to take into account a prisoner's likely conditions of incarceration—in that case, whether time would be served in solitary confinement—at the time of sentencing:

> One hundred and twenty-five years ago, this Court recognized that, even for prisoners sentenced to death, solitary confinement bears "a further terror and peculiar mark of infamy."

188

. . .

> Yet despite scholarly discussion and some commentary from other sources, the condition in which prisoners are kept simply has not been a matter of sufficient public inquiry or interest.  To be sure, cases on prison procedures and conditions do reach the courts.  Sentencing judges, moreover, devote considerable time and thought to their task.  *There is no accepted mechanism, however, for them to take into account, when sentencing a defendant, whether the time in prison will or should be served in solitary*.  So in many cases, it is as if a judge had no choice but to say: "In imposing this capital sentence, the court is well aware that during the many years you will serve in prison before your execution, the penal system has a solitary confinement regime that will bring you to the edge of madness, perhaps to madness itself."  Even if the law were to condone or permit this added punishment, so stark an outcome ought not to be the result of society's simple unawareness or indifference.
>
> Too often, discussion in the legal academy and among practitioners and policymakers concentrates simply on the adjudication of guilt or innocence.  *Too easily ignored is the question of what comes next.  Prisoners are shut away—out of sight, out of mind.*  It seems fair to suggest that, in decades past, the public may have assumed lawyers and judges were engaged in a careful assessment of correctional policies, while most lawyers and judges assumed these matters were for the policymakers and correctional experts.

*Davis v. Ayala*, 135 S. Ct. 2187, 2209-10 *reh'g denied*, 136 S. Ct. 14 (2015) (Kennedy, J.,

concurring) (citations and quotation marks omitted) (emphasis added).  Justice Kennedy observed

that judges may be required to inquire as to correctional policies and consider alternatives to long-

term solitary confinement:

> In a case that presented the issue, the judiciary may be required, within its proper jurisdiction and authority, to determine whether workable alternative systems for long-term [solitary] confinement exist, and, if so, whether a correctional system should be required to adopt them.

*Id*. at 2210.

Outside of the Eighth Amendment context, sentencing courts have taken into consideration

the impact of conditions of confinement on punishment.  For example, even prior to *Booker*, the

189

Supreme Court found that downward departures from the then mandatory Sentencing Guidelines could be justified based on a defendant's likelihood of victimization in prison. *See Koon v. United States*, 518 U.S. 81 (1991) (finding that district court acted within its discretion in considering police officers' high "susceptibility to abuse in prison" in downwardly departing from the guidelines). Section 3553(b) of title 18 of the United States Code allowed courts to downwardly depart from the otherwise mandatory Guidelines range if they found that a "mitigating circumstance" existed "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b).

In the Second Circuit, courts recognize that vulnerable individuals may experience particularly oppressive conditions in prison, and that this bears on the propriety of the sentence imposed. *See, e.g.*, *United States v. Gonzalez*, 945 F.2d 525, 527 (2d Cir. 1991) (noting that the court had previously recognized that "prison conditions may be particularly oppressive to vulnerable individuals"). In particular, courts understand that factors such as a defendant's physical appearance and demeanor, or his actual or perceived sexual orientation, increase susceptibility to prison abuse.

In *United States v. Lara*, the district judge issued a sentence below that prescribed by the Guidelines based on the defendant's "*potential for victimization*" in prison. 905 F.2d 599, 601 (2d Cir. 1990) (emphasis added). In that case, the defendant was deemed to be particularly vulnerable to prison abuse because of his "diminutive size, immature appearance and bisexual orientation." *Id*. The only available means of protection while incarcerated was solitary confinement. *See id*. at 602-03. The court explained that applying the sentencing range indicated by the Guidelines would result in a "*sentence which is unduly severe relative to most other defendants in this Court*

190

*who do not have the vulnerability, the appearance, the sexual orientation that this defendant presents.*" *Id.* at 601 (emphasis added).

The Court of Appeals for the Second Circuit affirmed in *Lara*. It held that "*extreme vulnerability of a criminal defendant [in prison] is a proper ground for departure.*" *Id.* at 603 (emphasis added). It agreed that the characteristics rendering the defendant particularly vulnerable to prison abuse presented an "*extraordinary situation*," justifying the consideration of factors generally not relevant to sentencing determinations:

> Here, the district court obviously believed it had such an extraordinary situation because of the defendant's particular vulnerability due to his immature appearance, sexual orientation and fragility. *The severity of [the defendant's] prison term is exacerbated by his placement in solitary confinement as the only means of segregating him from other inmates.* We agree with the district court that this presents an extraordinary situation that warrants considering factors "ordinarily" irrelevant.

*Id.* at 603. It concluded by recognizing that "[t]he personal characteristics of [the defendant] made him particularly vulnerable to in-prison victimization. Assaults against vulnerable male or female prisoners make life especially dangerous for such individuals." *Id.* at 605.

In *United States v. Gonzalez*, the Court of Appeals for the Second Circuit, relying on its decision in *Lara*, affirmed a below-Guidelines sentence to ensure the defendant's safety. 945 F.2d 525 (2d Cir. 1991). In that case, the court determined that the defendant "was extremely small and feminine looking, and that, although he was nineteen, he had the appearance of a fourteen or fifteen year old boy." *Id.* at 526. This was "sufficient to establish that [the defendant] was unusually susceptible to prison abuse." *Id.* The court noted that the fact that defendant could be *perceived* as gay was sufficient to render him vulnerable to abuse, regardless of his actual sexual orientation:

> Harassment of individuals on the basis of sexual orientation is not directed only at persons who are gay or bisexual; rather, homophobic attacks are often based on the perpetrator's mistaken perception that a heterosexual individual is in fact gay. Thus, even

191

> if Gonzalez is not gay or bisexual, his physical appearance, insofar as it departs from traditional notions of an acceptable masculine demeanor, may make him as susceptible to homophobic attacks as was the bisexual defendant before us in *Lara*.

*Id.* at 526-27 (citation omitted).

While in *Lara* the defendant had already been victimized in prison, this was not the case in *Gonzalez*. The Court of Appeals for the Second Circuit found that it would be "*absurd*" to require prior victimization before allowing a downward sentencing departure in instances where inmate safety was a concern:

> [W]e believe it would be absurd to interpret *Lara* as requiring a defendant to have already been victimized as a prerequisite to departing downward under the Sentencing Guidelines. After all, *does it not make more sense to allow judges to prevent violence before it occurs, rather than requiring them to wait until the damage has already been done*?

*Id.* at 527 (emphasis added). It affirmed the sentence, finding that "the [district] court sensibly balanced [the defendant's] need for safety against the Government's interest in incarcerating wrongdoers." *Id.* at 527.

Courts adopt a similar approach outside of the Second Circuit. *See, e.g.*, *United States v. LaValle*, 439 F.3d 670 (10th Cir. 2006) (affirming downward departure based on former prison guards' susceptibility to abuse in prison which was compounded by public and emotional outrage at offense); *United States v. Parish*, 308 F.3d 1025 (9th Cir. 2002) (affirming downward departure based on the determination that defendant was susceptible to abuse in prison because he had been convicted of a child pornography offense, combined with his stature, demeanor and naiveté); *United States v. Shasky*, 939 F. Supp. 695 (D. Neb. 1996) (downwardly departing from the applicable guidelines range because the defendant was "a Nebraska state trooper at the time of the offense, is a homosexual, of diminutive stature . . . who is charged, in a well-publicized case, with

receiving pornography involving minors, and he is therefore unusually susceptible to abuse in prison").

## VI.    Application of Law to Facts

A fifteen year sentence, if served in the general population of a medium or high security prison, almost certainly will result in D.W. suffering physical and sexual abuse and being subjected to the extended deleterious effects of solitary confinement.  The court is prepared to declare such a sentence a violation of the Eighth Amendment prohibition against cruel and unusual punishment.

While still opposing such a long sentence as inappropriate in the instant case, the court finds that the BOP can structure a fifteen year sentence to avoid unconstitutional cruelty.  By providing care and following the court's recommendations in the treatment afforded D.W., cruelty in prison can be minimized.

The court strongly recommends that D.W. serve his sentence at a BOP medical facility such as FMC Devens, where sex offender treatment programs are available and the staff is trained to manage inmates with defendant's vulnerabilities.  *See supra* Part IV.C.

Data indicates that the BOP follows judges' recommendations as to sentencing in approximately seventy-four percent of cases.  *See supra* Part IV.A.1; Vasquez & Bussert at 21.  The necessity of housing this defendant in a safe and medically appropriate environment is apparent, as demonstrated by findings after extensive hearings in the present case.  *See supra* Part IV.  It must be assumed that this court's recommendation for appropriate incarceratory conditions will be followed by the Bureau.  *See infra* Part VII.A.  This conclusion is supported by the fact that the BOP's and the federal government's policy is to reduce the use of solitary confinement to protect vulnerable inmates.

If the court's recommendations are followed so that defendant serves his term under prison conditions reasonably calculated to protect him from the hazards he would face in the open, general population of a medium or high security prison, and he is treated appropriately medically, his mandatory sentence of fifteen years cannot be found to violate the United States Constitution.

In imposing a sentence of fifteen years, the court takes into consideration the defendant's express desire to be sentenced to the statutory minimum term, lest a reversal ultimately result in a lengthier sentence. *See* Letter of D.W. to the Court, July 6, 2015, ECF No. 74.

An appropriate sentence would be an incarceratory term of approximately five years with intensive treatment both in prison and following release. But, there is no sentence less than fifteen years presently allowed. *See, e.g.*, *United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013). By providing protective conditions for the prisoner, the effective prison term becomes substantially less harsh, and, therefore, constitutional. The law can thus be moved in a required direction without flouting Congressional requirements. As already pointed out, Congressional concern over abuse in prison indicates that its policy accords with the court's concerns over the conditions D.W. will face after sentencing. *See, e.g.*, *supra* Part IV.A.2 (discussion of PREA).

## A.      Fifteen Year Sentence If Properly Carried Out Not Unconstitutional

In the instant case, D.W. is subject to a congressionally mandated minimum term of imprisonment. Unlike the Sentencing Guidelines at issue in *Lara* or *Gonzalez*, the relevant statute does not allow a sentencing court to depart from the applicable minimum term if mitigating circumstances exist. *See* 18 U.S.C. §§ 2251(e), 2252(b)(2).

Limits, if any, on imposition of the statutory mandatory minimum sentence are to be found in the Eighth Amendment's ban on cruel and unusual punishments. As stated by the Supreme Court, "[o]utside the context of capital punishment, successful challenges to the proportionality of

particular sentences have been exceedingly rare." *Ewing*, 538 U.S. at 21 (quotation marks and citations omitted) (alterations in original) (rejecting Eighth Amendment challenge to twenty-five years to life sentence for theft of golf clubs worth $1,200); *see also Harmelin*, 501 U.S. at 957 (upholding a mandatory sentence of life without parole for possessing a large quantity of cocaine); *Hutto v. Davis*, 454 U.S. 370 (1982) (per curiam) (rejecting Eighth Amendment challenge to a sentence of 40 years' imprisonment for possession of marijuana with intent to distribute and distribution of marijuana); *Rummel*, 445 U.S. at 265 (upholding a sentence of life with the possibility of parole for a defendant's third nonviolent felony; the crime of obtaining money by false pretenses).

In challenges to the proportionality of sentences as applied to a particular defendant, courts must initially consider whether the "gravity of the offense and the severity of the sentence" give rise to an "inference of gross disproportionality." *Graham*, 560 U.S. at 60 (internal quotation marks and citations omitted).

### 1.      Gravity of Offense

Defendant pled guilty to serious crimes.  Possession of child pornography arguably tends to perpetuate the harm initially suffered by minors in the production of the images.  *See, e.g.*, *R.V.*, 2016 WL 270257 at *1 ("The theory is that (1) computer depiction of children being sexually exploited creates a permanent widespread record of abuse, perpetuating and potentially exacerbating the harm initially suffered by the victim in the production, and (2) acquisition of these images encourages abuse of children in their production since viewers create demand.").

Defendant was not simply a passive viewer of child pornography.  He pleaded guilty to sexual exploitation of a child.  In 2009, he abused a young boy in the back of a car.  He pulled the boy's pants and underwear down, rubbed his penis and masturbated him.  PSR at ¶ 20.  On at least

one occasion, defendant masturbated in front of the boy. *Id.* He did not engage in any sodomy, penetration, or fellatio. Defendant took pictures of the abuse; they were found on his phone. *Id.* There is no evidence that defendant ever distributed the images. The boy complained about the harm he suffered as a consequence of D.W.'s conduct: "When I was younger it affected me a lot because I thought about it a lot but never told anyone." *Id.* at ¶ 23; *see also supra* Part III.G.2.

Defendant was himself the victim of serious abuse. His offenses were driven, at least in part, by his own prior victimization. *See, e.g.*, Prentky Report at 16-17; Hr'g Tr., Dec. 23, 2015, ECF No. 104, at 240:12-241:04 (Testimony of Dr. Berrill). He has expressed remorse and a desire to take responsibility for his actions. *See supra* Part IV.D.4; *see also* Letter of D.W. to the Court, July 6, 2015, ECF No. 74. These are powerful mitigating factors.

Nonetheless, the gravity of the offense is underscored by defendant's conduct following his release from State custody. Despite being under State supervision and attending treatment, he quickly returned to viewing child pornography. Although nothing in the record suggests that D.W. physically accosted any minor during this period of presence in the community, the medical experts agreed that his test scores and past conduct indicate a substantial risk of recidivism, both for contact and non-contact sexual offenses. *See supra* Part IV.D. The public must be protected.

### 2.    Severity of Sentence

Judges have increasingly criticized the often unjustified harshness of lengthy mandatory minimum sentences in the child pornography context. In a recent survey, over seventy-one percent of judges found the five-year minimum for receiving child pornography to be unduly severe in the circumstances of their cases. *See* Survey of Federal Judges at 5, table 1. This sentiment was shared by almost a fifth of judges with respect to the ten-year mandatory minimum for producing child pornography, and over a third of judges with respect to the five-year minimum for distribution. *Id.*

196

American prison terms for conduct such as D.W.'s are far more severe than those in comparable countries. *See, e.g.*, Yaman Akdeniz, Internet Child Pornography and the Law: National and International Responses *passim* (2008).

The Court of Appeals for the Second Circuit has recognized that Eighth Amendment jurisprudence, as well as other penological considerations, may impact the reasonableness of lengthy sentences, even if authorized by statute. In the case of *United States v. Brown*, the defendant pleaded guilty to three counts of production and two counts of possession of child pornography. No. 13-1706, --- F.3d ----, 2016 WL 3254735, at *1 (2d Cir. June 14, 2016). A minimum term of fifteen years and a maximum sentence of thirty years applied to the production counts. The statutory maximum for the possession charges was ten years. *Id*. at *4. The defendant was sentenced by the district court to sixty years' imprisonment—twenty years for each count of production of child pornography to run consecutively and ten years on each possession count to be served concurrently with the sixty year term. *Id*. The Court of Appeals for the Second Circuit remanded, "to ensure that the sentence [was] not based on a clearly erroneous understanding of the facts." *Id*. at *7 (footnote omitted). The court, while noting that it was not at that time expressing a definitive view on the reasonableness of the sentence, urged the district court to consider the appropriateness of an effective life term:

> We understand and emphatically endorse the need to condemn Brown's crimes in the strongest of terms. But the Supreme Court has recognized that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers." As the Court explained in *Graham*,
>
> > There is a line between homicide and other serious violent offenses against the individual. Serious nonhomicide crimes may be devastating in their harm [,] but in terms of moral depravity and of the injury to the person and to the public, they cannot be compared to murder in their severity and

197

> irrevocability. This is because life is over for the victim of the murderer, but for the victim of even a very serious nonhomicide crime, life is not over and normally is not beyond repair. Although an offense like robbery or rape is a serious crime deserving serious punishment, those crimes differ from homicide crimes in a moral sense.
>
> The sentencing transcript suggests that the district court may have seen no moral difference between Brown and a defendant who murders or violently rapes children, stating that Brown's crime was "as serious a crime as federal judges confront," that Brown was "the worst kind of dangerous sex offender," and that he was "exactly like" sex offenders who rape and torture children.
>
> Punishing Brown as harshly as a murderer arguably frustrates the goal of marginal deterrence, "that is, that the harshest sentences should be reserved for the most culpable behavior." . . . Moreover, while the district court appropriately recognized the need for the sentence imposed to afford adequate general deterrence, "sentencing judges should try to be realistic about the *incremental* deterrent effect of extremely long sentences."

*Id*. at *7-8 (alteration in original) (emphasis in original) (citations omitted).

Despite its disquiet about extremely long prison sentences, the Second Circuit Court of Appeals has regularly rejected Eighth Amendment challenges to the constitutionality of long mandatory minimum sentences in child pornography offenses. *See, e.g.*, *Reingold*, 731 F.3d at 216-22 (finding that the application of a mandatory five-year sentence to defendant convicted of distributing child pornography did not give rise to an inference of gross disproportionality suggestive of cruel and unusual punishment); *United States v. Ramos*, 685 F.3d 120, 134, n.11 (2d Cir. 2012) ("The district court acted well within its discretion in imposing the statutory mandatory minimum of 180 months' imprisonment, a sentence that was well below the Guidelines range of 324-405 months, and that was reasonable under all the circumstances."); *United States v. Puglisi*, 458 F. App'x 31, 35-36 (2d Cir. 2012) ("While we agree that compelling mitigating factors exist in this case, there are also aggravating factors: [the defendant] abused his position as a teacher to

198

maintain a sexual relationship with a teenage student, and obstructed the authorities' attempts to obtain the photographic evidence of his crimes. Moreover, the mitigating factors in this case do not render the sentence imposed 'grossly disproportionate' to the serious crimes [the defendant] committed."); *United States v. Rivera*, 546 F.3d 245, 255 (2d Cir. 2008) (no "inference of gross disproportionality" arose from mandatory life sentence for recidivist offender convicted of charges involving the sexual exploitation of children) (quotation marks and citation omitted).

Courts in other circuits have reached similar decisions upholding long mandatory minimums. *See, e.g.*, *United States v. Hughes*, 632 F.3d 956, 959-60 (6th Cir. 2011) (upholding defendant's ten-year mandatory minimum sentence under 18 U.S.C. § 2422(b) for attempting in online chats to entice an undercover officer he thought was fourteen to engage in joint sexual activity); *United States v. Farley*, 607 F.3d 1294, 1343-45 (11th Cir. 2010) (upholding thirty-year mandatory minimum sentence under 18 U.S.C. § 2241(c) for crossing State line with intent to have sex with a child); *United States v. Nagel*, 559 F.3d 756, 762-65 (7th Cir. 2009) (upholding mandatory ten-year minimum under 18 U.S.C. § 2422(b) for attempted sexual enticement of a minor); *United States v. Paton*, 535 F.3d 829, 837-38 (8th Cir. 2008) (upholding life sentence under 18 U.S.C. § 2251(e) for recidivist offender who pleaded guilty to five counts of production of child pornography); *United States v. MacEwan*, 445 F.3d 237, 249-50 (3d Cir. 2006) (upholding fifteen-year mandatory minimum sentence for receiving child pornography by a repeat offender).

The severity of the sentence in the instant case is, however, exacerbated by the possible conditions of defendant's incarceration. Being raped or beaten in prison or, alternatively, being subjected to extreme isolation, are added punishments which violate the Constitution. *See, e.g.*, *Farmer*, 511 U.S. at 833-34 ("Prison conditions may be restrictive and even harsh, but gratuitously *allowing the beating or rape of one prisoner by another serves no legitimate penological*

*objectiv[e]*, any more than it squares with evolving standards of decency. *Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay* for their offenses against society.") (alteration in original) (emphasis added) (citations and quotation marks omitted); *In re Medley*, 134 U.S. 160, 168 (1890) ("A considerable number of the prisoners fell, after even a short [period in solitary] confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."); *Davis*, 135 S. Ct. at 2209-10 (Kennedy, J. concurring) ("The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators. . . . [R]esearch still confirms what this Court suggested over a century ago: Years on end of near-total isolation exact a terrible price."); *see also supra* Part V.D.2.

Defendant's characteristics—the fact that he identifies as gay or bisexual, was the victim of repeated sexual abuse, suffers from mental illness and is a convicted sex offender of children— make D.W. uniquely susceptible to abuse in prison and to placement in solitary confinement for protective purposes. Although called "administrative" segregation, the conditions of confinement in protective custody—whether voluntary or involuntary—are essentially the same as those suffered by inmates in punitive segregation. *See supra* Part IV.B. There is growing national and international consensus that such extreme isolation and the pain it causes may be in violation of constitutional and international standards prohibiting cruel and usual punishment. *See, e.g.*, *Ashker v. Brown*, No. 09-CV-5796, 2013 WL 1435148, at *5 (N.D. Cal. Apr. 9, 2013) (denying defendant's motion to dismiss putative class action brought by ten Pelican Bay SHU inmates, finding that they "have adequately plead both elements of an Eighth Amendment claim. They

have alleged that their prolonged social isolation and lack of environmental stimuli—each Plaintiff has lived in the SHU for at least eleven years—causes 'serious psychological pain and suffering and permanent psychological and physical injury.' . . . Plaintiffs' asserted injuries—the symptoms of which include 'chronic insomnia,' 'severe concentration and memory problems,' 'anxiety,' and other ailments—are sufficient to satisfy the objective component of their Eighth Amendment claim, considering the length of Plaintiffs' exposure to these conditions.") (citations omitted); *Madrid v. Gomez*, 889 F. Supp. 1146, 1264-65 (N.D. Cal. 1995) ("[T]he conditions of extreme social isolation and reduced environmental stimulation found in the Pelican Bay SHU will likely inflict some degree of psychological trauma upon most inmates confined there for more than brief periods."); *Peoples*, 2016 WL 1464613 (approving a landmark class action settlement limiting the use of disciplinary solitary confinement in New York State prisons); Eur. Comm. for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment (CPT), 21st General Report of the CPT, 39-50 (Aug. 1, 2010 to July 31, 2011), http://www.cpt.coe.int/en/annual/rep-21.pdf (finding that "the damaging effect [of solitary confinement] can be immediate and increases the longer the measure lasts and the more indeterminate it is.  The most significant indicator of the damage which solitary confinement can inflict is the considerably higher rate of suicide among prisoners subjected to it than that among the general prison population" and providing that "[r]esort should be had to solitary confinement for protection purposes only when there is absolutely no other way of ensuring the safety of the prisoner concerned."); United Nations Economic and Social Council    Res.    2015/20,    at    17    (July    21,    2015), http://www.un.org/ga/search/view_doc.asp?symbol=E/RES/2015/20 (revising the United Nations Standard Minimum Rules for the Treatment of Prisoners to state that "[s]olitary confinement shall

201

be used only in exceptional cases as a last resort, for as short a time as possible and subject to independent review").

A sentence of fifteen years in this case, if served in the general population of a medium or high security prison, is likely to be significantly more severe than a sentence of fifteen years served by a defendant who does not possess the combination of grave vulnerabilities exhibited by D.W.

The BOP has taken steps to limit violence in its facilities and develop alternatives to solitary confinement for inmates in need of protection. The court is reasonably assured that the BOP can, and will, carry out the court's recommendation for treatment and attempt to minimize risks and dangers, as well as the unnecessary use of solitary confinement, by housing defendant in a medical facility such as FMC Devens rather than in the general population of a medium or high security prison.

If housed and treated in a facility responsive to defendant's treatment and safety needs, the minimum term of incarceration of fifteen years, although excessive in this court's judgment, is not grossly disproportionate to the offense.

### 3.     MDC and Pre-Release Halfway House

Defendant was housed for over three years in the Brooklyn Metropolitan Detention Center ("MDC"), awaiting trial or plea, and sentence. The court has recently visited the MDC in connection with defendant's sentencing.

The MDC is an administrative pretrial detention facility which houses defendants awaiting trial or sentencing. It is different in its relaxed, safe atmosphere from the BOP's medium or high security institutions where dangerous offenders often serve long sentences. *See* Def.'s Reply to Gov't Mem. in Opp'n at 29-30.

At the MDC, D.W. has been housed primarily in specialized units for vulnerable inmates. Gov't Opp'n Post-Hr'g Mem. at 36-37 and Ex. 202 (Inmate History Quarters).  The government indicates that D.W. has not been attacked during his incarceration at the MDC.  *See* Gov't Opp'n Post-Hr'g Mem. at 6, 18, 35-41.  As Mr. Wise testified:

> [Pretrial and medium or high security facilities] are very, very different kinds of facilities.  At a pretrial facility, inmates are generally confined to a much smaller area.  They interact with way fewer inmates.  There's staff on the floor in the unit around the clock.  It's just a very different, smaller, less movement, less geography kind of setting.
>
> If he goes to a typical facility, he will be placed in a housing unit but he'll interact with inmates from all over that institution.  He may interact at all meals, at recreation, at any kind of religious services, education.  Basically anything that happens is going to involve inmates from all of the institutions, so that right now, while he's housed with a small group of inmates, and that's who he primarily interacts with in an open population, he will be interacting with a lot more people over a lot more space.
>
> So the opportunities for encountering somebody with whom he may have a problem, or who may have a problem with him, as well as the different areas within the facility for something that happened they're just larger.
>
> . . .
>
> A pretrial detention center, number one, has a smaller population, easier to kind of put like folks together, folks that are not going to have a problem with that population.  It's just easier to hold on to.
>
> It's also a very transient population, so the inmates that are not may not be there long enough to understand what everybody else is there for.  It turns over pretty quickly.

Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 68:23-70:19.

During the court's visit to the MDC it inquired about the facility's operations, particularly with respect to accommodations for vulnerable inmates, use of protective custody, and incidence of physical and sexual assaults in relation to an inmate's gender, sexual orientation or sex offender

status.  Sexual assaults were said to be rare in the MDC.  The few PREA allegations made in the last several months involved harassment rather than contact claims and were found to be unsubstantiated.  Protective custody is used at the facility, but sparingly; the handful of inmates in protective custody at the time of the court's visit were described by MDC officials as being in the SHU for their safety because of prior gang affiliations.

The MDC is quite different from a medium or high security BOP facility.  D.W.'s experience at the MDC is not indicative of what his experience is likely to be following sentencing, should this court's recommendations not be followed.

In connection with defendant's sentence, the court also visited the Eastern District of New York's Residential Reentry Center ("RRC").  This is a halfway house where newly released individuals are placed towards the end of a long prison term.  It assists in readjustment and reentry into the community.  No attacks based on sexual or gender reasons were reported.  Notices are posted informing residents of their right to be free from sexual abuse and with indications as to how to report any incidents.

The RRC is the facility that defendant will be placed in for some months at the end of his prison term.  During that period, he will be able to leave for medical treatment, work, and visits with family and friends.  He will be closely supervised.  If he is granted home detention, he will wear a device allowing the facility to find him at any time.

### B.    Guidelines Excessive

The Guideline term provided by the Sentencing Commission for the instant case is 292 months (24 years) to 365 months (30 years) of imprisonment.  *See* Hr'g Tr., Nov. 23, 2015, ECF No. 101, at 13:20-14:10.

Such a term is absurdly excessive.  It results primarily from the Sentencing Commission's reliance on Congressional mandates rather than on its own empirical analysis of what sentences courts were likely to—or should—impose.  *See, e.g.*, U.S. Sentencing Comm'n, *Fifteen Years of Guidelines Sentencing*, 73 (2004) ("The frequent mandatory minimum legislation and specific directives to the Commission to amend the guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress."); United States Sentencing Comm'n, *The History of the Child Pornography Guidelines* (2009); *E.L.*, 2016 WL 2939152 at \*19-20; *R.V.*, 2016 WL 270257 at \*41; *see also* Mark Hansen, *A Reluctant Rebellion*, A.B.A Journal (June 2, 2009), http://www.abajournal.com/magazine/article/a_reluctant_Rebellion (discussing judicial opposition to child pornography sentencing guidelines).

Having considered the Guidelines and the sentencing factors set forth in section 3553(a) of title 18, as required by the Court of Appeals for the Second Circuit and the Supreme Court, the applicable Guidelines advisory sentencing range is rejected in this case as a basis for an appropriate sentence.  *See Gall*, 552 U.S. at 46, 49; *Kimbrough*, 552 U.S. at 101.  The unreasonable harshness of the child pornography Sentencing Guidelines has been recognized by the Court of Appeals for the Second Circuit.  *See, e.g.*, *Dorvee*, 616 F.3d at 184-87; *United States v. Alhakk*, 505 F. App'x 51, 55 (2d Cir. 2012) ("[T]he court noted that it had given 'special consideration' to the concerns expressed in *Dorvee*.  Based on all of these considerations, the court concluded that a below-Guidelines sentence . . . was sufficient but not greater than necessary to fulfill the requirements of § 3553(a).") (citation omitted); *United States v. Chow*, 441 F. App'x 44, 45 (2d Cir. 2011) ("*Dorvee* recognizes district courts' post-*Booker* authority to 'vary from the Guidelines range based solely on a policy disagreement with the Guidelines,' and encourages courts to take seriously

that discretion 'in fashioning sentences under § 2G2.2' for child pornography defendants.")
(citations omitted); *United States v. Tutty*, 612 F.3d 128, 133 (2d Cir. 2010) ("[T]he district court
should . . . bear in mind that the eccentric child pornography Guidelines, with their highly unusual
provenance, can easily generate unreasonable results if they are not carefully applied.") (citations
and quotation marks omitted).

D.W. suffered a childhood marked by extreme abuse.  Time and again, the system failed
him; he was exposed to sexual assault as a child in New York City's foster care program and then
as a young adult in New York State's prisons.  *See supra* Part II.  He was diagnosed with mental
illnesses such as depression, bipolar disorder and post-traumatic stress disorder, but the treatment
he received was never sufficient to address the trauma he had endured.  From victim, he became
abuser.  The experts testified that his offense conduct could be attributed, at least in part, to the
abuse he himself experienced as a child.  *See, e.g.*, Hr'g Tr., Dec. 23, 2015, ECF No. 104, at
240:12-241:04 (Dr. Berrill testifying that there "certainly [is] some relationship between all of this.
. . . His early inappropriate exposure to sex, his being abused a kid and traumatized, I'm sure it did
lay the groundwork for his developing an interest in finding young kids sexually attractive").

While unacceptable, D.W.'s conduct did not involve penetration or fellatio.  There is no
evidence that he has physically accosted a minor after 2009.  He has expressed remorse for his
actions, recognized his addiction to child pornography, and indicated his need and desire to be
treated medically.  *See* Part IV.D.4 (describing defendant's amenability to treatment); Hr'g Tr.,
Dec. 22, 2015, ECF No. 105, at 32:24-33:05 (Dr. Krueger testified that "[D.W.] said that he was
interested in treatment.  He was insightful.  He . . . said he had a problem with pornography
addiction . . . and he realized he had a problem with pedophilia . . . .  He realized that he wants
treatment and he said that he's willing to engage in it."); *see also* Hr'g Tr., Dec. 23, 2015, ECF

206

No. 104, at 259:02-260:07 (Dr. Berrill testifying that defendant's recognition of his addiction indicated a "motivation to get better").

Defendant's risk of recidivism and the need to protect the public must, under the law, be addressed in part through the imposition of an incarceratory sentence aimed at treatment other than incapacitation.

A sentence longer than the mandatory minimum of fifteen years is not necessary and would, in all likelihood, further limit defendant's chance of obtaining much-needed treatment and successfully reentering the community. *See* Hr'g Tr., Dec. 22, 2015, ECF No. 105, at 39:21-41:14 (Dr. Krueger explained that a long period of incarceration in D.W.'s case "would do more harm than good" since he would likely not obtain treatment, would lose his adaptive skills and further sever his remaining ties to his outside support network). The high risk of being abused while incarcerated or placed in solitary confinement would compound D.W.'s already serious mental health problems, making readjustment upon his eventual release from custody less likely and increasing the risk he poses to the public. *See id.* at 42:20-44:06.

General and specific deterrence are achieved by a below-Guidelines sentence. Assuming the court's recommendations, as outlined below, are followed, defendant will serve approximately fifteen mandatory years in prison. He will be entitled to a credit of up to 54 days at the end of each year for "exemplary compliance with institutional disciplinary regulations." *See* 18 U.S.C. § 3624(b).

Upon his release, he will have to live with the serious collateral consequences of his conviction: he will perpetually bear the scarlet letter that comes with being a convicted felon registered as a sex offender. *See, e.g.*, *Lawrence v. Texas*, 539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for a violation of a sex crime statute "is not trivial"); Model Penal Code:

Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law. Inst., Discussion Draft No. 2, 2015) ("*[T]he treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state*. For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements.") (emphasis added); *see also E.L.*, 2016 WL 2939152 at *17-18.

## VII. Conclusion

### A. Sentencing Recommendations to BOP

The court is required by Congress and current case law to impose a sentence of fifteen years in prison on this defendant. But, it has the responsibility and power to ensure that the sentence is carried out in a civilized way—a way that recognizes the humanity, the personhood, of defendant.

As indicated in Part VII.C below, the sentence in the instant case is based on a number of specific recommendations. Nothing in the record or in the court's visits to federal correctional institutions suggests that the BOP will be unable to readily follow this court's recommendations, including that defendant serve his sentence at FMC Devens or a similar medical facility.

Recent data, confirmed by expert testimony, indicates that the BOP makes every effort to comply with judges' sentencing recommendations and, in most cases, succeeds in doing so. *See supra* Part IV.A.1. Reasons for non-compliance generally include concerns with safety, the need to comply with appropriate security designations, limits posed by overcrowding, and the lack of specific programming or medical services required by a particular defendant at a suggested facility. *See id.*; Vasquez & Bussert at 21; Hr'g Tr., Nov. 23, 2015, ECF No.101, at 65:10-66:07 (Testimony of Mr. Wise).

None of these concerns are present in the instant case.  For example, FMC Devens is an administrative medical facility capable of holding inmates in all security categories.  *See supra* Part IV.C.  A recent audit, as well as the facility's own website, report that the facility's medical center where D.W. should be housed (given that, as a sex offender, he is not eligible for the prison's minimum security camp) is not overcrowded; it is operating at under its inmate capacity.  *See* Williams, Final PREA Audit Report; Federal Bureau of Prisons, *FMC Devens*, https://www.bop.gov/locations/institutions/dev/ (last visited July 26, 2016).

Security, medical, and programming concerns all underscore defendant's need to be housed at a facility such as FMC Devens.  It is a BOP institution offering specialized treatment for sex offenders.  It has a comprehensive residential Sex Offender Treatment Program of approximately thirty months.   In addition to this intense medical work, a non-voluntary Sex Offender Management Program geared towards managing sex offenders in its special general population is available.  *See supra* Part IV.C.  It also has medical staff trained to treat and manage defendants suffering from mental illness, such as D.W.  *Id.*  While the facility has a Special Housing Unit and the use of protective custody may at times be warranted, an independent audit report published in July of this year indicates that it is in full compliance with the requirements of the Prison Rape Elimination Act.  *See* Williams, Final PREA Audit Report; *see also supra* Part IV.C.3.

Should the BOP be unable to comply with this court's recommendations, it is requested to explain in writing to this court the reasons that it is unable to do so.  *See* Vasquez & Bussert at 22 ("Where the Bureau cannot meet a recommendation, it will attempt to identify another suitable facility that will.   The Bureau no longer writes courts explaining the reason(s) why a recommendation is not followed unless the court specifically requests such a notification.").

If a sentence of fifteen years is to be constitutional in the instant case—and properly protective of the public and defendant—defendant's sentence must be served primarily at FMC Devens or a comparable facility.  *See, e.g.*, *supra* Part III.G.3 and Part IV.D.

### B.        Unconstitutionality Should Court's Recommendations Not Be Followed

Defendant warns that, "[d]espite the sentencing judge's recommendation [in past child pornography cases], litigation on this issue, pledges by the BOP, and the particular vulnerabilities and suitability of the defendants in question, on no occasion that we know of has the Court's request been honored by the BOP."  Def.'s Reply to Gov't Mem. in Opp'n at 46-47.

Should this court's recommendations not be followed, defendant may raise a challenge to the constitutionality of the sentence.  The sentence relies on the assumption that recommendations will be carried out by the BOP.  If recommendations are ignored, the court's assumptions are without adequate foundation, and a resulting cruel sentence is not avoided by amelioration in prison.

This court would have jurisdiction over such a motion.  *See* 28 U.S.C. § 2255(a) ("A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.").

### C.        Sentence Imposed

The defendant is sentenced to fifteen years of incarceration for count one (sexual exploitation of a child) pursuant to section 2251(e) of title 18 of the United States Code, and ten

years of incarceration for count two (possession of child pornography) pursuant to section 2252(b)(2) of title 18, to run concurrently, with time off for good behavior (*see* 18 U.S.C. 3624(b)) and time already served in pretrial detention.

The total mandatory sentence of fifteen years (180 months) is broken down as follows:

- About 41 months already served in pretrial detention at the MDC;

- About 103 months to be served in the Sex Offender Management Program at FMC Devens or a similar federal medical facility;

- About 30 months to be served in the residential Sex Offender Treatment Program at FMC Devens or a similar federal medical facility; and

- About 6 months to be served in a Residential Reentry Center providing assistance with reintegration into the community and continued medical treatment.

The court strongly recommends (assuming its recommendation will be followed) that defendant serve his incarceration at FMC Devens or a similar federal medical facility, and that he be treated in a Sex Offender Management Program and Sex Offender Treatment Program while incarcerated.  Placing him in the general population of a medium or high security non-medical prison would expose him to dangers of rape and other physical attack that would almost certainly result in illegal excess solitary confinement.

The court strongly recommends (assuming its recommendation will be followed) that defendant not be placed in solitary confinement for his protection, but that more appropriate, less harsh, methods of protection be relied upon.  This recommendation does not apply to reasonable disciplinary action.

After D.W. completes an appropriate intensive medical program in prison, the court strongly recommends (assuming its recommendation will be followed) that he remain in that institution or a similar one until he is released.

The court assumes, based on current practice (expecting that its assumption is correct) that the ending months of D.W.'s incarceration will include a period of intensive halfway house community residence assisting the defendant in reentering into society and in receiving appropriate medical treatment.

Five years of intense supervised release by this court's Probation Department after release from incarceration, with continued sex offender treatment, is imposed, plus other standard conditions of supervised release stated orally at the sentencing. *See* Hr'g Tr., July 28, 2016. This court's Probation Department shall carefully supervise and assist defendant during the period of supervised release, promptly reporting to the court any deviations from strict compliance with its directions.

No fine is imposed. Defendant is unable to pay now or in the future. A special assessment of two hundred dollars is imposed.

Restitution is ordered as follows: $1,000 for the victim known as "Angela"; $3,000 for the victim known as "J_Blonde"; and $5,000 for the victim known as "Andy." In determining restitution, the court has relied upon the fully briefed and supported government suggestions. *See* Gov't Letter, July 18, 2016, ECF No. 152. It has also considered defendant's objections. *See* Def.'s Letter, July 24, 2016, ECF No. 155. The amounts requested by the government are fair.

SO ORDERED.

Jack B. Weinstein
Senior United States District Judge

212

Date:   July 28, 2016
        Brooklyn, New York